### IN THE UNITED STATES DISTRICT COURT FOR
### THE NORTHERN DISTRICT OF WEST VIRGINIA

**DIANA MEY,**
**individually and on behalf of a class of all**
**persons and entities similarly situated,**

       **Plaintiffs,**

**vs.**                                        **Civil Action No.:  5:17-cv-179**

**DIRECTV, LLC;**
**ADAM COX;**
**AC1 COMMUNICATIONS;**
**IQ MARKETING 2, CORP., d/b/a PACIFICOM;**
**and MICHAEL ASGHARI,**

       **Defendants**

### DIANA MEY'S OPPOSITION TO DEFENDANT DIRECTV, LLC'S
### MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION

Incredibly, DIRECTV's motion would force Plaintiff Diana Mey into arbitration based on a cell phone account agreement ***to which neither she nor DIRECTV were signatories***. Worse still, the agreement came ***several years before*** the eventual corporate relationship between DIRECTV and AT&T Mobility—the sole factual basis that allegedly gives rise to Ms. Mey's duty to arbitrate her TCPA claims against DIRECTV. This attenuated argument stretches contract law beyond recognition, and DIRECTV's motion must be denied.

### Summary of Argument

First and foremost, Ms. Mey never consented to submit her TCPA claims against DIRECTV to arbitration. At its core, arbitration is "fundamental[ly]" a "matter of consent," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010), "and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 416 (4th Cir. 2000). Like DIRECTV

itself, Ms. Mey was not a signatory to the arbitration provision, and even if she had been, the

relationship between AT&T Mobility and DIRECTV—corporate cousins seven times removed—

*did not even exist at the time of the formation* of the arbitration agreement. *Energy Dev. Corp. v.*

*Moss*, 591 S.E.2d 135, 144 (W. Va. 2003) (a contract "will be interpreted and construed as of the

date of its execution").

Second, despite DIRECTV's incantations to the contrary, the presumption of arbitrability

"does not apply to the [threshold] determination of whether there is a valid agreement to arbitrate

between the parties." *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002);

*Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) (same).

Finally, DIRECTV's last-ditch argument—invoking the doctrine of equitable estoppel—

cannot save the motion. The doctrine has no application where, as here, the party seeking

arbitration and the party sought to be compelled to arbitration are nonsignatories to the arbitration

agreement. *Wachovia Bank, Nat. Ass'n v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006). The whole

point of equitable estoppel is to prevent the unfairness resulting from a *signatory* invoking only

favorable terms of a contract while repudiating others (like arbitration). *See id*. In addition, even if

the doctrine had application between nonsignatories, the facts show that Ms. Mey's TCPA claims

have literally nothing to do with the account agreement between her husband and AT&T Mobility.

Put another way, the TCPA claims against DIRECTV are in no way "intertwined" with or

dependent on the account agreement that is governed by arbitration. *See Brantley v. Republic*

*Mortg. Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005) (finding no intertwining where the plaintiffs'

"claim is a statutory remedy under the Fair Credit Reporting Act" that is "wholly separate from

any action or remedy for breach of the underlying mortgage contract that is governed by the

arbitration agreement.").

# BACKGROUND

## A. Mr. Mey opens a cell phone account with AT&T Mobility.

On January 11, 2006, Mark Mey opened a cell phone account with AT&T Mobility  and activated two lines of wireless service. ECF 15-2, Phillips Decl. ¶ 4. On August 12, 2018, Mr. Mey added his wife to the account as an "authorized user," and on January 8, 2009, Ms. Mey presented AT&T Mobility with a power of attorney authorizing her to make any necessary changes in her husband's name. *Id*. ¶ 5.

On March 16, 2012, "Mark Mey or an authorized user on the account"—which based on the acknowledgement appears to have been Ms. Mey—opened a new line of service under Mr. Mey's existing account at an AT&T retail store. *Id*. ¶ 6. In doing so, the authorized user was apparently required to acknowledge the terms and conditions, among other things, of the underlying account agreement. *Id*. ¶¶ 7-8.

