## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

**Wheeling Division**

**DIANA MEY,**
**CRAIG CUNNINGHAM,**
**STEWART ABRAMSON,**
**JAMES SHELTON,**
**DAVID and ROXY VANCE,**
**RUSSELL LOCKE, and**
**THOMAS STARK, individually**
and on behalf of a class of all
persons and entities similarly situated,

      **Plaintiffs,**

**vs.**                            **Case No. 5:17-cv-00179-JPB**

**DIRECTV, LLC,**

      **Defendant.**

## THIRD AMENDED CLASS ACTION COMPLAINT

### Preliminary Statement

1.     According to the Federal Trade Commission's December 2017 Biennial Report to Congress, the emergence of new communications technologies has caused the number of illegal telemarketing calls to explode in recent years. Consumer complaints to the FTC about illegal calls have more than quintupled over the last 8 years, growing from about 63,000 per month in 2009 to an average of more than 375,000 per month in 2017.

2.     The sheer volume of illegal telemarketing overwhelms the enforcement efforts of government agencies such as the FTC and the Federal Communications Commission. Consequently, private consumer enforcement actions, which Congress authorized when it enacted the Telephone Consumer Protection Act ("TCPA") in 1991, play a critical role in combatting illegal telemarketing.

3.      Plaintiffs bring this action to enforce the TCPA in the face of rampant illegal telemarketing by DirecTV Authorized Dealers to sell DirecTV satellite television subscriptions. Telemarketing abuses are enabled through a compensation structure between DirecTV and its Authorized Dealers, where the Dealers receive cash payments for generating new customers for DirecTV. To facilitate sales, the Dealers use DirecTV trademarks and trade names, access their proprietary customer-service databases and pricing information, and hold themselves out as Authorized Dealers of the much larger, better known, and more reputable DirecTV.

4.      DirecTV benefits handsomely from the sales generated by the Authorized Dealers, who it claims are independent contractors and not acting on behalf of DirecTV. DirecTV seeks to reap all of the benefits of illegal telemarketing, while disclaiming all responsibility. Meanwhile, consumers subjected to DirecTV's agents' relentless marketing receive hundreds of thousands or even millions of illegal calls. Even after this lawsuit was filed, the class representatives continued to receive illegal DirecTV telemarketing calls.

5.      Plaintiffs bring this action to enforce the telemarketing laws against DirecTV. DirecTV turns a blind eye to its agents' blatantly illegal practices, while gratefully accepting the new business they generate. DirecTV hides behind self-serving contracts with its Dealers that effectively claim TCPA compliance is the Dealers' sole responsibility, and DirecTV asserts these contractual provisions in attempt to shield itself from liability.

6.      Under the TCPA, these efforts to shirk responsibility fail. The TCPA imposes liability not only on the entities that physically dial illegal telemarketing calls, but also on those entities that benefit from them.

7.      Vicarious liability is an essential feature of the remedial provisions and purposes of the TCPA. Under applicable law, a seller is not shielded from liability simply because *others*

violate the law on its behalf and for its benefit. This is so in part because the dealers and lead-generators that place illegal calls often are judgment proof and difficult to identify, and sellers like DirecTV are best positioned to monitor and control their activities. Under these circumstances, and in service of protecting consumers from the nuisance and privacy-invasion of unwanted telemarketing, liability is imputed to the more reputable and more financially solvent sellers – here, DirecTV.

8.      This case underscores the importance of vicarious liability under the TCPA. Here, comparatively small dealers placed hundreds of thousands and possibly millions of illegal telemarketing calls to sell DirecTV products or services, for which DirecTV is and should be responsible.

9.      Plaintiffs bring this action to enforce the TCPA's strict limits on telemarketing calls placed through automated telephone dialing systems ("ATDS") and artificial or prerecorded voice messages, and calls placed to numbers listed on the Do Not Call Registry. On behalf of the proposed classes defined below, Plaintiffs seek statutory damages of $500-$1500 per illegal call, as well as injunctive relief requiring Defendant to comply with the law.

**Parties**

10.      Plaintiff Diana Mey resides in Wheeling, West Virginia, in this District.

11.      Plaintiff Craig Cunningham resides in Collin County, Texas.

12.      Plaintiff Stewart Abramson resides in Allegheny County, Pennsylvania.

13.      Plaintiff James Shelton resides in King of Prussia, Pennsylvania.

14.      Plaintiffs David and Roxy Vance reside in Beverly, West Virginia, in this District.

15.      Plaintiff Russell Locke resides in Jane Lew, West Virginia, in this District.

16.      Plaintiff Thomas Stark resides in Weston, West Virginia, in this District.

17.     Defendant DirecTV, LLC is a California limited liability company that transacts business throughout the United States, including in this District.

## Jurisdiction & Venue

18.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227 et seq.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim—namely, the automated calls to the Plaintiffs—occurred in this District.

## Statutory Background

20.     In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry.  In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

21.     Perhaps the most well-known aspect of the TCPA was the creation of the National Do Not Call Registry. By adding a telephone number to the Registry, a consumer indicates her desire not to receive telephone solicitations.  *See* 47 C.F.R. § 64.1200(c)(2).

22.     The TCPA and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry.  47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).  Plaintiffs allege violations of this statute in Count Three.

23.     The TCPA also makes it unlawful to (1) make calls to cellular telephone lines using an "automatic telephone dialing system," or (2) make calls to any cellular or residential line using an artificial or prerecorded voice, without the call recipient's prior express consent. *See* 47 U.S.C. § 227(b)(1)(A) & (B); *In the Matter of Rules & Regulations Implementing the Tel.*

4

*Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012).  Plaintiffs allege violations of these provisions in Counts One and Two.

24.     The FCC has explained that such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and can be costly and inconvenient.

25.     Because allowing an entity "to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions," the FCC has consistently held that a corporation or other entity "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling").

26.     Further, a corporate officer or employee who, acting on behalf of the corporation, directly participates in or authorizes a violation of the TCPA, may be held individually liable. *See Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 416 (D. Md. 2011).

27.     Here, the corporate officers named had direct participation in the telemarketing conduct at issue or authorized and oversaw the same.

### Factual Allegations

28.     Each Plaintiff has received illegal telemarketing calls from DirecTV Authorized Dealers. Each Plaintiff was harmed by these calls. Among other things, they were temporarily deprived of legitimate use of their phones and their privacy was invaded.

29.     The chart below summarizes the calls received, all of which were placed to promote the sale of DirectTV satellite television subscriptions.

