## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

### Wheeling Division

DIANA MEY,
CRAIG CUNNINGHAM,
STEWART ABRAMSON,
JAMES SHELTON,
DAVID and ROXY VANCE,
RUSSELL LOCKE, and THOMAS STARK,
individually and on behalf of a class of all
persons and entities similarly situated,
         Plaintiffs,

v.

DIRECTV, LLC,

      Defendant.

Case No.: 5:17-cv-00179-JPB

### DIRECTV LLC's MEMORANDUM IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(2) AND 12(B)(6)

# TABLE OF CONTENTS

**Page**

FACTUAL ALLEGATIONS ........................................................................................ 2

STANDARD ............................................................................................................ 6

ARGUMENT ........................................................................................................... 7

I.     Mey's Claims Must Be Arbitrated. ...................................................................... 7

II.    The Court Lacks Personal Jurisdiction Over The Claims Brought By Cunningham, Abramson, and Shelton. ................................................................ 7

     A.    The Court's Exercise Of Personal Jurisdiction Over DIRECTV Would Be Inconsistent With Due Process ............................................................. 8

          1.    The Court Lacks Specific Jurisdiction Over DIRECTV........................... 9

          2.    The Court Lacks General Jurisdiction Over DIRECTV. ........................ 11

III.   Plaintiffs Have Not Plausibly Alleged That They Received Texts From An ATDS....... 11

     A.    Only Texts From An ATDS Violate The TCPA. ................................................. 11

          1.    Applying The Rules of Grammar to the Statute's Plain Language Shows That Equipment That Only Dials From A List Is Not An ATDS ................................................................................................ 13

          2.    Excluding List-Based Dialing Systems From the Definition of an ATDS is Consistent With the TCPA's Legislative History.................... 17

     B.    Plaintiffs Have Not Plausibly Pled That An ATDS Was Used To Call Them. ................................................................................................................. 18

IV.   In The Alternative, The Court Should Stay This Matter Pending The Supreme Court's Decision In The *Facebook* Case. ....................................................... 19

V.    Plaintiffs' First Two Putative Classes Should Be Stricken............................. 20

CONCLUSION........................................................................................................ 20

i

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACA International v. FCC,*
  885 F.3d 687 (D.C. Cir. 2018) ................................................................13, 17, 18, 20

*Allan v. Pennsylvania Higher Education Assistance Agency,*
  968 F.3d 567 (6th Cir. 2020) ................................................................13, 16

*Am. Int'l Grp. Inc. v. Bank of Am. Corp.,*
  712 F.3d 775 (2d Cir. 2013).................................................................15

*Artis v. D.C.,*
  138 S. Ct. 594 (2018)...........................................................................14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).............................................................................7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..........................................................................7, 20

*Bingham, Ltd. v. United States,*
  724 F.2d 921 (11th Cir. 1984) .............................................................15

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.,*
  137 S.Ct. 1773 (2017)..........................................................................9

*In re Celotex Corp.,*
  124 F.3d 619 (4th Cir. 1997) ................................................................8

*Clinton v. Jones,*
  520 U.S. 681 (1997)............................................................................20

*Combs v. Bakker,*
  886 F.2d 673 (4th Cir. 1989) ................................................................7

*Cyan, Inc. v. Beaver Cnty Emps. Ret. Fund,*
  138 S. Ct. 1061 (2018).........................................................................15

*Daimler AG v. Bauman,*
  571 U.S. 117 (2014)....................................................................8, 10, 12

*Dominguez v. Yahoo Inc.,* 894 F.3d 116, 199 (3rd Cir. 2018)................................13, 16

## TABLE OF AUTHORITIES—continued

**Page(s)**

*Duran v. La Boom Disco Inc.*,
   955 F.3d 279 (2nd Cir. 2020) ................................................................13

*Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*,
   17 F.3d 616 (3d Cir. 1994) ....................................................................15

*ESAB Grp. Inc., v. Centricut Inc.*,
   126 F.3d 617 (4th Cir. 1997) ...................................................................9

*Facebook Inc. v. Duguid: Brief of United States as Respondent Supporting*
   *Petitioner*, 2020 WL 5439453 (Sept. 4, 2020) ......................13, 14, 20, 22

*Farrar v. McFarlane Aviation, Inc.*,
   823 Fed Appx 161 (4th Cir. 2020) ...........................................................8

*Fidrych v. Marriott Int'l Inc.*,
   952 F.3d 124 (4th Cir. 2020) ...................................................................9

*Gadelhak v. AT&T Services, Inc.*,
   950 F.3d 458 (7th Cir. 2020) ..............................................13, 15, 17, 18

*Glasser v. Hilton Grand Vacations Company*,
   948 F.3d 1301 (11th Cir. 2020) ...............................................13, 16, 18

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
   564 U.S. 915 (2011) .................................................................................9

*Grayson v. Anderson*,
   816 F.3d 262 (4th Cir. 2016) ...................................................................7

*Hernandez v. Equifax Info. Servs. LLC*,
   2020 WL 4584249 (W.D.N.C. Aug. 10, 2020) ........................................8

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) .............................................................................8, 9

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
   494 U.S. 827 (1990) ...............................................................................12

*Landis v. N. Am. Co.*,
   299 U.S. 248 (1936) ...............................................................................20

*Lincoln, et al., v. Ford Motor Co.*,
   2020 WL 5820985 (D. Md. Sept. 29, 2020) ...........................................8

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*Malik v. Cabot Oil and Gas Corp.*,
710 Fed. Appx. 561 (3d Cir. 2017) .......................................................................10

*Marks v. Crunch San Diego*,
904 F.3d 1041 (9th Cir. 2018) ...........................................................13, 16, 17, 18

*Mey v. DIRECTV, LLC*,
971 F.3d 284 (4th Cir. 2020) .................................................................................2