## B. What Does DIRECTV have to do with AT&T Mobility?

Nearly a decade after Mr. Mey opened his account, on July 28, 2015, AT&T's acquisition of DIRECTV was approved and made final by the FCC. *See* FCC, *In re Applications Of AT&T, Inc. & DIRECTV*, No. FCC 15-94 (July 28, 2015). DIRECTV presents no facts suggesting that it had anything to do with AT&T Mobility (or any AT&T entity) prior to that date.

By way of sworn declaration, DIRECTV explains how it currently fits into the expansive family of AT&T, Inc. companies—and specifically how DIRECTV and AT&T Mobility (the actual arbitration clause signatory) are related. *See* Phillips Decl. ¶ 10-15. DIRECTV and AT&T Mobility are currently corporate cousins at least seven times removed. It looks like this:



**C.  DIRECTV placed an illegal telemarketing call to Ms. Mey in 2017.**

On December 11, 2017, Ms. Mey filed a class action complaint against DIRECTV, LLC

and its dealers for violations of the TCPA, a federal statute enacted in response to widespread

public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims. v.*

*Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). Despite the fact that Ms. Mey's number was

listed on the National Do Not Call Registry, 47 C.F.R. §64.1200(c)(2), DIRECTV's dealers made

unlawful automated and pre-recorded telemarketing calls to Ms. Mey's number on three separate

occasions in August 2017. *See* Compl. ¶¶ 22-44.

On February 16, 2018, DIRECTV filed a motion to compel Ms. Mey to arbitrate her TCPA claims—even though AT&T did not acquire DIRECTV until nearly a decade after her husband signed the arbitration agreement, and even though Ms. Mey never signed it at all. ECF 15.

## ARGUMENT

### A.  Ms. Mey did not consent to arbitrate her TCPA claims against DIRECTV.

It is "fundamental" that arbitration is a "matter of consent." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010). Indeed, as "a matter of contract . . . a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *State ex rel. U-Haul Co. of W. Virginia v. Zakaib*, 232 W. Va. 432, 439, 752 S.E.2d 586, 593 (2013). Despite DIRECTV's resort to policy concerns, a court may "not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *Equal Emp't Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). "After all, the basic objective . . . is not to resolve disputes in the quickest manner possible, . . . but to ensure that . . . arbitration agreements, like other contracts, are enforced according to their terms." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 947 (1995). Thus, a court can order a dispute to arbitration only if, under the principles of contract law, "the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis added).

### 1.  No presumption in favor of arbitration applies.

DIRECTV incorrectly asserts that the Court should apply a presumption in favor of arbitrability. Because arbitration is a matter of consent, the general presumption in favor of arbitrability "does not apply to the [threshold] determination of whether there is a valid agreement to arbitrate between the parties"—a question that is instead resolved by reference to ordinary state-

law principles governing the formation of contracts. *Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)); *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) ("While federal policy broadly favors arbitration, the initial inquiry is whether the parties agreed to arbitrate their dispute."); *see also First Options*, 514 U.S. at 943. It is only after the Court concludes that a binding agreement to exists that the presumption in favor of arbitrability comes into effect. *See id.* at 944-45; *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 977 (10th Cir. 2014) (Gorsuch, J.) ("Everyone knows the Federal Arbitration Act favors arbitration. But before the Act's heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated.").

### 2. DIRECTV has the burden of establishing an agreement to arbitrate between it and Diana Mey.

The question is whether DIRECTV, the party who seeks to compel arbitration, has met its burden of establishing the existence of a mandatory agreement to arbitrate disputes between the parties, without the benefit of any presumption for or against arbitrability. *See Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017) ("[A] defendant who seeks to compel arbitration under the Federal Arbitration Act bears the burden of establishing *the existence* of a binding contract to arbitrate the dispute.") (emphasis added). In this context, that burden extends to proving that there was an agreement to all material terms and that the parties intended to submit to mandatory arbitration. *Bailey v. Fed. Nat'l Mortg. Ass'n*, 209 F.3d 740, 745 (D.C. Cir. 2000). As noted, "[w]hether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002).

3.      **DIRECTV has shown no arbitration agreement between it and Diana Mey.**

Under West Virginia law, the party asserting the existence of a contract has the burden of proving its existence. *See Spradlin v. AXA Equitable Life Ins. Co.*, No. 13-cv-23381, 2014 WL 5450244, at *8 (S.D. W. Va. Oct. 22, 2014) ("[I]t is a generally accepted rule that the party asserting the existence of an enforceable contract bears the burden of proof on the issue of contract formation.") (applying West Virginia law) (quotations omitted). DIRECTV has fallen far short of satisfying that burden.