30.     Additionally, Plaintiffs Abramson, Cunningham, Mey, and Shelton each received additional calls from or on behalf of DirecTV, and will supply information about these calls, for which they also seek TCPA penalties, in discovery.

| Recipient | Dealer | Date | Count 1: Autodialer or Prerecord to Cell | Count 2: Prerecord to Residential Line | Count 3: Call to DNC Number |
|---|---|---|---|---|---|
| Abramson | Xcite Satellite, LLC | 05/15/18 | X | | |
| Abramson | Exact Estimating, LLC | 05/23/18 | X | | |
| Abramson | CDS V1, LLC | 05/26/18 | X | X | |
| Abramson | Kreatamotive, LLC | 07/17/18 | X | | |
| Abramson | Super Sale Outlets, LLC | 09/11/18 | X | | |
| Abramson | PerfectVision Mfg. | 08/23/19 | X | | |
| Cunningham | Birju, LLC | 05/10/18 | X | | |
| Cunningham | Pic Six, LLC | 04/11/18 | X | | |
| Cunningham | Mylan Johnson Group | 05/18/18 | X | | |
| Cunningham | PerfectVision Mfg. | 11/19/19 | X | | |
| Cunningham | Pro Edge | 02/26/20 | X | | |
| Mey | AC1 | 08/12/17 | X | | |
| Mey | IQ/Ashgari | 08/03/17 | X | X | X |
| Mey | IQ/Ashgari | 12/11/17 | X | X | X |
| Mey | IQ/Ashgari | 12/13/17 | X | X | X |
| Mey | IQ/Ashgari | 01/24/18 | X | X | X |
| Mey | IQ/Ashgari | 01/24/18 | X | X | X |
| Mey | IQ/Ashgari | 02/09/18 | X | X | X |
| Mey | Nas Air | 07/26/18 | X | | X |
| Mey | Nas Air | 07/26/18 | X | | X |
| Mey | Nas Air | 07/26/18 | X | | X |
| Mey | Nas Air | 07/26/18 | X | | X |
| Mey | Nas Air | 07/26/18 | X | | X |
| Shelton | Kreatamotive, LLC | 06/12/18 | X | | |
| Shelton | Explosive Sales Mktg. | 06/16/18 | X | | |
| Shelton | Explosive Sales Mktg. | 06/19/18 | X | | |
| Shelton | Explosive Sales Mktg. | 06/20/18 | X | | |
| Shelton | Explosive Sales Mktg. | 06/25/18 | X | | |
| Shelton | Explosive Sales Mktg. | 06/26/18 | X | | |
| Shelton | Clear Home, Inc. | 12/07/18 | X | | |
| Locke | AC1 | 11/28/18 | X | | |

| Stark | AC1 | 11/29/18 | X | |
|-------|-----|----------|---|---|
| Vance | AC1 | 06/01/18 | X | X |
| Vance | AC1 | 11/29/18 | X | X |

*Call to Ms. Mey from AC1*

31.     On August 12, 2017, AC1 made an automated telemarketing call to Ms. Mey's cellular telephone line, (304) 242-XXXX, a number that had been listed on the National Do Not Call Registry for more than 31 days prior to the calls at issue.

32.     When Ms. Mey answered the call, a sales representative began reading a scripted pitch for DirecTV goods and services.

33.     The caller eventually identified himself as a representative of AC1.

34.     When Ms. Mey asked why the call appeared to be from a West Virginia area code, the caller claimed that was the number programmed into "the dialer."

35.     Upon further inquiry from Ms. Mey, the caller admitted the call had been made using an autodialer.

36.     Ms. Mey never gave AC1 or DirecTV consent to call her cellular phone using an autodialer.

37.     Before filing this lawsuit, Ms. Mey wrote to AC1 and its owner, Adam Cox, reported that she had received an illegal telemarketing call from AC1 in violation of the TCPA. In response, AC1 admitted making the call, but had no evidence of consent.

*Calls to Ms. Mey from IQ Marketing 2*

38.     On August 3, 2017, IQ Marketing 2 ("IQ") made a prerecorded telemarketing call to Ms. Mey's cellular telephone line, (304) 242-XXXX, a number that had been listed on the National Do Not Call Registry for more than 31 days prior to the calls at issue.

39.     The call came from (800) 217-8203, and played the following prerecorded message:

> Are you paying too much for your TV service? Hi! We're the premier television provider for this area. We have the lowest per channel cost in the industry with

more than 140 channels including local channels for only $29.99 per month. You also get free installation, free DVR equipment and free HD equipment. Act now and receive 33 premium commercial free movie channels free for three months. To hear more about this special offer, press 1 now or press 2 to be taken off this special list.

40.     To identify the caller, Ms. Mey dialed (800) 217-8203.  She reached a recording for "Best TV Offers."

41.     On August 17, 2017, IQ made a second prerecorded telemarketing call to Ms. Mey's cellular telephone line, (304) 242-XXXX.

42.     The call also came from (800) 217-8203, and played the same prerecorded message as the first call.

43.     This time, Ms. Mey pressed 1 and was transferred to an individual who identified himself as Sam Davis with "Special Deals for DirecTV" in Las Vegas.

44.     "Special Deals" is a fictitious name intended to disguise the legal name of the entity who made the call to Ms. Mey on behalf of DirecTV.

45.     Ms. Mey terminated the call after Mr. Davis asked Ms. Mey for her social security number to run a credit check.

46.     On December 11, 2017, IQ made a third prerecorded telemarketing call to Ms. Mey's cellular telephone line.

47.     The call came from (800) 217-8203, and played the same prerecorded message as the first two calls.

48.     On December 13, 2017, IQ made a fourth prerecorded telemarketing call to Ms. Mey's cellular telephone line.

49.     The call also came from (800) 217-8203, and played the same message referenced above.

10

50.   Ms. Mey pressed 1 and the call was disconnected.

51.   On December 13, 2017, IQ made a fifth prerecorded telemarketing call to Ms. Mey's cellular telephone line.

52.   The call also came from (800) 217-8203, and played the same prerecorded message.

53.   Ms. Mey pressed 1 and was transferred to an individual who identified himself as Hugh Daniels with "Perfect Source" in Texas.

54.   The connection was poor, so Hugh Daniels offered to call Ms. Mey back, and the call was terminated.

55.   "Perfect Source" is a fictitious name intended to disguise the legal name of the entity who made the call to Ms. Mey on behalf of DirecTV.