*Ohio Valley Env'l Coalition v. Bluestone Coal Corp.*,
2020 WL 5914524 (S.D. W. Va. October 6, 2020) ..............................................20

*Pinkus v. Sirius XM Radio, Inc.*,
319 F. Supp. 3d 938 (N.D. Ill 2018) .....................................................................16

*Puerto Rico v. Franklin California Tax-Free Tr.*,
136 S. Ct. 1938 (2016) ..........................................................................................14

*Ross v. Blake*,
136 S. Ct. 1850 (2016) ..........................................................................................12

*Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp.*,
509 F.3d 216 (5th Cir. 2007) ................................................................................15

*Thompson-Harbach v. USAA Fed. Savings Bank*,
359 F. Supp. 3d 606 (N.D. Iowa 2019)..................................................................16

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439 (1993)...............................................................................................14

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)................................................................................................9

**STATUTES**

47 U.S.C. § 227(a)(1).........................................................................................13, 14

47 U.S.C. § 227(b)(1)(A)......................................................................................6, 19

47 U.S.C. § 227(b)(1)(A)(iii)................................................................................2, 13

47 U.S.C. § 227(b)(1)(B)......................................................................................6, 18

47 U.S.C. § 227(c)(1)-(3)..........................................................................................19

**TABLE OF AUTHORITIES—continued**

**Page(s)**

**OTHER AUTHORITIES**

*The Chicago Manual of Style* § 6.24 (17th ed. 2017) ...................................................................15

*Consumer & Governmental Affairs Bureau Seeks Further Comment on*
    *Interpretation of the Telephone Consumer Protection Act in Light of the Ninth*
    *Circuit's Marks v. Crunch San Diego, LLC Decision* (Oct. 3, 2018), https://
    docs.fcc.gov/public/attachments/DA-1014-18A1.pdf ............................................................18

H.R. Rep. No. 102-317 ...................................................................................................................19

*Hearing Before the Subcomm. of Commc'ns of the S. Comm. On Commerce,*
    *Science, & Transp.*, 102d Cong. 45 (1991)...........................................................................18

*In re Rules and Regulations Implementing the Telephone Consumer Protection*
    *Act of 1991*, 18 FCC Rcd. 14014 (2003) ..............................................................................19

When Defendant DIRECTV, LLC ("DIRECTV") moved to compel the claims of Diana Mey ("Mey") to arbitration, she was the only named plaintiff in this case. But after DIRECTV appealed this Court's denial of its motion (and the case became stayed as to the claims against DIRECTV), Plaintiffs subsequently filed three amended complaints and added seven new named plaintiffs. With one exception, all of the claims of these new plaintiffs must be dismissed.

*First*, Mey herself must proceed with her claims in arbitration, for all the reasons described in DIRECTV's initial motion to compel arbitration (Dkt. No. 15) and in the Fourth Circuit's recent decision on the motion.[1] *Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020).

*Second*, the Court lacks personal jurisdiction over DIRECTV with respect to the claims of Craig Cunningham ("Cunningham"), Stewart Abramson ("Abramson"), and James Shelton ("Shelton"). The claims of these three Plaintiffs arise out of alleged telemarketing calls from third-party retailers authorized to sell DIRECTV service. But neither DIRECTV nor any of those retailers are West Virginia companies. Nor are Cunningham, Abramson, or Shelton residents of West Virginia, and they do not claim they were contacted in West Virginia. Thus, no contacts tie their claims to the forum state, and the Court cannot exercise personal jurisdiction.

*Finally*, the new named plaintiffs David and Roxy Vance ("Vance"), Russell Locke ("Locke"), and Thomas Stark ("Stark") all allege violations of 47 U.S.C. § 227(b)(1)(A)(iii) of the Telephone Consumer Protection Act ("TCPA").[2] That provision of the TCPA, however, only

---

[1] DIRECTV understands that Mey intends to argue that notwithstanding the Fourth Circuit's decision she need not arbitrate her case because she intends to challenge DIRECTV's arbitration clause as unconscionable. The Court has set a schedule for separate briefing on that question and DIRECTV will respond as provided for in that schedule.

[2] Although the Amended Complaint is somewhat ambiguous and they are not referenced in the associated cause of action, the Vances also appear to intend to also allege a do-not-call claim under Count III. Assuming Plaintiffs intended to plead it, that claim is the only claim DIRECTV does not seek to have dismissed.

prohibits calls made to cellular telephone numbers without the consent of the called party if the calls are made using a prerecorded voice or an "automatic telephone dialing system" ("ATDS"). Vance, Locke, and Stark do not allege that they received any calls sent with a prerecorded voice, so they must allege the use of an ATDS to state a claim. But the statutory definition of an ATDS covers only equipment that can generate numbers randomly or sequentially, and nothing in the complaint suggests that the company that allegedly called them (AC1) used that type of equipment.[3]

## FACTUAL ALLEGATIONS

Plaintiffs allege that DIRECTV contracted with certain authorized dealers to sell its services and that the dealers then "receive cash payments for generating new customers for DIRECTV." Third Am. Comp. ¶ 3. Plaintiffs do not allege that DIRECTV expressly authorized these dealers to engage in telemarketing, but instead allege that DIRECTV "turns a blind eye" to such alleged telemarketing. *Id.* at ¶ 5. Each of the named Plaintiffs asserts that he or she received some form of unwanted telemarketing from an authorized dealer selling DIRECTV service, as follows:

**Mey:** Mey claims she resides in West Virginia (*id.* at ¶ 10) and that she received one call from AC1 Communications ("AC1") in August 2017 (*id.* at ¶¶ 31-37), eight calls from IQ Marketing 2 Corp. ("IQ") between August 2017 and February 2018 (*id.* at ¶¶ 38-74), and five calls from Nas Air Logistics LLC ("Nas Air") in July 2018 (*id.* at ¶¶ 75-94). Mey claims that each of the eight calls from IQ used a prerecorded voice. *Id.* at ¶¶ 39, 42, 47, 49, 52, 57, 63, 68. With

---

[3] To the extent Mey's claims are not compelled to arbitration or Cunningham, Abramson and Shelton's claims are not dismissed for lack of jurisdiction, their claims under Count I should also be dismissed for failing to allege the use of an ATDS for any calls that did not involve a prerecorded voice.

respect to the call from AC1, Mey alleges she received "an automated telemarketing call" from what AC1's representatives referred to as an "autodialer." *Id.* at ¶¶ 31, 34-35. Likewise, with respect to the calls from Nas Air, Mey alleges only that she received calls sent using an automated dialing system known as "Vici." *Id.* at ¶ 93. The Amended Complaint contains no details about what the "Vici" system is, how it functions or what capacity it has for generating numbers to be called.

**Locke:** Locke claims he resides in West Virginia (*id.* at ¶ 15) and alleges that he received a single telemarketing call from AC1 in November 2018. *Id.* at ¶¶ 251-54. He does not allege that call utilized a prerecorded voice, but instead claims that the call was "placed using a predictive auto-dialer." *Id.* at ¶ 253.

**Stark:** Stark likewise claims he resides in West Virginia (*id.* at ¶ 16) and received a single telemarketing call from AC1 in November 2018. *Id.* at ¶¶ 255-58. He also alleges that the calls were placed with a predictive autodialer, but does not claim it used a prerecorded voice. *Id.* at ¶ 257.

**Vances:** The Vances also allege that they reside in West Virginia and claim that they received two telemarketing calls from AC1 in June 2018 and in November 2018. *Id.* at ¶¶ 244-50. They assert that the calls were placed with a predictive autodialer, but do not allege those calls used a prerecorded voice message. *Id.* at ¶ 248. Unlike Locke and Stark, the Vances allege their number was on the national do-not-call list. *Id.* at ¶ 244.

**Abramson:** Abramson allegedly resides in Pennsylvania. *Id.* at ¶ 12. He claims he received one telemarketing call each from (i) Xcite Satellite, LLC ("Xcite Satellite") in May 2018 (*id.* at ¶¶ 134-44); (ii) Exact Estimating, LLC ("Exact Estimating") in May 2018 (*id.* at ¶¶ 155-67); (iii) CDS V1, LLC ("CDS V1") in May 2018 (*id.* at ¶¶ 168-83); (iv) Kreatamotive, LLC

3

("Kreatamotive") in July 2018 (*id.* at ¶¶ 184-192); (v) Super Sale Outlets ("Super Sale Outlets") in September 2018 (*id.* at ¶¶ 210-220)); and (vi) Fati Tech LLC ("Fati Tech") (a sub-dealer of PerfectVision Manufacturing Inc. ("Perfectvision")) in August 2019 (*id.* at ¶¶ 230-237). Abramson alleges that only the calls from CDS V1 and Fati Tech used a prerecorded voice. *Id.* at ¶¶ 171, 230. As to the other calls, he claims delays occurred after he picked up the line but before he connected to a representative. Abramson further asserts that delays like this suggest the use of a predictive dialer. *Id.* at ¶¶ 137, 158, 186, 213-14.

**Cunningham:** Cunningham alleges that he resides in Texas. *Id.* at ¶ 11. He claims he received calls from (i) Birju, LLC ("Birju") in May 2018 (*id.* at ¶¶ 97-108); (ii) Pic Six LLC ("Pic Six") in April 2018 (*id.* at ¶¶ 109-120); (iii) the Mylan Johnson Group ("Mylan Johnson") in May 2018 (*id.* at ¶¶ 121-133); (iv) SNY Marketing in November 2019 (*id.* at ¶¶ 145-154); and (v) Pro Edge Marketing Services LLC ("Pro Edge") in February 2020 (*id.* at ¶¶ 238-43). Cunningham alleges that all of the calls he received used a prerecorded voice. *Id.* at ¶¶ 98-100, 110-12, 122-24, 145, 238-39. Like Abramson, he also claims that with the exception of the call from Pro Edge, the calls all had delays when he picked up that he believes are indicative of the use of a predictive dialer. *Id.* at ¶¶ 99, 111, 123.

**Shelton:** Shelton alleges that he resides in Pennsylvania. *Id.* at ¶ 12. He claims that he received (i) a single call from Kreatamotive in June 2018 (*id.* at ¶¶ 193-99); (ii) six calls from Explosive Sales Marketing ("Explosive Sales") in June 2018 (*id.* at ¶¶ 200-209); and (iii) six calls from Clear Home Inc. ("Clear Home") in December 2018 (*id.* at ¶¶ 221-29). Shelton claims that one call from Clear Home and one call from Explosive Sales used a prerecorded voice. *Id.* at ¶¶ 200-01, 221-22. As to the rest of the calls, he alleges that there were delays in connecting him to

a representative that he believes are indicative of the use of a predictive dialer or other automated equipment in placing those calls. *Id.* at ¶¶ 194, 208, 228.

To summarize, Mey, Vance, Locke, and Stark are all allegedly West Virginia residents; Cunningham, Shelton and Abramson are not. Vance, Locke, and Stark all allege that they only received calls from AC1 and none of these Plaintiffs alleged that those calls used a prerecorded voice. In contrast, the calls to Cunningham, two of the calls to Shelton, two of the calls to Abramson, and the six calls from IQ to Mey are all alleged to have used a prerecorded voice. As to the other calls, Plaintiffs claim they were made with autodialers (such as predictive dialers), but provide no information regarding how the equipment used to call them generated their numbers.