First, Ms. Mey never signed the arbitration agreement with AT&T Mobility that DIRECTV now seeks to invoke—and of course, ***neither did DIRECTV***. Rather, the arbitration clause is contained in a cell phone agreement between Ms. Mey's husband and AT&T Mobility. As a result, the arbitration clause is not binding under West Virginia law, which imposes a "rule requiring ***express assent*** to require arbitration." *State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 204 W. Va. 23, 27, 511 S.E.2d 134, 138 (1998) (emphasis added). Thus, "[a] court may not direct a nonsignatory to an agreement containing an arbitration clause to participate in an arbitration proceeding absent evidence that would justify consideration of whether the nonsignatory exception to the rule requiring express assent to arbitration should be invoked." Syl. Pt. 3, *id.*; *see also Chesapeake Appalachia, L.L.C. v. Hickman*, 781 S.E.2d 198, 216 (W. Va. 2015) (same).[1]

DIRECTV attempts to elide the nonsignatory issue by pointing to evidence that Ms. Mey signed an "acknowledgement" at an AT&T retail store when she activated her cell phone number. Mot. 15. But as DIRECTV concedes, the account is in her husband's name—a critical fact relegated to a footnote, *id.* at 2 n.2. Careful not to call Ms. Mey a signatory (which she isn't),

---

[1] *See, e.g., High v. Capital Senior Living Properties*, 594 F. Supp. 2d 789 (E.D. Mich. 2008) (refusing to enforce nursing home's arbitration clause in wrongful death suit when clause was not signed by patient or anyone on her behalf); *Crown Pontiac, Inc. v. McCarrell*, 695 So. 2d 615, 618 (Ala. 1997) ("the absence of a signature under the arbitration clause shows a lack of mutuality and assent").

DIRECTV recognizes that she is, at best, an "authorized user" *under her husband's account. See* Mot. at 9 n.6. To the extent her "signature" on the electronic key pad in March 2012 mattered it all, it was simply done on behalf of her husband, since she was only an "authorized user"—not a signatory party—of his account.

Second, even if Ms. Mey's "acknowledgement" on the electronic pad in March 2012 constituted assent to the arbitration clause at issue, that is still insufficient evidence to show that Ms. Mey assented to arbitration ***with DIRECTV***. This is a critical point, because in March 2012 DIRECTV had literally nothing to do with the AT&T family of companies, including the other party to the arbitration provision, AT&T Mobility. The corporate relationship between AT&T Mobility and DIRECTV—distant cousins, at best—did not even exist at the time of the formation of the arbitration agreement. *See Energy Dev. Corp. v. Moss*, 591 S.E.2d 135, 144 (W. Va. 2003) (a contract "will be interpreted and construed as of the date of its execution"). Therefore, it was simply impossible for Ms. Mey to have agreed to arbitrate all claims—including TCPA violations—with DIRECTV. *See Thomson-CSF v. Am. Arbitration Assoc*., 64 F.3d 773, 776 (2d Cir. 1995) (arbitration agreements "must not be so broadly construed as to encompass claims and parties that were not intended by the original contract").

DIRECTV's only option is to rely on an expansive interpretation of the term "affiliate" to show that Ms. Mey's husband (and somehow, Ms. Mey) agreed to arbitrate any future claims against any person or entity who ***might*** in the future become "affiliated" with AT&T Mobility. DIRECTV points to no definition of the word in the arbitration agreement. Rather, it cites a slew of definitions found in various irrelevant statutes, cases, and dictionaries. *See* Mot. 9-10 & n.7. But this approach gives away the game: the arbitration clause is at best ambiguous as to whether "affiliates" means simply then-existing affiliates, or both then-existing and future "affiliates." *R.J.*

*Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 165 (4th Cir. 2004) (ambiguity exists where "the terms of the contract [] are reasonably susceptible of more than one interpretation"). Of course, "[i]t is a well-accepted principle that ambiguities in a contract should be construed against the drafter." *CONSOL Energy, Inc. v. Hummel*, 238 W. Va. 114, 122, 792 S.E.2d 613, 621 (2016) (quotations omitted); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995) (addressing the doctrine within the context of federal arbitration law). In this case, that means construing the term "affiliates" to mean only those AT&T Mobility affiliates in existence at the time of the contract formation—whether in 2006 or March 2012. And, at that time, DIRECTV had nothing to do with AT&T family of companies.