56.   On January 24, 2018, IQ made a sixth prerecorded telemarketing call to Ms. Mey's cellular telephone line.

57.   The call also came from (800) 217-8203, and played the same prerecorded message.

58.   Ms. Mey pressed 1 and was transferred to an individual who identified himself as "James" with "Best TV Offers."

59.   Ms. Mey told "James" that someone was at her door and requested his number to call him back.

60.   After almost an hour had passed from the second call, "James" called Ms. Mey again.

61.   Ms. Mey made a do not call request, and the call ended.

62. On January 24, 2018, IQ made a seventh prerecorded telemarketing call to Ms. Mey's cellular telephone line.

63. The call came from (602) 555-0151, and played the same prerecorded message.

64. Ms. Mey pressed 1 and was transferred to a call center where the representative made a pitch for DirecTV.

65. The representative hung up on Ms. Mey when she began asking questions in her effort to determine the identity of the caller.

66. Others have complained about receiving unsolicited DirecTV prerecorded telemarketing from this same number. *See* http://800notes.com/Phone.aspx/1-800-217-8203.

67. On February 9, 2018, IQ made an eighth prerecorded telemarketing call to Ms. Mey's cellular telephone line.

68. The call also came from (800) 217-8203, and played the same prerecorded message.

69. Ms. Mey pressed 1 and was transferred to a call center where the representative again began pitching DirecTV.

70. The representative claimed that he was with "Best Offers in Satellite Services."

71. Ms. Mey made a do not call request and the representative hung up on her.

72. Eventually, Ms. Mey learned that "Special Deals" was a d/b/a for IQ, identified by DirecTV as Authorized Dealer # 1789851.

73. Neither DirecTV nor IQ had Ms. Mey's prior express written consent to call her cell phone via an automatic telephone dialing system or by prerecorded message.

74. Before filing this action, Ms. Mey wrote to DirecTV complaining about these calls, but DirecTV did not respond.

*Calls to Ms. Mey from Nas Air Logistics*

75. On July 26, 2018, Nas Air Logistics ("Nas Air") made an automated dialed telemarketing call to Ms. Mey's cellular telephone line, (304) 242-XXXX.

76. The call came from (800) 531-5000.

77. Ms. Mey was unable to understand the caller due to a poor connection, and hung up.

78. On July 26, 2018, Nas Air made a second telemarketing call to Ms. Mey's cellular telephone line.

79. This call also came from (800) 531-5000, and again had a poor connection.

80. Ms. Mey requested a call back number, but the representative stated he would call back.

81. On July 26, 2018, Nas Air made a third telemarketing call to Ms. Mey's cellular telephone line.

82. This call came from (740) 807-3043. The representative on the line stated that he was with Nas Air Logistics, a reseller in New Jersey.

83. Ms. Mey told the representative that she did not want DirecTV and told him to stop calling.

84. Ms. Mey called (740) 807-3403 in an attempt to identify the reseller.

85. The representative that answered informed Ms. Mey that his name was "Don" and he was with DirecTV.

86. "Don" told Ms. Mey the name of the calling entity was Nas Air Logistics.

87. "Don" refused to give Ms. Mey an address for Nas Air Logistics.

88.     On July 26, 2018, Nas Air made a fourth telemarketing call to Ms. Mey's cellular telephone line.

89.     Neither DirecTV nor Nas Air had Ms. Mey's prior express written consent to call her cell phone via an automatic telephone dialing system or by prerecorded message.

90.     On July 26, 2018, Nas Air made a fifth telemarketing call to Ms. Mey's cellular telephone line.

91.     This call came also from (740) 807-3043. The individual on the line stated that his name was John Matthew and he was the owner of Nas Air Logistics, the reseller for DirecTV.

92.     Ms. Mey questioned Mr. Matthew about the dialer used and how many numbers were programmed into the dialer.

93.     Mr. Matthew identified the dialer used as a "Vici."

94.     Ms. Mey told Mr. Matthew that her number was on the federal Do Not Call list and that she had a pending class action lawsuit for these calls.

95.     Mr. Matthew directly participated in or authorized Nas Air's illegal calls to Ms. Mey. Prior to this suit, Ms. Mey wrote to DirecTV complaining about these calls, but DirecTV did not respond.

96.     Prior to this suit, Ms. Mey wrote to DirecTV complaining about these calls, but DirecTV did not respond.

### *Calls to Mr. Cunningham from Birju, LLC*

97.     On May 10, 2018, Birju, LLC made a prerecorded telemarketing call to Mr. Cunningham's cellular telephone line, (615) 348-XXXX from a spoofed, non-working number identified as (978) 353-6968.

98.     The call played a prerecorded message after a significant delay of dead air after Mr. Cunningham answered the phone.

99.     This delay is evidence that the call was made using a predictive dialer, which is an automatic telephone dialing system.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

100.     The prerecorded message stated:

Are you paying too much for your TV service? Hi! We're the premier television provider for this area. We have the lowest per channel cost in the industry with more than 140 channels including local channels for only $29.99 per month. You also get free installation, free DVR equipment and free HD equipment. Act now and receive 33 premium commercial free movie channels free for three months. To hear more about this special offer, press 1 now or press 2 to be taken off this special list.

101.     Mr. Cunningham pressed 1 and was transferred to a call center where the representative pitched DirecTV services.

102.     The agent claimed to be with "Best TV offers." The agent claimed his name was Steve Norman, and said he was calling from (800) 217-8203, extension 106.

103.     To identify the caller, Mr. Cunningham proceeded with the solicitation, and Mr. Norman informed Mr. Cunningham that his DirecTV account number would be 36803276.

104.     On or about the same day, Mr. Cunningham received an inquiry on his credit report from DirecTV, and he received a pending charge of $1.00 on his credit card from DirecTV.

105.     Several days later Mr. Cunningham received a letter in the mail from DirecTV that gave him a DirecTV account number of 36803276.

15

106.    After receiving that letter, Mr. Cunningham called DirecTV at 800-531-5000.  He gave the agent his DirecTV account number of 36803276, and he was informed by the agent that the account was sold by an authorized reseller named Birju, LLC.

107.    Because he had identified the caller, Mr. Cunningham cancelled the enrollment.

108.    Neither DirecTV nor Birju had Mr. Cunningham's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### *Calls to Mr. Cunningham from Pic Six, LLC*

109.    On April 11, 2018, Pic Six, LLC made two prerecorded telemarketing calls to Mr. Cunningham's cellular telephone line, (615) 348-XXXX from a spoofed, non-working number identified as (800) 778-4191.

110.    After Mr. Cunningham answered the phone, the call played a prerecorded message after a significant delay of dead air.