**Plaintiffs' Three Counts:** Count I alleges violations of 47 U.S.C. § 227(b)(1)(A), which prohibits the use of a prerecorded voice or an ATDS to call a cellular telephone without the Plaintiff's consent. *Id.* at ¶¶ 287-89. The allegations of this count are made on behalf of all of the Plaintiffs, and presumably Plaintiffs intend the count to cover all of the alleged calls made by each of the alleged retailers. *Id.* at ¶ 288.

Count II alleges violations of 47 U.S.C. § 227(b)(1)(B), which prohibits the use of a prerecorded voice message to call a residential telephone line. *Id.* at ¶¶ 290-92. Although this count is nominally directed at the claims of all the Plaintiffs (*id.* at ¶ 291), only Mey, Cunningham, Abramson, and Shelton allege that they received *any* prerecorded calls at all. *See* discussion *supra.* This count, then, cannot apply to the claims of the other Plaintiffs or to the calls for which Mey, Abramson, and Shelton did not allege they received prerecorded calls.[4]

---

[4] To the extent Count II can be read to apply to those calls that did not reference the use of a prerecorded call, partial dismissal is plainly appropriate as to those calls.

The third count alleges violations of the do-not-call list. *Id.* at ¶¶ 293-95. Notably, this count only expressly alleges violations for calls made to *Mey's* telephone number. *Id.* at ¶ 294. However, because the Vances allege they were on the national do-not-call list (*id.* at ¶ 244), DIRECTV presumes that they intend to proceed under this count as well.

## **STANDARD**

Plaintiff bears the burden of establishing personal jurisdiction over each defendant. *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989). Where, as here, the court addresses jurisdiction at the pleading stage, the plaintiff must "make a prima facie showing of personal jurisdiction to survive the jurisdictional challenge." *Grayson v. Anderson,* 816 F.3d 262, 268 (4th Cir. 2016). While that *prima facie* showing requires the Court to take the allegations and evidence in the light most favorable to plaintiff, it does not relieve plaintiff of its burden to allege sufficient facts to show jurisdiction. *Id.*[5]

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "[A] plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Thus "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

---

[5] At later stages in the proceedings, Plaintiffs must satisfy a preponderance of the evidence standard for personal jurisdiction. *Id.*

## ARGUMENT

### I.     Mey's Claims Must Be Arbitrated.

For all the reasons set forth in DIRECTV's original motion to compel arbitration, Mey's claims are subject to arbitration and she cannot serve as a class representative in this case.

### II.    The Court Lacks Personal Jurisdiction Over The Claims Brought By Cunningham, Abramson, and Shelton.

When a class action involves more than one named plaintiff, *each* plaintiff must show that the Court has jurisdiction over their claims in order to serve as a named plaintiff and bring claims on behalf of a class in the forum. *Hernandez v. Equifax Info. Servs. LLC*, 2020 WL 4584249, at *4 (W.D.N.C. Aug. 10, 2020); *Lincoln, et al., v. Ford Motor Co.,* 2020 WL 5820985, at *5 (D. Md. Sept. 29, 2020). But Cunningham, Abramson, and Shelton cannot show jurisdiction over their claims and thus their claims must be dismissed.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman,* 571 U.S. 117, 125 (2014). Under Fourth Circuit law, the Court may only exercise jurisdiction over a foreign defendant (such as DIRECTV) if (1) jurisdiction is authorized by West Virginia's long-arm statute and (2) application of the West Virginia long-arm statute is consistent with due process. *See Farrar v. McFarlane Aviation, Inc.,* 823 Fed Appx 161, 163 (4th Cir. 2020). However, because West Virginia's long-arm statute is co-extensive with the limits imposed by the Due Process Clause, these two inquiries collapse and the relevant question becomes whether the exercise of jurisdiction complies with due process. *In re Celotex Corp.,* 124 F.3d 619, 627 (4th Cir. 1997). To establish jurisdiction in a manner that complies with due process, a plaintiff must show that the defendant has constitutionally sufficient "minimum contacts" with West Virginia to subject themselves to suit here. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945).

7

A.      **The Court's Exercise Of Personal Jurisdiction Over DIRECTV Would Be Inconsistent With Due Process.**

To satisfy the due process requirement where, as here, the defendant is not physically located in the forum, certain minimum contacts must exist between the nonresident and the state such that maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co.,* 326 U.S. at 316. As explained by the Supreme Court, the minimum contacts requirements for due process has two related, but independent, purposes:

> It protects the defendant against the burden of litigating in a distant or inconvenient forum. And it acts to ensure that the States through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

*World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980). In analyzing the due process limits of personal jurisdiction, a distinction is made between "specific" jurisdiction and "general" jurisdiction, either one of which is an adequate basis for personal jurisdiction, and "the nature and quantity of forum-state contact" differs based on the type of jurisdiction alleged. *See Fidrych v. Marriott Int'l Inc.*, 952 F.3d 124, 131-132 (4th Cir. 2020).

Specific jurisdiction exists when a suit arises out of or is related to a defendant's contacts with the forum state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923-24 (2011), *Fidrych,* 952 F.3d at 132. Thus, "[w]ith respect to specific jurisdiction, the touchstone remains that an out-of-state person [has] engaged in some activity purposefully directed toward the forum state. The contacts related to the cause of action must create a substantial connection with the forum state." *ESAB Grp. Inc.*, *v. Centricut Inc.,* 126 F.3d 617, 625 (4th Cir. 1997) (internal quotations omitted). Moreover, the Supreme Court has made clear that even extensive ties to the state do not suffice to show *specific* jurisdiction when those contacts are not related to the claims of the actual plaintiff. *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.,* 137 S.Ct. 1773, 1781 (2017).