Ultimately, "[i]t is a fundamental tenet of contract law that the parties must enter into a meeting of the minds in order to form an enforceable contract." *Chesapeake Appalachia, L.L.C. v. Hickman*, 781 S.E.2d 198, 216 (W. Va. 2015); Syl. Pt. 2, *Triad Energy Corp. of W. Virginia v. Renner*, 215 W. Va. 573, 574, 600 S.E.2d 285, 286 (2004); *see also Restatement (Second) of Contracts* § 201(3) (1981) (where parties to an agreement attached different meanings to a term thereof, and neither party had reason to know of the meaning attached by the other, "neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.").

In sum, Ms. Mey never consented to arbitrate her TCPA claims with DIRECTV because (1) she was not a signatory to the underlying arbitration agreement, and (2) even if she was, the word "affiliates" cannot reasonably be understood to include any and all persons or corporate entities that may become connected with AT&T Mobility, regardless of how attenuated the relationship, even a decade in the future. DIRECTV cannot satisfy its burden demonstrating Ms. Mey's consent to arbitrate her TCPA claims against DIRECTV.

**4. Even if an arbitration agreement was formed, no exceptions to the nonsignatory rule apply to allow DIRECTV to enforce it against Ms. Mey.**

Despite the fact that DIRECTV is not a signatory to the cell phone account arbitration agreement between Ms. Mey's husband and AT&T Mobility, there are rare circumstances in which a nonsignatory may avail itself of an arbitration agreement. *See Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002) ("Arbitration agreements apply to nonsignatories only in rare circumstances."); *Int'l Paper Co.*, 206 F.3d 411, 416-17; *Chesapeake Appalachia*, 781 S.E.2d at 217 ("A court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party.") (quotations omitted). Therefore, in limited cases, "theories arising out of common law principles of contract and agency law" may allow a nonsignatory to exercise rights pursuant to an arbitration agreement. *Id*. at 417; *Chesapeake Appalachia*, 781 S.E.2d at 217. DIRECTV only raises estoppel.

To begin with, none of these theories—including estoppel—apply, for the simple reason that DIRECTV, a nonsignatory, cannot employ them against ***another nonsignatory***. DIRECTV cites no cases in which the Fourth Circuit has permitted a nonsignatory to enforce a contractual arbitration provision against an another nonsignatory under these exceptions. *Int'l Paper Co*., 206 F.3d at416-17 ("Well-established common law principles dictate that in an appropriate case a non-signatory can enforce, or be bound by, an arbitration provision within a contract *executed by other parties*.") (emphasis added).

Neither can the "intertwined claims test," also based on estoppel principles, help DIRECTV. *See U.S. ex rel. Coastal Roofing Co. v. P. Browne & Assocs., Inc*., 585 F. Supp. 2d 708, 714 (D.S.C. 2007) ("[W]hile less common, courts have also allowed a nonsignatory to an arbitration agreement to force one of *the signatories* to that agreement to arbitrate claims against it pursuant to a so-called 'intertwined claims' test.") (emphasis added). Under the intertwined claims

10

test, "the circuits have been willing to estop *a signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Thomson*, 64 F.3d at 779 (emphasis added); *Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 395-96 (4th Cir. 2005). Once again, however, the intertwined claims test only applies when a nonsignatory is attempting to compel arbitration with *a signatory*, *see id.*, and here there is neither.

Moreover, even assuming for the sake of argument that Ms. Mey is considered a signatory to the arbitration agreement with AT&T Mobility, DIRECTV fails to satisfy equitable estoppel exception on its merits.