111.    This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

112.    The prerecorded message stated:

Are you paying too much for your TV service? Hi! We're the premier television provider for this area. We have the lowest per channel cost in the industry with more than 140 channels including local channels for only $29.99 per month. You also get free installation, free DVR equipment and free HD equipment. Act now and receive 33 premium commercial free movie channels free for three months. To hear more about this special offer, press 1 now or press 2 to be taken off this special list.

113.    Mr. Cunningham pressed 1 and was transferred to a call center where the representative again began pitching DirecTV. The agent claimed to be with "Best TV offers," and said his name was "Alan Smith."

114.    To determine if this was true, Mr. Cunningham proceeded with the solicitation, and Mr. Smith informed Mr. Cunningham that his DirecTV account number would be 16624826.

115.    On or about the same day, Mr. Cunningham received an inquiry on his credit report from DirecTV, and he received a pending charge of $1.00 on his credit card from DirecTV.

116.    Several days later Mr. Cunningham received a letter in the mail from DirecTV that listed his account number.

117.    Several days later, Mr. Cunningham called DirecTV at 800-531-5000.  He gave the agent his DirecTV account number, and he was informed by the agent that the account was sold by an authorized reseller named Pic Six, LLC.

118.    Once he identified the calling party, Mr. Cunningham cancelled his enrollment.

119.    Mr. Cunningham also called Pic Six, LLC and gave them the account number. Pic Six, LLC confirmed that they were an authorized agent of DirecTV, and that they had created the account.

120.    Neither DirecTV nor Pic Six had Mr. Cunningham's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### *Call to Mr. Cunningham from Mylan Johnson Group*

121.    On May 18, 2018, Mylan Johnson Group made a prerecorded telemarketing call to Mr. Cunningham's cellular telephone line, (615) 348-XXXX from a spoofed, non-working number, (800) 778-4191.

17

122.    The call played a prerecorded message after a significant delay of dead air after Mr. Cunningham answered the phone.

123.    This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

124.    The prerecorded message stated:

> Hi, if you are paying high bills for your internet or cable TV services, we can get you cable TV for just $35 per month with four premium movie channels and free installation. Sign up today and get a $200 Visa gift card for free. Press 1 to connect with an operator. Press 9 to disconnect.

125.    Mr. Cunningham pressed 1 and was transferred to a call center where the representative again began pitching DirecTV services.

126.    The agent claimed to be with DirecTV, and identified himself as "Stewart."

127.    To investigate this claim, Mr. Cunningham proceeded with the solicitation, and "Stewart" informed Mr. Cunningham that his DirecTV account number would be 25086456, and his order number was DSI11442542.

128.    On or about the same day, Mr. Cunningham received an inquiry on his credit report from DirecTV, and he received a pending charge of $1.00 on his credit card from DirecTV.

129.    Mr. Cunningham received an email from AT&T confirming the enrollment and indicating that Mylan Johnson Group was the sales agent.  The email provided a phone number of (214) 206-7445.

130.    Several days later, Mr. Cunningham received a letter in the mail from DirecTV indicating that his DirecTV account number was 25086456.

131.    Mr. Cunningham later called DirecTV at (800) 531-5000.  He gave the agent his DirecTV account number, and the agent told him that the account was sold by an authorized reseller named Mylan Johnson Group.

132.    Because he had identified the caller, Mr. Cunningham cancelled his enrollment.

133.    Neither DirecTV nor Mylan Johnson had Mr. Cunningham's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### Call to Mr. Abramson from Xcite Satellite, LLC

134.    On May 15, 2018, Xcite Satellite, LLC made an automated telemarketing call to Mr. Abramson's cellular telephone line, (412) 362-XXXX.

135.    Neither DirecTV nor Xcite had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

136.    The caller identification number associated with the call on May 15, 2018 was (385) 237-5889, but when Mr. Abramson subsequently called (385) 237-5889, he discovered it was not a working number.

137.    Mr. Abramson answered the call on May 15, 2018, but there was a significant delay after he answered.  This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

138.     The telemarketing agent that Mr. Abramson spoke with gave his name as Emanuel Brown.  Mr. Brown informed Mr. Abramson that he was calling directly from DirecTV, and he insisted that he was not calling from a separate independent company authorized to sell DirecTV services.

139.     To investigate this claim, Mr. Abramson proceeded with the solicitation, and Mr. Brown informed Mr. Abramson that his DirecTV account number would be 36832412.

140.     On May 15, 2018, Mr. Abramson received an inquiry on his credit report from DirecTV, and he received a pending charge of $1.00 on his credit card from DirecTV.

141.     On May 23, 2018, Mr. Abramson received a letter in the mail from DirecTV that gave his order date as May 15, 2018 and his DirecTV account number as 36832412.

142.     On May 23, 2018, Mr. Abramson called DirecTV at 800-531-5000.  He gave the agent his DirecTV account number, and he was informed by the agent that the account was sold by an authorized reseller named Xcite Satellite, LLC.

143.     Because he had identified the calling party, Mr. Abramson cancelled the enrollment.

144.     Neither DirecTV nor Xcite Satellite had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### Call to Mr. Cunningham from SNY Marketing for PerfectVision Manufacturing, Inc.

145.     On November 19, 2019, SNY Marketing, while working for PerfectVision Manufacturing, made a prerecorded telemarketing call to Mr. Cunningham's cellular telephone line, (615) 348-XXXX from (615) 319-1129.

146.    There was a delay and a distinctive "bloop" sound after he answered. This delay and "bloop" are indicative of a telemarketing call made by a type of automatic telephone dialing system known as a predictive dialer. The delay results from the fact that the automatic telephone dialing system must ensure that a customer answered the call before the automatic telephone dialing system searches for and connects the call to a telemarketing agent.

147.    A telemarketing agent answered the line and identified himself as "Justin from DirecTV."

148.    Mr. Cunningham was transferred to "Danny Morrison," who said he was a "product specialist."

149.    Mr. Cunningham expressed interest in purchasing DirecTV so he could obtain an order number and customer account number and identify the dealer behind the call.

150.    Because he did not want to provide his real name to an illegal telemarketer, Mr. Cunningham identified himself as Russell McMinn, of 1525 Valencia Drive, Plano, Texas.

151.    After the initial call, DirecTV itself called Mr. Cunningham and gave him an account number (301211243) and order number (99100000023774568).

152.    That day, DirecTV charged Mr. Cunningham's credit card to pay for the service.

153.    Mr. Cunningham cancelled his enrollment.

154.    Neither DirecTV nor any Authorized Dealer had prior express written consent to place the call at issue.

### Call to Mr. Abramson from Exact Estimating, LLC

155.    On May 23, 2018, Exact Estimating, LLC made an automated telemarketing call to Mr. Abramson's cellular telephone line, (412) 362-XXXX.