In contrast, only a limited set of activities can lead to general jurisdiction over a corporate defendant. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home" including the corporation's state of incorporation and state of the corporation's principal place of business. *Daimler,* 571 U.S. at 137. Indeed, as the federal courts have subsequently recognized, after *Daimler* it is "incredibly difficult to establish general jurisdiction over a corporation in a forum *other* than the place of incorporation or principal place of business." *Malik v. Cabot Oil and Gas Corp.*, 710 Fed. Appx. 561, 564 (3d Cir. 2017) (internal quotations and citations omitted).

### 1.    The Court Lacks Specific Jurisdiction Over DIRECTV.

Vance, Locke, and Stark allege they received calls while residents of West Virginia.[6] But Cunningham, Abramson, and Shelton are not West Virginia residents, and cannot point to any alleged contacts with the State that permit the exercise of specific jurisdiction.

Plaintiffs' theory of the case is that DIRECTV contracted with a series of independent retailers, who then called the plaintiffs. There are therefore two relevant steps that could lead to the minimum contacts necessary to sustain specific jurisdiction—DIRECTV contracting with the retailers and the retailers calling the Plaintiffs. But with respect to Cunningham, Abramson, and Shelton's claims, nothing in the Complaint suggests that either step has anything to do with West Virginia. None of the companies these three Plaintiffs claim contacted them are located in West Virginia or gave DIRECTV a West Virginia address for their place of business when they signed their agreements, as set forth in the below table:

---

[6] Of course, the Court does not have jurisdiction to adjudicate Mey's claims, which belong in arbitration.  DIRECTV also reserves the right to argue that the claims of other Plaintiffs, named and unnamed belong in arbitration upon discovery of appropriate facts.

| Company | Plaintiff Allegedly Called | State of Incorporation[7] | Address Provided on Contract With[8] DIRECTV |
|---|---|---|---|
| Birju | Cunningham | California | California |
| CDS V1 | Abramson | Arizona | Arizona |
| Clear Home | Shelton | Utah | Utah |
| Exact Estimating | Abramson | New York | New York |
| Explosive Sales | Shelton | Illinois | Illinois |
| Kreatamotive | Shelton, Abramson | Texas | Texas |
| Mylan Johnson Group | Cunningham | Texas | Texas |
| Perfectvision[9] | Abramson, Cunningham | Arkansas | Arkansas |
| Pic Six | Cunningham | Illinois | Illinois |
| Pro Edge Marketing Service | Cunningham | Louisiana | Louisiana |
| Super Sale Outlets | Abramson | New York | New York |
| Xcite Satellite | Abramson | Utah | Utah |

Moreover, even assuming *arguendo* that it is appropriate to attribute the actions of these alleged third-party contractors to DIRECTV—and to be clear, DIRECTV does not concede that is the case—the complaint does not allege facts that link these retailers' calls to West Virginia. To the contrary, none of these three Plaintiffs suffered any alleged injury in West Virginia because

---

[7] *See* Steinmetz Affidavit (Ex. 1), ¶¶ 3-14 and Exs. A-L.

[8] *See* Haley Affidavit (Ex. 2), ¶¶ 6-17 and Exs. A-L.

[9] Plaintiff alleges that Fati Tech and SNY Marketing were hired by Perfectvision, not by DIRECTV itself. Am. Comp. ¶¶ 145, 230.

none of the named Plaintiffs is a West Virginia citizen or alleges they were in West Virginia at the time of the calls. Third Am. Comp. at ¶¶ 11-13.

### 2. The Court Lacks General Jurisdiction Over DIRECTV.

Nor can Plaintiffs show that DIRECTV is subject to general jurisdiction in West Virginia. DIRECTV is a California limited liability company that also has its principal place of business in California. Phillips Decl. (Ex. 3) ¶ 4. Similarly, none of its parent companies are incorporated in or have their principal places of business in West Virginia. *Id.* at ¶¶ 5-6. Thus, it is not subject to jurisdiction under either of the two traditional methods provided for by the "at home" test outlined in *Daimler.* Nor have the Plaintiffs made any other allegations which might show why DIRECTV is at home in West Virginia. To the contrary, Plaintiffs simply allege that DIRECTV regularly "transacts" business nationwide, which is exactly the type of theory of general jurisdiction that was disapproved of by the Supreme Court in *Daimler.* 571 U.S. at 137.

## III. Plaintiffs Have Not Plausibly Alleged That They Received Texts From An ATDS.

To the extent the Court has personal jurisdiction over any Plaintiff's claim under Count I, that Count must be dismissed as to all alleged calls that did not contain a prerecorded voice message. Such non-prerecorded calls only violate the pertinent provision of the TCPA if they were made using an ATDS. But alleging the use of an ATDS requires alleging the use of equipment that is capable of random or sequential number generation. Plaintiffs pled no facts to suggest that is the case here, and instead alleged that they were called using equipment that instead generates numbers from a list— *i.e.*, a predictive dialer.

### A. Only Texts From An ATDS Violate The TCPA.

"Statutory interpretation . . . begins with the text[.]" *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016); *see also Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 835 (1990). The TCPA does not ban all calls to cellular telephones placed without consent—just calls made using

a prerecorded voice or an ATDS. 47 U.S.C. § 227(b)(1)(A)(iii). By statute, an ATDS means equipment that has "the capacity: (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. § 227(a)(1). Thus, "a device constitutes an ATDS if it has the capacity to perform both of two enumerated functions: 'to store or produce telephone numbers, to be called using a random or sequential number generator,' and 'to dial such numbers.'" *ACA International v. FCC*, 885 F.3d 687, 701 (D.C. Cir. 2018).