*First*, DIRECTV is wrong that the estoppel exception to the nonsignatory rule applies here to force Ms. Mey to arbitrate her TCPA claims against DIRECTV, because Ms. Mey's TCPA claims do not hinge on her alleged rights under her husband's cell phone account agreement. *See R.J. Griffin & Co. v. Beach Club II Homeowners Ass'n*, 384 F.3d 157, 160 (4th Cir. 2004). "In the context of arbitration, the doctrine applies when one party attempts to hold another party to the terms of an agreement while simultaneously trying to avoid the agreement's arbitration clause." *Id.* at 160-61 (brackets and quotation marks omitted). The Fourth Circuit has "held more specifically that 'a nonsignatory is estopped from refusing to comply with an arbitration clause when it is seeking or receives a direct benefit from a contract containing an arbitration clause.'" *Id.* at 161 (quoting *Int'l Paper Co.*, 206 F.3d at 418).

Here, equitable estoppel does not apply because Ms. Mey's TCPA claims have nothing to do with the cell phone account agreement between her husband and AT&T Mobility. Moreover, she is not attempting to "hold another party to the terms of the [account] agreement." *Id.* at 160-61. Unlike the nonsignatory in *International Paper Company*, 206 F.3d 411, Ms. Mey is not "seeking

to gain a direct benefit from certain provisions in the [account] contract." *R.J. Griffin*, 384 F.3d at 161 (discussing *Int'l Paper Co.*, 418 F.3d at 418). Put another way, nothing about Ms. Mey's TCPA claims "hinges on" her asserted rights under the account agreement. *Int'l Paper Co.*, 418 F.3d at 418.

DIRECTV's argument that Ms. Mey is seeking a "direct benefit" from the account agreement because AT&T provided the phone to which AT&T made illegal calls is not only absurd on its face, but is exactly the type of attenuated argument the Fourth Circuit expressly rejected in the *R.J. Griffith* case. *See* 384 F.3d at 161 (rejecting argument that "a nonsignatory seeks a direct benefit whenever a 'contract provides part of the factual foundation' for its complaint"). Like the party seeking to compel arbitration in *R.J. Griffith*, DIRECTV's "argument misses a key element of estoppel. Equitable estoppel operates to prevent one party from holding another to the terms of an agreement while simultaneously avoiding the same agreement's arbitration clause." Id. at 165. As in that case, Ms. Mey "is not attempting to hold [DIRECTV] to any term of the [account agreement]." *Id*. Rather, Ms. Mey's TCPA "claims themselves have nothing to do with the breach of any provision of the [account agreement]." *Id*. Equitable estoppel does not apply.

**B. Ms. Mey's TCPA claims are not within the scope of the arbitration provision.**

Finally, even if the Court concludes that DIRECTV has satisfied its burden to demonstrate Ms. Mey's consent to arbitrate, the arbitration provision in the account agreement between Mr. Mey and AT&T Mobility hardly encompasses the type of dispute authorized under the TCPA asserted by Ms. Mey in the complaint.

True enough, the language in the arbitration provision is cosmically wide-ranging. *See* Mot. 12 (including "all disputes and claims between us," including "claims arising out of or relating to

any aspect of the relationship between us"). And courts have held that language in an arbitration clause purporting to cover all disputes "arising out of or relating to" a contract is "extremely broad," *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998), and that when applying an arbitration provision that is broad in scope, "t[o] trigger an arbitration requirement, the movant's factual allegations need only 'touch matters' covered by the contract containing the arbitration clause." *Homestake Lead Co. of Mo. v. Doe Run Res. Corp*., 282 F. Supp. 2d 1131, 1138 (N.D. Cal. 2003) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13).

As several courts nationwide have found, however, such broad language, when untethered to the underlying agreement to which it is contained, creates the serious risk of absurd results. *Parm v. Bluestem Brands*, Inc., No. 15-3437, 2017 WL 1193993, at *9 (D. Minn. Mar. 30, 2017) ("Despite an arbitration provision's very broad language regarding the types of disputes that are arbitrable, courts have been hesitant to compel arbitration of claims that do not 'touch matters' related to the underlying contract containing the arbitration provision."). The "wisdom of this principle" makes sense when applied to the account agreement, *id*., which purports to cover all disputes "arising out of or relating to any aspect of the relationship between us," and defines "us" to "include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services of Devices under this or prior Agreements between us." Mot. at 4. As another district court found under nearly identical circumstances, "To hold that the [account agreement] could reach any and all disputes regarding the actions of the parties and undefined third parties, even those claims

wholly unrelated to the [account agreement], would be an absurd result." *Parm*, 2017 WL 1193993, at *9.[2]