156.    Neither DirecTV nor Exact Estimating had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

157.    The caller identification number associated with the call on May 23, 2018 was (800) 531-5000, which is a telephone number for DirecTV.

158.    Mr. Abramson answered the call on May 15, 2018, but there was a significant delay after he answered.  This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

159.    The telemarketing agent that Mr. Abramson spoke with gave his name as Alex Dunn, and said he was calling from DirecTV.

160.    Again, to investigate this claim, Mr. Abramson proceeded with the solicitation. The telemarketing agent Alex Dunn sold Mr. Abramson DirecTV services.  Then he informed Mr. Abramson that his telephone number was (888) 624-4745 and that someone from DirecTV would call back within one or two days to provide a DirecTV account number.

161.    On May 23, 2018, Mr. Abramson received a pending charge of $1.00 on his credit card from DirecTV.

162.    On May 24, 2018, Mr. Abramson received an inquiry on his credit report from DirecTV.

163.    On May 29, 2018, Mr. Abramson called (888) 624-4745 and the agent he spoke with informed him that he had reached DirecTV.  The agent found Mr. Abramson's account with DirecTV, and he told Mr. Abramson that his DirecTV account number was 17353831.

164.    On May 29, 2018 Mr. Abramson received a letter in the mail from DirecTV that gave his order date as May 23, 2018 and his DirecTV account number as 17353831.

165.    On May 29, 2018 Mr. Abramson called DirecTV at 800-531-5000.  He gave the agent his DirecTV account number of 17353831, and he was informed by the agent that the account was sold by an authorized reseller named Exact Estimating, LLC.

166.    Because he had identified the caller, Mr. Abramson cancelled his enrollment.

167.    Neither DirecTV nor Exact Estimating had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### *Call to Mr. Abramson from CDS V1, LLC*

168.    On May 26, 2018, CDS V1, LLC made an automated telemarketing call to Mr. Abramson's cellular telephone line, (412) 362-XXXX.

169.    Neither DirecTV nor CDS had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

170.    The caller identification number associated with the call on May 26, 2018 was (704) 799-1794, but when Mr. Abramson subsequently called (704) 799-1794 he discovered that it was not a working number.

171.    Mr. Abramson answered the call on May 26, 2018, and the caller delivered a prerecorded message in a female voice. The prerecorded message said that it was from "your

23

television provider for this area," whom it said was offering 140 channels for $39.99/month.  The prerecorded message ended by saying something about a "special list."

172.     Mr. Abramson believes that the full text of the prerecorded message was as follows:

Hi.  We are from the television provider for this area.  We have the lowest per channel cost in the industry, with more than one hundred forty channels, including local channels, for only thirty nine dollars, ninety nine cents per month, two years fixed price.  You also get free installation, free DVR equipment, and free HD equipment.  Act now.  You receive thirty three premium commercial-free movie channels, free for three months.  To hear more about the special offer press one now, or press two to be taken out of this special list.

173.     Mr. Abramson pressed 1 in response to the prerecorded message so that he could determine who had called him. As a result, Mr. Abramson spoke with an agent who said his name was Dwayne White, and that his employee ID number was DW7836.

174.     Mr. Abramson gave the agent Dwayne White his name and address, but a manager who gave his name as "Dave" came on the line and told Mr. Abramson that there was already a pending account and bill in Mr. Abramson's name.

175.     This pending account was from Mr. Abramson's investigation of another automated telemarketing call he had received, outlined above.

176.     "Dave" suggested that they could set up the services in Mr. Abramson's wife's name.  Mr. Abramson gave the agent his wife's name, and Mr. Abramson was informed that the new DirecTV account number in his wife's name would be 32451241.

177.    On May 26, 2018, Mr. Abramson received a pending charge of $1.00 on his credit card from DirecTV.

178.    On May 26, 2018, Mr. Abramson received a call on his cellular telephone line (412) 362-XXXX from (800) 667-9963.  The prerecorded message said the call was from "Direct Sat USA", his service provider for DirecTV.  The message indicated that Direct Sat USA was calling about his installation, and that he could call them back at (800) 667-9963.

179.    On May 26, 2018, Mr. Abramson received two separate emails from order@ecom.wireless.att-mail.com.  They were addressed to his wife's name, listed a DirecTV account number as 32451241, and informed him that if he had any questions about this DirecTV order, he should call CDS V1, LLC.

180.    On May 29, 2018, Mr. Abramson called DirecTV at (800) 531-5000 and the agent he spoke with informed him that he obtained his DirecTV account from an authorized reseller named CDS V1, LLC.

181.    On June 2, 2018, Mr. Abramson received a letter from DirecTV addressed to his wife.  The letter gave an order date of May 26, 2018, and a DirecTV account number of 32451241.

182.    Because he had identified the calling party, Mr. Abramson cancelled his enrollment.

183.    Neither DirecTV nor CDS V1 had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### *Calls to Mr. Abramson and Mr. Shelton from Kreatamotive LLC*

184.    On July 17, 2018, Kreatamotive LLC made an automated telemarketing call to Mr. Abramson's cellular telephone line, (412) 362-XXXX.

185.     The caller identification number associated with the call on July 17, 2018 was marked as "restricted."

186.     Mr. Abramson answered the call on July 17, 2018, but there was a significant delay after he answered.  This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

187.     Mr. Abramson spoke with an agent named "Bruce", who said he was calling from DirecTV.

188.     To investigate this claim, Mr. Abramson proceeded with the solicitation. "Bruce" then sold Mr. Abramson DirecTV services, and informed Mr. Abramson that his DirecTV order number would be DSI11862436.  Mr. Abramson asked "Bruce" several times for the name of his company.  "Bruce" insisted that he worked for DirecTV in El Segundo, California, and stated that if Mr. Abramson had any problems, he could call DirecTV at (800) 531-5000.

189.     On July 17, 2018, Mr. Abramson received a pending charge of $1.00 on his credit card from DirecTV.

190.     On July 17, 2018, Mr. Abramson received two emails from order@ecom.wireless.att-mailcom.  The emails gave his DirecTV order number of DSI11862436, and they instructed Mr. Abramson to call Kreatamotive if he had any questions about his DirecTV account.

191.     On July 18, 2018 Mr. Abramson called DirecTV at 800-531-5000 and the agent he spoke with informed him that his DirecTV account, number 9318565, was sold by an authorized reseller named Kreatamotive LLC.