Critical to the resolution of Count I, then, is whether equipment that dials only from a preexisting list of numbers (such as a list of potential telemarketing targets) can constitute an ATDS. The circuits have split on the question, but the Fourth Circuit has not addressed it. *Compare Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020); *Glasser v. Hilton Grand Vacations Company*, 948 F.3d 1301 (11th Cir. 2020); *Dominguez v. Yahoo Inc.!*, 894 F.3d 116, 199 (3rd Cir. 2018) *with Marks v. Crunch San Diego*, 904 F.3d 1041 (9th Cir. 2018); *Duran v. La Boom Disco Inc.*, 955 F.3d 279, (2nd Cir. 2020); *Allan v. Pennsylvania Higher Education Assistance Agency*, 968 F.3d 567 (6th Cir. 2020). The split hinges on what portion of the definition of an ATDS the phrase "using a random or sequential number generator" modifies—just the verb "produce"; both verbs ("store" and "produce"); or something else entirely. The Supreme Court has resolved to address this circuit split in *Facebook, Inc. v. Duguid*, Case No. 19-511. In the meantime, an analysis of the statute and the relevant opinions shows that the Third, Seventh, and Eleventh Circuits have the better of the argument, that the phrase modifies both verbs, and thus list-based dialing cannot be subject to liability under 47 U.S.C. § 227(b)(1)(A)(iii).[10]

---

[10] In the case currently pending before the Supreme Court, the United States has also taken the position that the Supreme Court should adopt the interpretation of the definition of an ATDS

1.   **Applying The Rules of Grammar to the Statute's Plain Language Shows That Equipment That Only Dials From A List Is Not An ATDS.**

"In determining the meaning of a statutory provision, we look first to its language, giving the words used their ordinary meaning." *Artis v. D.C.*, 138 S. Ct. 594, 603 (2018). Where "the statute's language is plain" the analysis should begin "with the language of the statute itself, and that is also where the inquiry should end." *Puerto Rico v. Franklin California Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016).

Here, the plain meaning of the statute, informed by basic rules of punctuation and grammar, permits only one interpretation. As noted above, the critical language is the TCPA's definition of an ATDS, which covers equipment with the capacity:

> (A) to store or produce telephone numbers to be called, ***using a random or sequential number generator***; and

> (B) to dial such numbers.

47 U.S.C. § 227(a)(1) (emphasis added).

In assessing this language, punctuation matters. The Supreme Court has explained that a statute's meaning "will typically heed the commands of its punctuation." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993). The placement of the comma answers how to interpret the key text—"to store or produce telephone numbers to be called, using a random or sequential number generator." This passage has a parallel structure: two linked verbs ("store ***or*** produce") that share a common object ("numbers to be called"), and a dependent modifier ("using a random or sequential number generator") set off by a comma.

These principles of grammar align with well-established rules of statutory interpretation. The Supreme Court has explained that, when interpreting modifiers set off by commas, "the most

---

promulgated by these three circuits. *See Facebook Inc. v. Duguid: Brief of United States as Respondent Supporting Petitioner,* 2020 WL 5439453 (Sept. 4, 2020).

natural way to view the modifier is as applying to the entire preceding clause." *Cyan, Inc. v. Beaver Cnty Emps. Ret. Fund*, 138 S. Ct. 1061, 1077 (2018). Numerous courts of appeals similarly recognize that the "use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to ***all*** of the previous phrases *and not merely the immediately preceding phrase.*" *Elliot Coal Mining Co. v. Dir., Office of Workers' Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994) (emphasis added); *accord Bingham, Ltd. v. United States*, 724 F.2d 921, 925-26 n.3 (11th Cir. 1984) (same); *see also, e.g., Am. Int'l Grp. Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013) ("When a comma is included . . . the modifier is generally understood to apply to the entire series."); *Sobranes Recovery Pool I, LLC v. Todd & Hughes Const. Corp.*, 509 F.3d 216, 223 (5th Cir. 2007) (when "there is a serial list followed by modifying language that is set off from the last item in the list by a comma, this suggests that the modification applies to the whole list and not only the last item.").

Ordinary principles of style and usage also confirm this point. "When a dependent clause precedes the main, independent clause, it should be followed by a comma." *The Chicago Manual of Style* § 6.24 (17th ed. 2017). Here, the phrase "to store or produce telephone numbers to be called" is dependent on the clause "using a random or sequential number generator," and the term "using a random or sequential number generator" thus modifies the phrase "telephone numbers to be called" (and, by extension, both verbs in the statute, to store and to produce).

The better reasoned appellate decisions have found that to constitute an ATDS, a system must have the capacity to either (i) produce telephone numbers randomly or sequentially on its own, and then dial them, or (ii) store numbers that have been generated randomly or sequentially and then dial them. For example, in *Gadelhak*, Judge Coney Barrett, writing for a unanimous panel, settled on an interpretation under which the phrase "using a random or sequential number

generator" modified both "to store" and "to produce." 950 F.3d at 465, 467-68. Likewise, in *Glasser,* the Eleventh Circuit relied on rules of grammar that state that "[w]hen two conjoined verbs . . . share a direct object . . . a modifier following that object . . . customarily modifies both verbs." 948 F.3d at 1306. Numerous other courts have adopted a similar approach. *See e.g., Dominguez*, 894 F.3d at 121 ("those messages were sent precisely because the prior owner of Dominguez's telephone number had affirmatively opted to receive them, not because of random number generation"); *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 938, 939 (N.D. Ill 2018); *Thompson-Harbach v. USAA Fed. Savings Bank,* 359 F. Supp. 3d 606, 624 (N.D. Iowa 2019).

It is true that some other courts have adopted a more expansive reading of the definition of an ATDS, including the Ninth and Sixth Circuits. Thus, in *Marks* the Ninth Circuit held that the phrase "using a random or sequential number generator" does not modify the verb "store," and instead the ATDS definition encompasses all equipment that has the capacity to store any list of numbers (no matter how the numbers were generated) and then dial them automatically. 904 F.3d at 1051. The Sixth Circuit likewise adopted this approach in *Allan.* 968 F.3d at 574-75.