To use the same example as the *Parm* court:  if DIRECTV personnel (or that of any AT&T "affiliated" entity now or decades in the future) "sexually harassed a [DIRECTV] employee, and that employee just happened to also have a [cell phone account agreement with AT&T Mobility], it would be an absurd result to find that the [account agreement's] arbitration provision would compel the employee to arbitrate an employment action regarding the harassment. *Parm*, 2017 WL 1193993, at *9 n.20; *accord Smith v. Steinkamp*, 318 F.3d 775, 776–778 (7th Cir. 2003) (explaining that it would be an absurd result to interpret an arbitration agreement purportedly covering "all common law claims, based upon contract, tort, fraud, and other intentional torts" to truly waive any and all such claims against the drafter, as opposed to only waiving those "common law claims" that also "arise under" the underlying contract containing the arbitration clause). *See generally Wexler v. AT&T Corp*., No. 15–0686, 2016 WL 5678555, at *3 (E.D.N.Y. Sept. 30, 2016) ("[A]n arbitration clause that is unlimited in scope presents a question of contract formation."); *see also id*. at *4 (explaining that when applying state law to determine the meaning of terms in a contract containing an arbitration provision, "the words expressed must be judged according to 'what an objective, reasonable person would have understood [them] to convey' " and that when "checking a box accepting the 'terms and conditions' necessary to obtain cell phone

---

[2] The Eleventh Circuit, for example, has held that "[t]he term 'arising out of' is broad, but it is not all encompassing" and that the term " 'related to' marks a boundary by indicating some direct relationship; otherwise the term would stretch to the horizon and beyond." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218–19 (11th Cir. 2011); *see Telecom Italia, SpA v. Wholesale Telecom Corp.*, 248 F.3d 1109, 1116 (11th Cir. 2001) ("Disputes that are not related—with at least some directness—to performance of duties specified by the contract do not count as disputes 'arising out of' the contract, and are not covered by the standard arbitration clause. . . . However, where the dispute occurs as a fairly direct result of the performance of contractual duties . . . then the dispute can fairly be said to arise out of or relate to the contract in question. . . ."); *U.S. ex rel. Vining Corp. v. Carothers Constr., Inc.*, No. 09–438, 2010 WL 1931100, at *3 (M.D. Ga. May 12, 2010) (same).

service," a "reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement" (citation omitted)).

Under this framework and a plain reading of the arbitration clause, it is patently unreasonable to find that by agreeing to the terms of a cell phone agreement, either Mr. or Ms. Mey would have understood that any TCPA claims that might arise against a satellite T.V. provider would be arbitrable. *See Steinkamp*, 318 F.3d at 777–78. To avoid this absurd result, the Court should join other courts to interpret the account agreement's arbitration provision to mean that disputes that are arbitrable include only those that "aris[e] out of or relat[e] to" either (a) the account agreement or (b) the relationship between AT&T Mobility (and its agents, successors, and assigns) and the account-holder, as established in the agreement. *Savage v. Citibank N.A.*, No. 14–3633, 2015 WL 2214229, at *4 (N.D. Cal. May 12, 2015) ("[T]he Court concludes that the 'our relationship' language in the [credit] card agreements must be limited to the relationship created by those agreements. . . ."); *see Wexler*, 2016 WL 5678555, at *4.

## CONCLUSION

For the foregoing reasons, the motion should be denied.

Respectfully submitted,
Plaintiff,
By Counsel,


 */s/ John W. Barrett*_____
John W. Barrett (WV Bar No. 7289)
Jonathan R. Marshall (WV Bar No. 10580)
Ryan McCune Donovan (WV Bar No. 11660)
J. Zak Ritchie (WV Bar No. 11705)
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV  25301
(304) 345-6555

jbarrett@baileyglasser.com
jmarshall@baileyglasser.com
rdonovan@baileyglasser.com
skinney@baileyglasser.com

## **CERTIFICATE OF SERVICE**

I, John W. Barrett, hereby certify that on March 2, 2018, I caused to be filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ John W. Barrett*
John W. Barrett