192.     Because he had identified the calling party, Mr. Abramson cancelled his enrollment.

193.     On June 12, 2018, Kreatamotive LLC made at least one automated telemarketing call to Mr. Shelton's cellular telephone line, (484) 626-XXXX.

194.     Mr. Shelton answered the call on June 12, 2018, but there was a significant delay after he answered.  This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

195.     On June 12, 2018, Mr. Shelton received two emails from DirecTV designating an Order Confirmation Number of 287395591 and Account Number of 25414032.

196.     Mr. Shelton called DirecTV and cancelled the order.

197.     Mr. Shelton wrote to DirecTV on June 14, 2018 to let them know about the automated call and to make clear that he did not want to be contacted again.

198.     DirecTV advised Mr. Shelton that Kreatamotive had made the calls at issue in his letter.

199.     Neither DirecTV nor Kreatamotive had Mr. Abramson's or Mr. Shelton's prior express written consent to call their cell phones via an automatic telephone dialing system or by prerecorded message.

*Calls to Mr. Shelton from Explosive Sales Marketing Group, Inc.*

200.     On June 16, 2018, Explosive Sales Marketing Group, Inc. made a prerecorded

telemarketing call to Mr. Shelton's cellular telephone line, (484) 626-XXXX.

201.     During the call, Mr. Shelton pressed one in response to the prerecorded message

so that he could determine who had called him.

202.     After responding to the message, Mr. Shelton spoke with an agent named "Brian"

who attempted to sell Mr. Shelton DirecTV goods and services.

203.     During a later call from Explosive Sales Marketing, Mr. Shelton followed through

with the solicitation so he could identify the company calling him, and provided his information

on June 20, 2018.

204.     Thereafter, Mr. Shelton received an email from DirecTV informing him that his

order number was DSI11673663 and this his DirecTV account number was 17545013.

205.     Mr. Shelton then canceled the order.

206.     Mr. Shelton wrote DirecTV to inform them of the automated call and to advise

that he did not want any further communications from them.

207.     DirecTV told Mr. Shelton that Explosive Sales Marketing Group made the calls

mentioned in his correspondence.

208.     Explosive Sales Marketing Group also made automated telemarketing calls to Mr.

Shelton's cellular telephone number on other dates, including June 19, 20, 25, 26, and 27 of

2018.

209.     Neither DirecTV nor Explosive Sales had Mr. Shelton's prior express written

consent to call his cell phone via an automatic telephone dialing system or by prerecorded

message.

### *Call to Mr. Abramson from Super Sale Outlets, LLC*

210.    On September 11, 2018, Super Sale Outlets, LLC made an automated telemarketing call to Mr. Abramson's cellular telephone line, (412) 362-XXXX.

211.    Neither DirecTV nor Super Sale Outlets had Mr. Abramson's prior express written consent to call his cell phone via an automatic telephone dialing system or by pre-recorded message.

212.    The caller identification number associated with the call on September 11, 2018 was (704) 865-4980, but when Mr. Abramson subsequently called (704) 865-4980 he spoke with a woman who claimed that she did not call Plaintiff, and who further claimed that her telephone number had been "hacked".

213.    Mr. Abramson answered the call on September 11, 2018, but there was a significant delay after Mr. Abramson said "Hello" before an agent answered.

214.    This delay is indicative of a telemarketing call made by a specific type of automatic telephone dialing system known as a predictive dialer.  The delay results from the fact that the automatic telephone dialing system must first ensure that a live customer answered the call, before the automatic telephone dialing system then searches for, and connects the call to, a waiting telemarketing agent.

215.    The telemarketing agents that Mr. Abramson spoke with gave their names as Jason and Ethan, and both informed Mr. Abramson that they were calling from DirecTV.

216.    To investigate their claims, Mr. Abramson proceeded with the solicitation.  Ethan then sold Mr. Abramson DirecTV services, and informed Mr. Abramson that his DirecTV account number would be 33253588.  Ethan informed Mr. Abramson that his company was an

authorized seller of DirecTV service, and that he had entered Mr. Abramson's information directly into DirecTV's customer relationship management database.

217.    On September 11, 2018, Mr. Abramson received a pending charge of $1.00 on his credit card from DirecTV.

218.    On September 11, 2018, Mr. Abramson received two e-mails from order@ecom.wireless.att-mailcom.  The e-mails gave his DirecTV order number of DSI12395720, and his DirecTV account number of 33253588, and they instructed Mr. Abramson to call Super Sale Outlets, LLC at (516) 474-3928 if he had any questions about his DirecTV account.

219.    On September 17, 2018, Mr. Abramson called DirecTV at (800) 531-5000 and the agent that he spoke with informed him that his DirecTV account number of 33253588 was sold by an authorized reseller named Super Sale Outlets, LLC.

220.    Now that the calling party had been identified, Mr. Abramson cancelled the enrollment.

### *Calls to Mr. Shelton from Clear Home, Inc.*

221.    On December 7, 2018, Clear Home, Inc., or a vendor they hired, made a pre-recorded telemarketing call to Mr. Shelton's cellular telephone line, (484) 626-XXXX.

222.    After he answered, Mr. Shelton pressed one in response to a prerecorded message so that he could determine who made the call.

223.    Mr. Shelton then spoke with an agent, who attempted to sell Mr. Shelton a DirecTV subscription.

224.    Mr. Shelton purchased the subscription so he could identify the caller.

225.    He received a DirecTV account number of 56616537.

226.   Mr. Shelton contacted DirecTV, who told him that Clear Home, Inc. was responsible for his DirecTV account.

227.   Mr. Shelton cancelled his enrollment.

228.   Clear Home also made at least five ATDS telemarketing calls to Mr. Shelton's cellular telephone number on December 11, 2018.

229.   Neither DirecTV nor Clear Home had Mr. Shelton's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### Call to Mr. Abramson from Fati Tech, LLC for PerfectVision Manufacturing, Inc.

230.   On August 23, 2019, Fati Tech, LLC, while working for PerfectVision Manufacturing, Inc., made a pre-recorded telemarketing call to Mr. Abramson's cellular telephone line, (412) 362-XXXX.

231.   When he answered the call, Mr. Abramson pressed one to speak to an agent so he could determine who made the call.

232.   Mr. Abramson was connected to an agent who said his name was "Eric," and that he worked for DirecTV.

233.   "Eric" attempted to sell Mr. Abramson a DirecTV subscription.

234.   To identify the caller, Mr. Abramson purchased a subscription, and received a DirecTV account number of 298-562-435.