However "the *Marks* court's decision [is] erroneous as a matter of statutory construction" because it would require "[r]earranging the text" of the statute, *Thompson-Harbach*, 359 F. Supp. 3d at 624, 626, to instead "provide that the term [ATDS] means equipment which has the capacity (1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers." *Marks*, 904 F.3d at 1053. In other words, the Ninth Circuit determined that the "using a random or sequential number generator" modifier should apply only to the numbers that are the object of the second verb "produce," and not the numbers that are the object of the first verb "store." But this approach "asks [the Court] to reorder

15

the sentence to separate 'store' and 'produce' but to clarify that 'telephone numbers' is the object of both. That would be a significant judicial rewrite." *Gadelhak,* 950 F.3d at 466.

Moreover, that expansive construction is impossible to square with the D.C. Circuit's decision invalidating the FCC's interpretation of the ATDS definition in *ACA International*. There, the D.C. Circuit acted on consolidated petitions challenging the validity of several aspects of an omnibus FCC order interpreting the TCPA. Among other things, the D.C. Circuit rejected and "set aside" the FCC's determination that in assessing whether equipment has the "capacity" to "store or produce telephone numbers to be called, using a random or sequential number generator," the "'capacity' of calling equipment 'includes its potential functionalities' or 'future possibility,' not just its 'present ability.'" *ACA Int'l*, 885 F.3d at 695, 703.

The court reasoned that if a device has the "capacity" to be an ATDS based only on potential functionality "that could be added through app downloads and software additions, and if smartphone apps can introduce ATDS functionality into the device, it follows that ***all smartphones***" are an ATDS. *Id*. at 697 (emphasis added). That, in turn, would mean that "every smartphone user violates federal law whenever she makes a call or sends a text message without advance consent." *ACA Int'l*, 885 F.3d at 697.

For that reason, the D.C. Circuit held that the FCC's interpretation of "capacity" was "unreasonably, and impermissibly, expansive"—because "[n]othing in the TCPA countenances concluding that Congress could have contemplated" that the TCPA's restrictions would apply "to the most commonplace phone device used every day by the overwhelming majority of Americans." *Id*. at 699-700. Put simply, as the D.C. Circuit explained, any interpretation of the TCPA that would result in treating smartphones as an ATDS "is utterly unreasonable." *Id*. at 699 (quotation marks and citation omitted). But the *Marks* court's broad interpretation similarly would

16

encompass even the most common smartphones on the market (which—even without modification through the use of "app downloads and software additions" (*ACA Int'l*, 885 F.3d at 696-697)— can readily store numbers to be called in their contact lists and can dial or text those numbers). The *Marks* approach to an ATDS thus gives the statute exactly the "eye-popping" sweep that concerned the D.C. Circuit in *ACA International* and cannot be correct.[11]

### 2.   Excluding List-Based Dialing Systems From the Definition of an ATDS is Consistent With the TCPA's Legislative History

The interpretation of the definition of an ATDS adopted in *Gadelhak* and *Glasser* is also supported by the TCPA's legislative history and the statute's structure.

When Congress first enacted the TCPA, most people used residential telephone landlines, not cellular phones, as their primary form of communication. *See Hearing Before the Subcomm. of Commc'ns of the S. Comm. On Commerce, Science, & Transp.*, 102d Cong. 45 (1991) (statement of Thomas Stroup) (only six million wireless subscribers nationwide in 1991). Congress thus naturally focused on protecting those landline consumers when drafting the law. In addition to the provision prohibiting autodialed calls to cellphones, the TCPA contains two major provisions limiting telemarketing to landlines, both of which some of the Plaintiffs have also sued under. *First*, companies generally cannot make prerecorded marketing calls to residential telephone lines without the express consent of the called party. 47 U.S.C. § 227(b)(1)(B). *Second*, the law establishes the regulatory framework for the national Do-Not-Call list, which provides consumers

---

[11] Indeed, after *Marks* was decided, the FCC issued a public notice pointing out that *ACA International* "held that the TCPA unambiguously foreclosed any interpretation that 'would appear to subject ordinary calls from any conventional smartphone to the Act's coverage.'" Public Notice, *Consumer & Governmental Affairs Bureau Seeks Further Comment on Interpretation of the Telephone Consumer Protection Act in Light of the Ninth Circuit's Marks v. Crunch San Diego, LLC Decision* (Oct. 3, 2018), https://docs.fcc.gov/public/attachments/DA-18-1014A1.pdf, at p. 2.

an opportunity to opt out of non-prerecorded marketing to their residential numbers. 47 U.S.C. § 227(c)(1)-(3).

Congress also recognized that some other types of telecommunications users (such as hospital or emergency lines, pagers, and cellular telephones) posed special problems when reached by a machine using random or sequential number generation. In particular, if those lines were dialed at random, they could be unavailable in an emergency or lead to expensive charges to their users. The House Report on the bill suggests that the concern of tying up lines through random or sequential dialing (and not some broader intention to ban automatic dialing to cell phones) spurred Congress to enact § 227(b)(1)(A):

> In recent years a growing number of telemarketers have begun using automatic dialing systems to increase their number of customer contacts. The Committee record indicates that these systems are used to make millions of calls every day. Each system has the capacity to automatically dial as many as 1,000 phones per day. *Telemarketers often program their systems to dial sequential blocks of telephone numbers, which have included those of emergency and public service organizations, as well as unlisted telephone numbers.*

H.R. Rep. No. 102-317 at 10 (emphasis added).