235.   Mr. Abramson provided this information to DirecTV, who told him that Fati Tech, LLC and PerfectVision Manufacturing, Inc was responsible for the DirecTV account number he received.

236.   Mr. Abramson then canceled the order.

31

237.    Neither DirecTV, Fati Tech, LLC nor PerfectVision Manufacturing, Inc. had prior express written consent to place the call.

### Calls to Mr. Cunningham from Pro Edge Marketing Service LLC

238.    On February 26, 2020, Mr. Cunningham's received an autodialed, prerecorded telephone message on his cellular telephone line, (615) 331-XXXX, a number listed on the National Do Not Call Registry for more than 30 days at the time of the call.

239.    To identify the caller, Mr. Cunningham pressed one during the recorded message to speak with a customer service representative, and purchased a DirecTV subscription so he could receive an order number that would allow him to identify the calling party.

240.    Mr. Cunningham was provided with the following account numbers: DirecTV prerecord account number 303655918, order number DSI22753388.

241.    With this information, Mr. Cunningham has learned that the dealer who placed the call was Pro Edge Marketing Service LLC.

242.    Because he had obtained the account numbers, Mr. Cunningham cancelled his DirecTV purchase.

243.    Neither DirecTV nor Pro Edge had Mr. Cunningham's prior express written consent to call his cell phone via an automatic telephone dialing system or by prerecorded message.

### Calls to David and Roxy Vance from AC1

244.    On June 1, 2018, AC1 made a telemarketing call using an ATDS to David and Roxy Vance's residential cellular telephone line, (304) 637-XXXX, a number that was and long had been listed on the National Do Not Call Registry.

245.     According to AC1's call detail records, this call was answered, and the call disposition was noted in the records as "Not Interested."

246.     On November 29, 2018, AC1 made a second ATDS telemarketing call to Mr. Vance at this same number.

247.     AC1's call records state the call was connected.

248.     AC1 has admitted the calls were placed using a predictive auto-dialer, which meets the TCPA definition of an ATDS.

249.     Neither AC1 nor DirecTV had express written consent to place these calls.

250.     Neither AC1 nor DirecTV had an established business relationship with Mr. Vance.

### Call to Russell Locke from AC1

251.     On November 28, 2018, AC1 made a telemarketing call using an ATDS to Russell Locke's cellular telephone line, (304) 871-XXXX.

252.     AC1's call records state the call was connected.

253.     AC1 has admitted the calls were placed using a predictive auto-dialer, which meets the TCPA definition of an ATDS.

254.     Neither AC1 nor DirecTV had express written consent to place these calls.

### Calls to Thomas Stark from AC1

255.     On November 29, 2018, AC1 made a telemarketing call using an ATDS to Thomas Stark's cellular telephone line, (304) 422-XXXX.

256.     AC1's call records state the call was connected.

257.     AC1 has admitted the calls were placed using a predictive auto-dialer, which meets the TCPA definition of an ATDS.

258.    Neither AC1 nor DirecTV had express written consent to place these calls.

***DirecTV is Vicariously Liable for the Calls***

259.    DirecTV markets and distributes its goods and services through a network of Authorized Dealers.

260.    Each Authorized Dealer is authorized to market DirecTV's products and services using DirecTV's trademarks and trade name.

261.    Likewise, DirecTV allows its Authorized Dealers to hold themselves out to the public as DirecTV.

262.    DirecTV exerts substantial control over the manner and means of its Dealers' telemarketing, including, among other things, providing calling lists, directing the content of the Dealers' advertising, and writing and approving the scripts used to make telemarketing calls.

263.    DirecTV also allows its Authorized Dealers to access proprietary internal computer systems for the purpose of selling DirecTV's products and services.

264.    Further, DirecTV was or should have been aware that the Authorized Dealers were violating the TCPA, but acquiesced to its agents' conduct by consenting or failing to object to those illegal acts.

265.    DirecTV has long known that its Dealers have resorted to illegal telemarketing. The United States government has twice initiated enforcement actions against DirecTV for illegal telemarketing.

266.    On December 12, 2005, the United States filed a Complaint seeking civil penalties and injunctive relief against DirecTV.

267.    The day after the Complaint was filed, the United States and DirecTV announced a settlement (Exhibit 1) that required DirecTV to pay $5,335,000 and agree to:

    a.   Be permanently restrained and enjoined from engaging in violations of the Telemarketing Sales Rule, including, but not limited to, initiating any outbound telephone calls to a person when that person previously has stated to DirecTV that they did not wish to receive an outbound telephone call made by or on behalf of DirecTV.  Exhibit 2 ¶ I(A)(1);

    b.   Be permanently restrained and enjoined from failing to monitor outbound telemarketing campaigns conducted by its authorized dealers. *Id.* ¶ II(D)(1)-(2);

    c.   Be permanently restrained and enjoined from providing any monetary compensation for any telemarketing related sales or activities, including but not limited to hourly rates of pay or commissions, to any authorized dealer after DIRECTV knows or reasonably should have known failed to comply with the Telemarketing Sales Rule. *Id.* ¶ II(E)(ii);

    d.   Cease doing business with any authorized dealer that failed to comply with the Telemarketing Sales Rule. *Id.* ¶ II(F); and to

    e.   Develop a system for receiving and promptly investigating all consumer complaints related to violations by any authorized dealers that have failed to comply with the Telemarketing Sales Rule. *Id.*  ¶ IV(A)-(B).

268.    The 2005 settlement did not stop DirecTV and its Authorized Dealers from engaging in illegal telemarketing practices.

269.    As a result, on April 16, 2009, the United States filed a second complaint against DirecTV.

270.    The allegations made in the 2009 Complaint are substantially the same as the complaints made in the 2005 Complaint.

271.    Shortly thereafter, the United States and DirecTV again announced that they had reached an agreement. (Exhibit 2). This time, DirecTV agreed to pay $2,310,000 and to:

    a.   Be permanently restrained and enjoined from engaging in violations of the Telemarketing Sales Rule, including, but not limited to, initiating any outbound telephone calls to a person when that person previously has stated to DirecTV that they did not wish to receive an outbound telephone call made by or on behalf of DirecTV.  *Id.* at ¶ I(A)(1);

b.   Be permanently restrained and enjoined from initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance. ¶ I(C);

c.   Be permanently restrained and enjoined from failing to monitor outbound telemarketing campaigns conducted by its authorized dealers. *Id.* at ¶ II(D)(1)-(2);|

d.   Be permanently restrained and enjoined from providing any monetary compensation for any telemarketing related sales or activities, including but not limited to hourly rates of pay or commissions, to any authorized dealer after DIRECTV knows or reasonably should have known failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ II(E)(ii);

e.   Cease doing business with any authorized dealer that failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ II(F); and to

f.   Develop a system for receiving and promptly investigating all consumer complaints related to violations by any authorized dealers that have failed to comply with the Telemarketing Sales Rule. *Id.* at ¶ IV(A)-(B).