### B.   Plaintiffs Have Not Plausibly Pled That An ATDS Was Used To Call Them.

Nothing in the Complaint plausibly suggests that any named Plaintiff received calls sent using equipment that can generate numbers randomly or sequentially. To the contrary, with the exception of Mey's claims, Plaintiffs allege only that they received calls involving the use of a "predictive dialer," or generically refer to the use of "automated" equipment. *See* discussion *supra*. A predicative dialer is equipment that dials numbers from a list and times the dialing to ensure representatives are available to take the call. That equipment, however, involves *programming* numbers into the dialer from a list, not generating numbers randomly or sequentially. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd.

14014, 14091 (2003). Indeed, the D.C. Circuit, in concluding the FCC's determination that predictive dialers could be ATDSs did not comply with reasoned rule-making, expressly contrasted predictive dialers with earlier, defunct systems used for telemarketing that could "create and dial" numbers arbitrarily. *ACA International,* 885 F.3d at 702. By alleging that they were called using a predictive dialer, Plaintiffs have pled themselves out of court, since a predictive dialer does not meet the statutory definition of an ATDS.[12]

## IV.    In The Alternative, The Court Should Stay This Matter Pending The Supreme Court's Decision In The *Facebook* Case.

As described *supra,* one of the central questions presented here (whether a system that dials from a list constitutes an ATDS) is currently under review by the Supreme Court. Oral argument is scheduled for early December, and there is no reason to believe a decision will not issue by the end of this Supreme Court term at the latest. Should the Court elect not to dismiss Count I of Plaintiff's complaint at this time, a stay pending the Supreme Court's decision in *Facebook* would best serve judicial economy and the interests of the parties.

A district court has discretionary power to stay proceedings as part of its inherent ability to control its own docket. *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The party requesting the stay "bears the burden of establishing its need." *Clinton v. Jones*, 520 U.S. 681, 708 (1997). In this district, courts generally consider a variety of factors in assessing whether to grant a *Landis* stay, including: "(1) the interests of judicial economy; (2) hardship and equity to the moving party if the action is not stayed; and (3) potential prejudice to the non-moving party." *Ohio Valley Env'l Coalition v. Bluestone Coal Corp.*, 2020 WL 5914524, at *1 (S.D. W. Va. October 6, 2020).

---

[12] Although the merits of her claim are for the arbitrator to decide, Mey's claims relating to the use of ATDS fare no better. Mey alleges that the representatives of the retailers informed her that they were using automated equipment to call her, but without some form of allegation that those systems differ from the predictive dialers used to call other plaintiffs, the allegations are merely conclusory and do not satisfy *Twombly*.

These factors counsel in favor of a stay here. Any prejudice to the plaintiff as a result of a stay is small, given the short time frame before any expected Supreme Court decision. In contrast, the burden on defendant should a stay not be granted would be significant. In the months before the Supreme Court rules, DIRECTV may need to engage in costly class discovery under Plaintiffs' expansive ATDS theory. The burdens are heightened here because DIRECTV has a considerable likelihood of success on the merits. Three circuits have already accepted the interpretation of an ATDS that DIRECTV argues for, and the United States government has urged the Supreme Court to accept that interpretation. *See* discussion *supra* at n. 10.

The Court, too, would benefit from the stay. Should the Supreme Court adopt a different interpretation of the TCPA, the Court would need to decide the same motion twice. That duplication of effort can be easily avoided by simply staying the case. Finally, nothing in the Complaint indicates that there is any substantial interest of a non-party or the public that might justify denying a stay.

**V.      Plaintiffs' First Two Putative Classes Should Be Stricken.**

Plaintiffs seek to represent three putative classes that track the counts of the Amended Complaint. Third Am. Comp. ¶¶ 275. But because all of the claims of the named Plaintiffs under Counts I and II should be dismissed, the classes corresponding to those Counts must be stricken. A class, after all, must have a class representative, and the named Plaintiffs cannot represent a putative class as to which they have no individual claim.

**CONCLUSION**

For the reasons stated above, DIRECTV respectfully requests that the Court enter an order (1) compelling Mey's claims to arbitration, (2) dismissing Cunningham, Abramson, and Shelton's claims for lack of personal jurisdiction, (3) dismissing all of the remaining claims under Count I, and (iv) striking the first two classes alleged in Paragraph 275 of the Amended Complaint. In the

alternative, the Court should stay the case pending the Supreme Court's decision in *Facebook, Inc. v. Duguid,* Case No. 19-511.

/s/ Danielle M. Waltz

Danielle M. Waltz (WVSB #10271)
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Charleston, WV 25301
Telephone: (304) 340-1000
Email: dwaltz@jacksonkelly.com

Hans J. Germann *(admitted pro hac vice)*
Kyle J. Steinmetz *(admitted pro hac vice)*
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Email: hgermann@mayerbrown.com
Email: ksteinmetz@mayerbrown.com

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA

**Wheeling Division**

| | |
|---|---|
| DIANA MEY,<br>CRAIG CUNNINGHAM,<br>STEWART ABRAMSON,<br>JAMES SHELTON,<br>DAVID and ROXY VANCE,<br>RUSSELL LOCKE, and THOMAS STARK,<br>individually and on behalf of a class of all<br>persons and entities similarly situated,<br>         Plaintiffs,<br><br>v.<br><br>DIRECTV, LLC,<br><br>         Defendant. | Case No.: 5:17-cv-00179-JPB |

## <u>CERTIFICATE OF SERVICE</u>

I, Danielle M. Waltz, counsel for Defendant DIRECTV, LLC, hereby certify that on this 23d day of October, 2020, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Danielle M. Waltz</u>

Danielle M. Waltz (WVSB #10271)
JACKSON KELLY PLLC
500 Lee Street East, Suite 1600
Charleston, WV 25301
Telephone: (304) 340-1000
Email: dwaltz@jacksonkelly.com