272.   Again, the enforcement action failed to curb DirecTV's illegal practices.

273.   DirecTV told the government that it could and would stop its Authorized Dealers' illegal telemarketing. But by failing to take effective action to do so, DirecTV impliedly authorized their violations of the TCPA.

**Class Action Allegations**

274.   As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on behalf of all other persons or entities similarly situated throughout the United States.

275.   The classes of persons Plaintiffs propose to represent include:

CLASS 1 (Count One):

All persons within the United States to whom, within the four years prior to the filing of this action, ACI, PerfectVision, IQ, Nas Air, Birju, Pic Six, Mylan Johnson, Xcite Satellite, Exact Estimating, CDS V1, Kreatamotive, Explosive Sales, or Super Sale Outlets (a) placed a call on a cellular telephone line, (b) using equipment that has the capacity to dial numbers automatically without human intervention, (c) on behalf of DirecTV.

CLASS 2 (Count Two):

> All persons within the United States to whom, within the four years prior to the filing of this action, IQ and CDS V1, (a) placed a call on a residential telephone line, (b) using an artificial or prerecorded voice, (c) on behalf of DirecTV.

CLASS 3 (Count Three):

> All persons within the United States (a) whose telephone numbers were listed on the Do Not Call Registry, and (b) to whom AC1 or IQ initiated more than one call within any twelve month period at any time within for years prior to the filing of this action, (c) to promote the sale of DirecTV products or services.

276.    Excluded from the class are the Defendant, any entities in which the Defendant has a controlling interest, the Defendant's agents and employees, any Judge to whom this action is assigned, and any member of the Judge's staff and immediate family.

277.    The proposed class members are identifiable through phone records and phone number databases that will be obtained through discovery.

278.    The potential class members number in the thousands, at least. Individual joinder of these persons is impracticable.

279.    Plaintiffs are members of the classes.

280.    There are questions of law and fact common to Plaintiffs and the proposed class, including but not limited to:

   a.   Whether the calls at issue were placed using an automatic telephone dialing system to send telemarketing calls;

   b.   Whether the calls were placed using an artificial or prerecorded voice to deliver a message;

   c.   Whether the calls were placed without obtaining the recipients' valid prior express written consent;

   d.   Whether the Defendant's agents placed more than one call within a 12-month period to numbers on the Do Not Call Registry;

   e.   Whether the Defendant's conduct was negligent, willful, or knowing; and

f.  Whether the Plaintiffs and the class members are entitled to statutory damages because of the Defendant's actions.

281.    Plaintiffs' claims are based on the same facts and legal theories, and therefore are typical of, the claims of class members.

282.    Plaintiffs are each adequate representatives of the classes because their interests do not conflict with the interests of the classes, they will fairly and adequately protect the interests of the classes, and they are represented by counsel skilled and experienced in class actions, including TCPA class actions.

283.    The actions of the Defendant are applicable to the classes and to Plaintiffs.

284.    Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.  The only individual question concerns identification of class members, which will be ascertainable from call records obtained in discovery and from reliable databases.

285.    The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case, and given the small recoveries available through individual actions.

286.    Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

**Legal Claims**

**Count One:**
**Violation of the TCPA's provisions prohibiting**
**autodialed calls to cell phones**

287.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

288.    The Defendant violated the TCPA, either directly or through the actions of others, by initiating a telephone call to Plaintiffs' cellular telephone lines using an automatic telephone dialing system.  *See* 47 U.S.C. § 227(b)(1)(A).

289.    The Defendant's violations were willful and/or knowing.

**Count Two:**
**Violation of the TCPA's provisions prohibiting**
**prerecorded calls to residential phones**

290.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

291.    The Defendant violated the TCPA, either directly or through the actions of others, by initiating a telephone call to Plaintiffs' residential telephone lines using an artificial or prerecorded voice.  *See* 47 U.S.C. § 227(b)(1)(B).

292.    The Defendant's violations were willful and/or knowing.

**Count Three:**
**Violation of the TCPA's Do Not Call provision**

293.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

294.    The Defendant violated the TCPA, either directly or through the actions of others, by initiating more than one telephone call to the Plaintiff Mey in a twelve-month period while her number was on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c).

295.    The Defendant's violations were willful and/or knowing.

**Relief Sought**

Plaintiffs request the following relief:

A.      That the Court certify the proposed classes;

B.      That the Court appoint Plaintiffs as class representatives;

C.      That the Court appoint the undersigned counsel as counsel for the class;

D.      That the Court enter a judgment permanently enjoining the Defendant from engaging in or relying upon telemarketing, or, alternatively, from engaging in or relying upon telemarketing that violates the TCPA;

E.      That, should the Court permit Defendant to engage in or rely on telemarketing, it enter a judgment requiring it to adopt measures to ensure TCPA compliance, and that the Court retain jurisdiction for a period of six months to ensure that the Defendant complies with those measures;

F.      That the Court enter a judgment awarding any other injunctive relief necessary to ensure the Defendant's compliance with the TCPA;

G.      That Defendant and its agents, or anyone acting on their behalves, be immediately restrained from altering, deleting or destroying any documents or records that could be used to identify class members;

H.      That the Court enter a judgment awarding Plaintiffs and all class members statutory damages of $500 for each negligent violation of the TCPA and $1,500 for each knowing or willful violation;

I.      That the Court enter an order awarding the Plaintiffs reasonable attorneys' fees and costs; and

J.      That the Plaintiffs and all class members be granted other relief as is just and equitable under the circumstances.

**Plaintiffs request a jury trial as to all claims of this Complaint so triable.**

Plaintiffs,
By Counsel,

40

 */s/ John W. Barrett*
John W. Barrett
Jonathan R. Marshall
Sharon F. Iskra
Benjamin Hogan
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV  25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
jmarshall@baileyglasser.com
siskra@baileyglasser.com
bhogan@baileyglasser.com

Anthony Paronich
PARONICH LAW, P.C.
350 Lincoln St., Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
anthony@paronichlaw.com

Edward A. (Ted) Broderick
BRODERICK LAW, P.C.
Boston, MA 02111
Telephone: (617) 738-7080
Ted@Broderick-law.com

Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA  01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

*Counsel for Plaintiff*