IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA

**Wheeling Division**

DIANA MEY,
CRAIG CUNNINGHAM,
STEWART ABRAMSON,
JAMES SHELTON,
DAVID and ROXY VANCE,
RUSSELL LOCKE, and
THOMAS STARK, individually
and on behalf of a class of all
persons and entities similarly situated,

     Plaintiffs,

vs.                                   Case No. 5:17-cv-00179-JPB

DIRECTV, LLC,

     Defendant.

## PLAINTIFFS' BRIEF CONCERNING UNCONSCIONABILITY

## **TABLE OF CONTENTS**

**Page**

BACKGROUND ................................................................................................................ 1

ARGUMENT .................................................................................................................... 5

I.    The arbitration contract is unconscionable because it defies consumers' reasonable
      expectations by imposing boundless arbitration obligations. ................................................... 6

      A.  The arbitration contract is procedurally unconscionable because it is a contract of
          adhesion that imposes arbitration obligations that defy ordinary consumers' reasonable
          expectations ................................................................................................................ 6

      B.  The arbitration contract is substantively unconscionable because its terms unduly
          disadvantage consumers ............................................................................................ 9

          1. The arbitration contract has an unreasonably harsh effect on consumers, rendering a
             wide swath of their interactions unexpectedly subject to arbitration. ......................... 10

          2. The arbitration contract is one-sided, imposing different risks on consumers than on
             AT&T Mobility. ...................................................................................................... 14

II.   Mey did not forfeit any unconscionability challenge to AT&T Mobility's arbitration
      contract .......................................................................................................................... 15

CONCLUSION ................................................................................................................ 18

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Applied Business Servs.*,
  2019 WL 7817080 (E.D. Va. Aug. 30, 2019) ........................................................16

*Adams v. AT&T Mobility, LLC*,
  816 F. Supp. 2d 1077 (W.D. Wash. 2011) ...........................................................13

*Allied Chem. Corp. v. Mackay*,
  695 F.2d 854 (5th Cir. 1983) .................................................................................16

*Brinkley v. Harbour Recreation Club*,
  180 F.3d 598 (4th Cir. 1999), *overruled on other grounds by Desert Palace,*
  *Inc. v. Costa*, 539 U.S. 90 (2003) ..........................................................................16

*Brown ex rel. Brown v. Genesis Healthcare Corp.*,
  724 S.E.2d 250 (W. Va. 2011), *cert. granted, judgment vacated sub nom. on*
  *other grounds by Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530
  (2012) ............................................................................................................... *passim*

*Brown v. Genesis Healthcare Corp.*,
  729 S.E.2d 217 (W. Va. 2012) ..............................................................................6, 7

*Bruni v. Didion*,
  160 Cal. App. 4th 1272 (2008) ...........................................................................12, 13

*Clawson v. FedEx Ground Package Sys., Inc.*,
  451 F. Supp. 2d 731 (D. Md. 2006) .......................................................................16

*Collins v. Click Camera & Video, Inc.*,
  621 N.E.2d 1294 (Ohio Ct. App. 1993) .................................................................14

*Cornell v. Council of Unit Owners Hawaiian Vill. Condos., Inc.*,
  983 F. Supp. 640 (D. Md. 1997) ............................................................................18

*Dan Ryan Builders, Inc. v. Nelson*,
  737 S.E.2d 550 (W. Va. 2012) .................................................................................1

*Doctor's Assocs., Inc. v. Casarotto*,
  517 U.S. 681 (1996) .................................................................................................6

*Goodwin v. Branch Banking & Tr. Co.*,
  2017 WL 960028 (S.D.W. Va. Mar. 10, 2017), *aff'd*, 699 F. App'x 274 (4th
  Cir. 2017) ...............................................................................................................11

*Gutierrez v. Autowest, Inc.,*
114 Cal. App. 4th 77 (2003) .................................................................11

*IGEN Int'l v. Roche Diagnostics GmbH,*
335 F.3d 303 (4th Cir. 2003) ...............................................................16

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.,*
847 F. Supp. 2d 1253 (S.D. Cal. 2012)...........................................12, 17

*Levin v. Caviar,*
146 F. Supp. 3d 1146 (N.D. Cal. 2015) ..................................................9

*Macurdy v. Sikov & Love, P.A.,*
894 F.2d 818 (6th Cir. 1990) ...............................................................18

*Mey v. DirecTV,*
LLC, 971 F.3d 284 (2020) .....................................................................3

*Nationstar Mortg., LLC v. West,*
785 S.E.2d 634 (W. Va. 2016)............................................................1, 6

*Nealon v. Stone,*
958 F.2d 584 (4th Cir. 1992) ...............................................................17

*Noye v. Johnson & Johnson,*
2017 WL 5135191 (M.D. Pa. Nov. 6, 2017) ...........................................9

*State ex rel. Ocwen Loan Servicing, LLC v. Webster,*
752 S.E.2d 372 (W. Va. 2013)..............................................................15

*Parada v. Superior Court,*
176 Cal. App. 4th 1554 (2009) .............................................................11

*Phelps v. McClellan,*
30 F.3d 658 (6th Cir. 1994) .................................................................18

*Reading Aviation Serv., Inc. v. Bertolet,*
311 A.2d 628 (Pa. 1973) ......................................................................12

*Revitch v. DirecTV LLC,*
-- F.3d --, 2020 WL 5814095 (9th Cir. Sept. 30, 2020).............................5

*Revitch v. DirecTV, LLC,*
2018 WL 4030550 (N.D. Cal. Aug. 23, 2018), *aff'd,* -- F.3d --, 2020 WL
5814095 (9th Cir. Sept. 30, 2020)..........................................................11

*State ex rel. Richmond Am. Homes v. Sanders,*
717 S.E.2d 909 (W. Va. 2011).......................................................7, 8, 14

*S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins.*,
    353 F.3d 367 (4th Cir. 2003) ..............................................................16

*Sisk v. Abbott Labs*,
    298 F.R.D. 314 (W.D.N.C. 2014) .........................................................18

*Smith v. Steinkamp*,
    318 F.3d 775 (7th Cir. 2003) .........................................................11, 17

*Smith v. Sushka*,
    117 F.3d 965 (6th Cir. 1997) ...............................................................16

*Thompson v. Toll Dublin, LLC*,
    165 Cal. App. 4th 1360 (2008) ............................................................12

*U.S. Home Corp. v. Settlers Crossing, LLC*,
    2015 WL 302816 (D. Md. July 22, 2015)............................................18

*Valued Servs. of Ky., LLC v. Watkins*,
    309 S.W.3d 256 (Ky. Ct. App. 2009) ..................................................12

*Wexler v. AT&T Corp.*,
    211 F. Supp. 3d 500 (E.D.N.Y. 2016) ...........................................12, 17

**Statutes**

9 U.S.C. § 2 .........................................................................................................6

**Other Authorities**

David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639 (2020).........................10

This brief addresses the open question posed by the Fourth Circuit on remand: whether, even if a validly formed arbitration contract exists, and even if the dispute in this case falls within the scope of that contract, compelling arbitration here would nevertheless be unconscionable under West Virginia law.

It would. The arbitration provision DirecTV seeks to enforce is procedurally unconscionable because it is a contract of adhesion with terms that are "beyond the reasonable expectations of an ordinary person," especially a consumer in Plaintiff Diana Mey's circumstances. *Nationstar Mortg., LLC v.* West, 785 S.E.2d 634, 639 (W. Va. 2016) (quotation omitted). No ordinary person would reasonably expect that, simply by entering an arbitration contract with their cell phone provider, they agreed to send to arbitration *any* claim, against *any* future affiliate, agent, or employee, that arose at *any* time. And it's substantively unconscionable too: a large telecommunications company's imposing such terms on individual consumers is grossly imbalanced and overly harsh. *Dan Ryan Builders, Inc. v. Nelson*, 737 S.E.2d 550, 558 (W. Va. 2012). Moreover, this Court isn't barred from reaching these conclusions despite DirecTV's invitation—declined by the Fourth Circuit—to hold the issue forfeited. DirecTV's motion to compel should be denied.

## BACKGROUND[1]

Diana Mey commenced this Telephone Consumer Protection Act action against DirecTV in December 2017, alleging that she had received automated and prerecorded telephone calls from DirecTV dealers despite the fact that her number was listed on the National Do Not Call Registry.

---

[1] This brief assumes the parties' and the Court's familiarity with the background of this case and provides only a brief background.

1

In February 2018, DirecTV moved to compel arbitration. But it didn't argue that Mey had agreed to arbitrate with it directly. Instead, it sought to exploit the fact that in 2012, while adding a new line of service as an authorized user at an AT&T Mobility store, Mey was shown the first page of AT&T Mobility's Wireless Customer Agreement on a pinpad device and signed an acknowledgement page stating the following: "I have reviewed and agree to the rates, terms, and conditions for the wireless products and service described in the Wireless Customer Agreement (including limitation of liability and arbitration provisions) and the Customer Service Summary, both of which were made available to me prior to my signing." Dkt. 15-3 ¶ 7, Ex. 2. The referenced "arbitration provision," reproduced below, was strikingly broad:

> AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:
>
> - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory;
> - claims that arose before this or any prior Agreement (including but not limited to, claims related to advertising);
> - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
> - claims that may arise after the termination of this Agreement.
>
> References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us.

Dkt. 15-2 Ex. 6, Arbitration Agreement § 2.2. DirecTV argued that, because AT&T Mobility's parent company had subsequently acquired *its* parent company (plus a few layers of corporate removal), DirecTV constituted an AT&T Mobility "affiliate[]" within the meaning of the Wireless Customer Agreement.

This Court denied DirecTV's motion, concluding that Mey's TCPA claim did not "fall within the ambit of the arbitration agreement." Dkt. 28 at 11. DirecTV appealed.

In a 2-1 decision, the Fourth Circuit reversed. *See Mey v. DirecTV,* LLC, 971 F.3d 284 (2020). The Fourth Circuit first concluded that Mey's signature on the acknowledgement page of the AT&T Mobility Wireless Customer Agreement was sufficient "to demonstrate her assent" to the arbitration contract, even if she was just an authorized user on an AT&T Mobility account in her husband's name. Slip Op. at 7–8. It then concluded that Mey had formed an agreement to arbitrate with DirecTV because the AT&T Mobility contract provided that "[r]eferences to 'AT&T', 'you,' and 'us'" included its affiliates (among other things). *Id.* at 8–13. Acknowledging that DirecTV was not, in fact, an affiliate of AT&T Mobility when Mey signed the Wireless Customer Agreement acknowledgement page, the Fourth Circuit nevertheless reasoned that the "ordinary meaning" of the term "affiliates" was not limited to affiliates existing at the time the contract was signed. *Id.* Because DirecTV subsequently became one, Mey could be considered to have formed an arbitration contract with it too. *See id.*

Having concluded that Mey had accepted the arbitration contract, and that she had formed that contract with DirecTV, the Fourth Circuit next concluded that the parties' dispute fell within the scope of that contract. *See id.* at 14–19. It noted that, when an arbitration clause provides for the arbitration of disputes "arising out of or related to" the underlying contract, the Fourth Circuit has generally construed such clauses to cover disputes that do not arise under the contract provided that there is a "significant relationship" between the asserted claims and the contract. *Id.* at 15 (first quoting *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 93 (4th Cir. 1996), then quoting *Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001), *overruled on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010)). But that limiting principle wasn't applicable here because the text of this arbitration contract was much broader. For one thing, the provision itself is "much more expansive," covering "**all disputes and claims**

between us." *Id.* at 16–17. And the "categories of claims [the provision] specifically includes" under that banner reinforced a broad reading. *Id.* at 17. For instance, the agreement provides for arbitration of "claims arising out of or relating to any aspect of the relationship between us." *Id.* One aspect of that relationship might be communication about advertising affiliates' products and services—such as DirecTV's. *Id.* at 17–18. Last, the Fourth Circuit pointed to the arbitration agreement's instruction that it be "broadly interpreted." *Id.* at 18. Applying these factors, the Fourth Circuit reasoned that the parties' contract was "susceptible of an interpretation" covering Mey's TCPA claim. *Id.* (quoting *Am. Recovery Corp.*, 96 F.3d at 92).

The Fourth Circuit did pause to note, though, that "construing the broadest language of this arbitration agreement in the abstract could lead to troubling hypothetical scenarios." *Id.* at 18–19. At least as to the scope issue, however, the panel majority thought that problem could be avoided by focusing on the specific question of Mey's TCPA claim.

Finally, the Fourth Circuit noted that this Court had recognized that a construction of the arbitration clause that did "not so limit the scope of the arbitration clause would be unconscionably overbroad." *Id.* at 20. But because this Court did not address the unconscionability issue in further detail, the Fourth Circuit remanded for consideration of that issue in the first instance. At DirecTV's urging, the Fourth Circuit added that this Court could consider whether Mey had waived any unconscionability challenge in the parties' initial briefing on the motion to compel.

Judge Harris dissented. She would have affirmed this Court's ruling on formation grounds: a reasonable person who entered into an arbitration agreement while procuring cell phone service from AT&T Mobility "would have no reason to believe she was signing away her right to sue all corporate entities that might later come under the same corporate umbrella as

4

AT&T Mobility, regardless of whether they were connected in any way to the provision of her cell phone service." *Id.* at 21–22 (Harris, J., dissenting).[2]

Following the Fourth Circuit's mandate, this Court ordered Mey to submit this brief on the unconscionability issue.

## ARGUMENT

As this Court recognized in its initial order on DirecTV's motion to compel arbitration, the arbitration contract in AT&T Mobility's Wireless Customer Agreement is "unconscionably overbroad" if applied without limitation. *See* Dkt. 28 at 14. Now that the Fourth Circuit has concluded that it has such breadth, this Court should conclude that it is unenforceable on this basis. First, it is procedurally unconscionable. No ordinary consumer who is clicking through the take-it-or-leave-it terms and conditions of a cell phone agreement at a retail store on a tiny pinpad reasonably expects she could be compelled to arbitrate disputes against any future corporate affiliate, at any time, without regard to whether that dispute had anything to do with her wireless service. And it is substantively unconscionable, imposing far greater risks of boundless arbitration obligations on consumers than on AT&T Mobility.

This Court should exercise its discretion to address this issue now. Contrary to DirecTV's suggestion before the Fourth Circuit, Mey has not forfeited this argument. There is no element of unfair surprise—or prejudice—weighing against reaching the question.

---

[2] Shortly after the Fourth Circuit's decision, the Ninth Circuit resolved a similar case but reached the exact opposite conclusion. Echoing Judge Harris's reasoning, it expressly broke with the Fourth Circuit on the formation issue. Writing for a 2-judge majority, Judge O'Scannlain reasoned that, absent more explicit, forward-looking language, a similarly situated AT&T Mobility consumer could not reasonably have expected he would be forced to arbitrate an unrelated claim with DirecTV, a satellite TV provider that would not become affiliated with AT&T until years later. *Revitch v. DirecTV LLC*, -- F.3d --, 2020 WL 5814095, at *4–5, 6–7 (9th Cir. Sept. 30, 2020). Accordingly, under California law, the consumer had not formed an arbitration agreement with DirecTV. *See id.*

I.      **The arbitration contract is unconscionable because it defies consumers' reasonable expectations by imposing boundless arbitration obligations.**

Under the Federal Arbitration Act, a provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract" is valid and enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.[3] Unconscionability is one such "generally applicable contract defense[]." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87 (1996). AT&T's arbitration contract—which DirecTV here seeks to exploit—is undoubtedly unenforceable on this basis.

Unconscionability has "two component parts"—"procedural" and "substantive." *Brown v. Genesis Healthcare Corp.*, 729 S.E.2d 217, 227 (W. Va. 2012) ("*Brown II*") (quotation omitted). While a contract term is "unenforceable if it is both procedurally and substantively unconscionable, . . . [b]oth need not be present to the same degree." *Id.* (quotation omitted). Instead, West Virginia courts, like most, apply a "sliding scale"—"the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required" (and vice versa). *Id.* (quotation omitted). Here, the math isn't complicated. Because this contract is both procedurally and substantively unconscionable, it should not be enforced.

A.      **The arbitration contract is procedurally unconscionable because it is a contract of adhesion that imposes arbitration obligations that defy ordinary consumers' reasonable expectations.**

"Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract." *Nationstar Mortg., LLC v. West*, 785 S.E.2d 634, 638 (W. Va. 2016) (quotation omitted). It "often begins with a contract of adhesion,"

---

[3] In light of the Fourth Circuit's limited remand, this brief assumes that Section 2 applies to this dispute. It is worth noting, however, that nothing about Mey's TCPA claim "aris[es] out of" her contract with AT&T Mobility.

that is, an all-or-nothing contract imposed by a stronger party on a weaker one. *Brown II*, 729 S.E.2d at 228. Such contracts must be "closely scrutinized" to determine whether they impose "terms beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable terms." *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 724 S.E.2d 250, 287 (W. Va. 2011) ("*Brown I*"), *cert. granted, judgment vacated sub nom. on other grounds by Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012).[4] AT&T Mobility's arbitration contract flunks this test.

To start, the arbitration contract is indisputably a contract of adhesion that warrants this Court's close scrutiny. The arbitration provision was a "non-negotiable term" that Mey was not permitted to opt out of or alter if she wanted to obtain AT&T Mobility service. *See State ex rel. Richmond Am. Homes v. Sanders*, 717 S.E.2d 909, 920–22 (W. Va. 2011).

And applying that close scrutiny to the circumstances under which AT&T Mobility's adhesive arbitration contract was imposed on Mey shows why it is procedurally unconscionable. *See id.* at 918–19 (explaining that the unconscionability analysis requires examining the fairness of the contract as a whole given "all of the facts and circumstances of a particular case" (quotation omitted)). Consider what the AT&T Mobility transaction looked like from Mey's perspective. AT&T Mobility presented an ordinary wireless consumer—one who was not even an accountholder herself—with a small electronic pinpad device. Dkt. 15-3 ¶ 4. That device displayed a few lines of AT&T's Wireless Customer Agreement at a time. *See* Dkt. 15-3 Ex. 1. Theoretically, Mey could have clicked through each of these screens. Or she could have clicked

---

[4] Although the United States Supreme Court vacated the West Virginia Supreme Court of Appeals's initial decision in *Brown I*, in *Brown II* the West Virginia Supreme Court of Appeals reaffirmed *Brown I*'s outline of West Virginia unconscionability law. *See Brown II*, 729 S.E.2d at 226–29.

a button at the bottom that skipped straight to an acknowledgement screen. Dkt. 15-3 ¶¶ 4–5, Ex. 1. Either way, once there, if she wanted to obtain her line of service, she was required to sign her name under an acknowledgement indicating that she had "reviewed and agree[d]" to the Wireless Customer Agreement terms and conditions, "including limitation of liability and arbitration provisions." Dkt. 15-3 ¶ 5, Ex. 2. And she was then required to click a box marked "I Accept." *Id.* At that point, Mey was now irrevocably locked in to face demands that she arbitrate any dispute arising out of any relationship with virtually any of AT&T Mobility's corporate cousins—a list that could, over time, comprise AT&T Mobility's current competitors, not-yet-created subsidiaries, or—who knows—half the S&P 500.

These circumstances demonstrate that the contract is procedurally unconscionable. *Brown I*, 724 S.E.2d at 287 (explaining that what matters for procedural unconscionability is the degree of party sophistication, the existence of "hidden or unduly complex contract terms," and "the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract"). For one thing, there is a wide gulf between the sophistication of AT&T, a multinational telecommunications conglomerate, and that of each of its customers—not to mention authorized users like Mey, who are unlikely to be familiar with its wireless contracts. *See Sanders*, 717 S.E.2d at 922 (explaining why it is "not credible" that consumers have the same level of sophistication or understanding about an arbitration clause as a national corporation with access to expert full-time legal counsel). AT&T's outsized bargaining position also made any "real and voluntary meeting of the minds" impossible. *See id.* On top of all this, AT&T made no effort to draw consumers' attention to the breadth of the obligations its arbitration contract imposed—none of which an ordinary consumer would have expected.

Of course, the arbitration clause was not *completely* hidden. Mey could have paged through each of who knows how many screens to find it—all the while standing in front of a representative at the point of sale. And at a minimum, the acknowledgement page referred to arbitration. Perhaps, after realizing this much, Mey could have tried to figure out how to page back through the agreement—although the pinpad screen, which provides only options to "decline," "accept," or "clear," does not make it easy to do so. *See* Dkt. 15-3 Ex. 2. Or Mey might have tried to "print" the agreement using a button available on at least its first page. *See* Dkt. 15-3 Ex. 1. But any of these steps would be more difficult to take on a pinpad device that renders ordinary text fine print. *See Brown I*, 724 S.E.2d at 286–87 (noting that "fine print" and "legalese disclaimers" may constitute "sharp or deceptive practices" that serve as a basis for a finding of procedural unconscionability); *see also, e.g.*, *Levin v. Caviar*, 146 F. Supp. 3d 1146, 1150–51, 1158 (N.D. Cal. 2015) (adhesive arbitration contract that depended on consumers to navigate to terms and conditions on webpages was procedurally unconscionable under California law); *but see Noye v. Johnson & Johnson*, 2017 WL 5135191, at *8 (M.D. Pa. Nov. 6, 2017) (opposite conclusion under Michigan law). And, even assuming Mey had tracked down the arbitration provision one way or another, it is unlikely she had a "reasonable opportunity to understand" its breathtaking scope. *Brown I*, 724 S.E.2d at 287. Under West Virginia law, this is textbook procedural unconscionability.

> **B.    The arbitration contract is substantively unconscionable because its terms unduly disadvantage consumers.**

Substantive unconscionability involves "unfairness in the contract itself," as opposed to the circumstances in which the plaintiff entered into it. *Brown I*, 724 S.E.2d at 287. The inquiry focuses on whether a contract term is "one-sided and will have an overly harsh effect on the disadvantaged party"—or is "unreasonably favorable to the more powerful party." *Id.* at 287–88

(quotation omitted). In West Virginia, that means considering such factors as the "commercial reasonableness of the contract terms," their "purpose and effect," the "allocation of the risks between the parties," and "similar public policy concerns." *Brown I*, 724 S.E.2d at 287. Applying these factors, this arbitration contract here is substantively unconscionable.

        1.     **The arbitration contract has an unreasonably harsh effect on consumers, rendering a wide swath of their interactions unexpectedly subject to arbitration.**

First, the contract imposes a harsh and sweeping effect on AT&T Mobility consumers—permanently forcing them into what has been called "infinite" arbitration. *See* David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639 (2020). Its terms are breathtakingly broad. First, as to *when*: it requires the parties to arbitrate at any time, seemingly even decades—or more—after the customer's contract with AT&T Mobility has been terminated. It is just as broad as to with *whom* it requires consumers to arbitrate: any person or entity within AT&T's corporate umbrella, regardless of when that entity joined the fold—or whether a consumer could have any reasonable expectation that it might do so. And it is strikingly broad as to *what* manner of claims it pulls into arbitration. Worse, the scope of these obligations is unknowable, exposing anyone who has ever signed an AT&T Mobility Wireless Service Agreement to the roving, unexpected risk that all manner of disputes with any corporate entity could be sent to arbitration at any time.

Contracts this broad impose unconscionably harsh costs on those forced to sign them. Consider just a few examples of the sorts of obligations AT&T Mobility's arbitration contract imposes. Simply through the ordinary acquisition, merger, and spinoff activities of a large corporation like AT&T, over the course of a decade, a consumer might be required, simply because she had once purchased a short-term cell phone contract, to arbitrate—at least at one point or another—any claim "arising out of or relating to any aspect" of her relationship with

half of the companies in the S&P 500. She might be required to arbitrate disputes arising out of a preexisting relationship—like an intellectual property dispute with a former employer that, "by virtue of an entirely fortuitous event," AT&T happened to acquire. *See Revitch v. DirecTV, LLC*, 2018 WL 4030550, at *11 (N.D. Cal. Aug. 23, 2018), *aff'd*, -- F.3d --, 2020 WL 5814095 (9th Cir. Sept. 30, 2020). Or an unscrupulous company could exploit such clauses to its advantage. As Judge Posner wondered in a similar case involving a contract drafted by a payday lender, what if the lender murdered one of its borrowers "to discourage defaults and her survivors brought a wrongful death suit" against the lender—and then sought to arbitrate a resulting wrongful death suit? *Smith v. Steinkamp*, 318 F.3d 775, 777 (7th Cir. 2003). Or what if an employee of the lender picked the borrower's pocket when she came in to pay back her loan, and the employee insisted on arbitrating a claim for conversion? *See id.* Either way, when arbitration clauses are construed as broadly as the AT&T Mobility's has been here, "absurd results" quickly ensue. *Id.*

But it's not just hypotheticals. This case proves that the contract requires arbitration in outrageously broad and completely unexpected circumstances: no ordinary person confronting AT&T Mobility's contract in 2012 would expect that an arbitration contract contained therein would require her to arbitrate, years later, a dispute with a totally separate company. To be sure, "*arbitration* may be within the reasonable expectations of consumers." *Gutierrez v. Autowest, Inc.*, 114 Cal. App. 4th 77, 90 (2003) (emphasis added). But that doesn't mean consumers are prepared to arbitrate any claim, with anyone, at any time, simply because they once signed an unrelated agreement. Just the opposite: Arbitration contracts containing unusual, unclear, and imbalanced arbitration provisions like those here are not within consumers' reasonable expectations. *See id.* (arbitration process with "prohibitively expensive" consumer fees); *see also, e.g.*, *Parada v. Superior Court*, 176 Cal. App. 4th 1554, 1571 (2009) (consumers obligated

to pay unspecified amounts for three-arbitrator panel); *Goodwin v. Branch Banking & Tr. Co.*, 2017 WL 960028, at *4 (S.D.W. Va. Mar. 10, 2017) (arbitration clause heavily favoring lender), *aff'd*, 699 F. App'x 274 (4th Cir. 2017).

Contracts with effects this sweeping and unpredictable are substantively unconscionable. A contract with no time or space limitation whatsoever is "absurd," and does not accord with an ordinary person's understanding of the obligations they are agreeing to. *See Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 503 (E.D.N.Y. 2016) (noting that it would be an "absurd result[]" if the AT&T Mobility arbitration contract obligated a consumer to arbitrate any claim, against AT&T Mobility or its affiliates, "forever"); *Reading Aviation Serv., Inc. v. Bertolet*, 311 A.2d 628, 629 (Pa. 1973).

The same is true of contracts that obligate parties to arbitrate disputes that have no connection to the underlying relationship or transaction. *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, 847 F. Supp. 2d 1253, 1263 (S.D. Cal. 2012) (noting that an arbitration contract that forced a dispute between a consumer and a franchisee of the contracting corporation, "regarding a tort action arising from a completely separate incident . . . would clearly be unconscionable"); *Valued Servs. of Ky., LLC v. Watkins*, 309 S.W.3d 256, 262 (Ky. Ct. App. 2009) (finding unconscionable an arbitration contract that, like this one, "encompasse[d] an intentional tort with so little connection to the underlying agreement that it could not have been foreseen" by the plaintiff); *see also, e.g.*, *Bruni v. Didion*, 160 Cal. App. 4th 1272, 1294 (2008); *Thompson v. Toll Dublin, LLC*, 165 Cal. App. 4th 1360, 1373 (2008). For instance, in *Bruni*, the California Court of Appeal examined an arbitration contract located in a warranty provided by a homebuilder. 160 Cal. App. 4th at 1294. That contract provided for arbitration of disputes having nothing to do with the warranty, such as disputes arising from the home itself or the buyer's sale of it. *Id.* A

homebuyer might, of course, expect that an arbitration contract found in a warranty would require her to arbitrate *warranty*-related disputes with the homebuilder. But she wouldn't expect that obligation to extend to other contexts—especially when there was no arbitration contract located in any of the documents pertaining to the sale. Under these circumstances, the contract was "unforeseeably broad." *Id.* That made the contract unconscionable. *See id.*

The contract DirecTV seeks to invoke here takes the same problem to a different order of magnitude. This contract is sweeping with respect to duration, counterparty, type of claim, and nature of dispute all at once. That effect can't be justified, at least not by reference to any commercially reasonable purpose. *See Brown I*, 724 S.E.2d at 288 ("The issue of unconscionability is considered in the light of the general commercial background and the commercial needs.") (citation and internal quotation marks omitted). AT&T Mobility has no interest—or at most a vanishingly small one—in the forum in which a onetime wireless customer litigates an entirely unrelated dispute with an affiliate or employee. True, there might be plenty of circumstances in which it would be important to AT&T Mobility that its agents or assigns could benefit from an arbitration contract it had entered with a wireless customer. AT&T might, for instance, have wanted to be able to ensure that subsidiaries servicing its customer accounts could exploit the underlying service agreement's arbitration contracts. *See Adams v. AT&T Mobility, LLC*, 816 F. Supp. 2d 1077, 1080 (W.D. Wash. 2011). But that narrow reasonable purpose provides no justification for extending the costs and benefits of the arbitration agreement to any entity that later became affiliated with AT&T for any reason. As a result, the striking overbreadth of the arbitration contract strongly weighs in favor of a conclusion that it is substantive unconscionable.

**2.    The arbitration contract is one-sided, imposing different risks on consumers than on AT&T Mobility.**

This isn't just an overbroad arbitration contract. It's also one-sided. And one-sided terms with "overly harsh effect[s] on the disadvantaged party" are substantively unconscionable. *Brown I*, 724 S.E.2d at 287 (quoting *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 997 (9th Cir. 2010)); *Sanders*, 717 S.E.2d at 921.

The contract is one-sided for two reasons. First, AT&T has countless agents, employees, affiliates, and other related entities, and will have many more over time, each of which could be entitled to compel the consumer to arbitrate a staggering array of different types of claims at any given moment. *See* Dkt. 15-2 ¶¶ 10–15 (spelling out just part of AT&T's corporate structure). It would be unmanageable for another corporation, let alone an ordinary individual, to keep track of the sheer number of disputes that might be sent to arbitration under this arrangement. In other words, because of the scope and variety of AT&T's corporate cousins, the arbitration contract curtails the extent to which a consumer could ever "accurately predict the extent of future liability." *Collins v. Click Camera & Video, Inc.*, 621 N.E.2d 1294, 1299 (Ohio Ct. App. 1993) (noting that the ability to make such a prediction is one component of whether a contract is commercially reasonable). By contrast, while the arbitration provision applies to a consumer's agents and affiliates too, there are likely to be far fewer.

And second, AT&T has access to far better information about who constitutes one of its agents or affiliates than an ordinary consumer could. Bizarrely enough, it could even keep the goal of limiting—or extending—such arbitration obligations in mind as it managed its corporate relationships.

One-sidedness is not, of course, necessarily substantively unconscionable (although many courts treat it as the "paramount consideration"). *Brown I*, 724 S.E.2d at 287 (quotation omitted);

*see also id.* (explaining that West Virginia has been "loath to adopt a bright-line set of considerations" for evaluating substantive unconscionability). But, "taking into consideration all of the facts and circumstances of [this] particular case," *id.*, the context here points to unconscionability. That is because there is no public policy or business reason for corporations to impose boundless and unpredictable arbitration obligations on consumers with respect to disputes that have nothing to do with the parties' contract. By contrast, for instance, in *State ex rel. Ocwen Loan Servicing, LLC v. Webster*, 752 S.E.2d 372 (W. Va. 2013), the West Virginia Supreme Court of Appeals concluded that an arbitration provision that carved out certain lender-filed claims from arbitration was not substantively unconscionable even though it affected the parties differently. *Id.* at 395–96. In that case, there was a good reason for the different treatment: the claims the agreement permitted the lender to litigate were heavily regulated by statute, and would be resolved in streamlined procedures not unlike arbitration. *See id.* No so here.

Bottom line: Taken together, AT&T's arbitration provision is both procedurally and substantively unconscionable. It is a form contract that imposes disproportionate burdens and risks on consumers who could not reasonably have expected that the terms of their agreement with AT&T would bind them, in perpetuity, to arbitrate claims against an unpredictable and wide-ranging set of entities. DirecTV's motion to compel should be denied.

## II.   Mey did not forfeit any unconscionability challenge to AT&T Mobility's arbitration contract.

DirecTV insisted before the Fourth Circuit, and will no doubt argue here, that Mey forfeited an unconscionability challenge to the arbitration agreement by failing to press one expressly in response to the motion to compel. That is wrong.

A party is not foreclosed from raising issues at a later stage in a proceeding where those issues are relevant and all parties have notice. That is because the doctrine of forfeiture is

designed with only one goal in mind: to ensure that parties cannot spring unexpected arguments on one another, long into discovery or on the eve of trial, to one another's disadvantage. *See Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997). But where an opposing party (and a court) are well aware of a relevant issue and have an opportunity to address it, that concern is absent. *S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins.*, 353 F.3d 367, 373 (4th Cir. 2003) (noting that waiver will not apply unless the failure to raise an argument "resulted in unfair surprise or prejudice"); *Allied Chem. Corp. v. Mackay*, 695 F.2d 854, 855–56 (5th Cir. 1983) (noting that there is nothing inherently "fatal" with a party's raising an argument later in a proceeding); *see also, e.g.*, *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612 (4th Cir. 1999) (explaining that "absent unfair surprise or prejudice," waiver should not apply to bar a particular argument or defense "when it is first raised in a pre-trial dispositive motion"), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). In other words, it is enough for a party to raise the issue at a "pragmatically sufficient time"—such as shortly after the issue first becomes relevant. *See IGEN Int'l v. Roche Diagnostics GmbH*, 335 F.3d 303, 311 (4th Cir. 2003) (quotation omitted).

So it is here. Given that none of these concerns are implicated, this Court can, and should, again consider the contract's unconscionability. For starters, the decision whether to address this question falls entirely within this Court's discretion. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (noting that a district court's decision to consider arguments is "discretionary"); *Smith*, 117 F.3d at 969. And that discretion turns on whether the opposing party would face either unfair prejudice or surprise. *See, e.g.*, *Adams v. Applied Business Servs.*, 2019 WL 7817080, at *1 (E.D. Va. Aug. 30, 2019) (noting that, "[i]n

16

deciding whether to exercise [its] discretion," a court "should consider whether prejudice will result" and whether the opposing party will have "an opportunity to respond").

DirecTV faces neither here. There is no surprise because the issue flows directly from the parties' arguments in their initial briefing on the motion to compel, and the Court noted the issue in its initial order. *See* Dkt. 15 at 11–16; Dkt. 20 at 13–15; Dkt. 28 at 14. DirecTV itself devoted several paragraphs of its briefing in the Fourth Circuit to the topic. *See* DirecTV Br. at 33–35. And in her opposition to the motion to compel, Mey specifically addressed the risk of absurd results flowing from DirecTV's interpretation of the arbitration contract in the course of arguing that her dispute could not fall under any reasonable interpretation of the contract's scope—the very reason why the contract is in fact unconscionable. *See* Dkt. 20 at 13–15; *see also supra* Part I. Indeed, the cases Mey cited in her brief specifically invoked unconscionability as a relevant consideration. *See, e.g.*, *Jiffy Lube*, 847 F. Supp. 2d at 1262–63 (noting that an arbitration clause covering "any and all disputes" would "clearly be unconscionable"). Regardless of whether it might have been "inartfully argu[ed]," *Nealon v. Stone*, 958 F.2d 584, 589 n.3 (4th Cir. 1992), the connection between the two topics was obvious—as this Court's own comment on the subject makes clear. *See* Dkt. 28 at 14.

Nor would DirecTV be prejudiced by the Court's considering the issue now. It would have made no difference to the course of this case if Mey had raised the issue in greater detail sooner. Because questions of contract formation and scope are logically antecedent to those of enforceability, there was no need for this Court to address unconscionability, regardless of the detail with which it had been briefed. Instead, like most of the courts to consider this issue, it could address the contract's extraordinary overbreadth through the threshold inquiries. *See, e.g.*, *Steinkamp*, 318 F.3d at 777–78; *Wexler*, 2016 WL 5678555, at *3. Nor does considering

unconscionability now waste any resources the parties have already spent (or require a new, unanticipated expenditure of resources). There is not, for instance, a need to conduct significant discovery or to delay or reopen a trial. *See Phelps v. McClellan*, 30 F.3d 658, 622–63 (6th Cir. 1994); *U.S. Home Corp. v. Settlers Crossing, LLC*, 2015 WL 302816, at *9 (D. Md. July 22, 2015); *Sisk v. Abbott Labs*, 298 F.R.D. 314, 317 (W.D.N.C. 2014). And Mey didn't delay raising the issue once it became dispositive. *See Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818 (6th Cir. 1990). Because the issue has been raised at a "pragmatically sufficient time," *see Cornell v. Council of Unit Owners Hawaiian Vill. Condos., Inc.*, 983 F. Supp. 640, 643 (D. Md. 1997) (quoting *Charpentier v. Godsil*, 937 F.2d 859, 864 (3d Cir. 1991)), and DirecTV will have an opportunity to respond, this Court should resolve it now.

## CONCLUSION

For the foregoing reasons, DirecTV's motion to compel should be denied.

Date:  November 2, 2020

Plaintiffs,
By Counsel,


 */s/ John W. Barrett*
John W. Barrett (W. Va. Bar No. 7289)
Jonathan R. Marshall (W. Va. Bar No. 10580)
Sharon F. Iskra (W. Va. Bar No. 6582)
Benjamin Hogan (W. Va. Bar No. 12997)
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV  25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
jmarshall@baileyglasser.com
siskra@baileyglasser.com
bhogan@baileyglasser.com

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA**

**Wheeling Division**

**DIANA MEY,
CRAIG CUNNINGHAM,
STEWART ABRAMSON,
JAMES SHELTON,
DAVID and ROXY VANCE,
RUSSELL LOCKE, and
THOMAS STARK, individually
and on behalf of a class of all
persons and entities similarly situated,**

      **Plaintiffs,**

**vs.**                                           **Case No. 5:17-cv-00179-JPB**

**DIRECTV, LLC,**

      **Defendant.**

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd of November 2020, a copy of the foregoing *Plaintiffs'*

*Brief Concerning Unconscionability* was filed using CM/ECF, the Court's electronic notification

system, which provided notice to all counsel of record.

                               */s/ John W. Barrett*
                               John W. Barrett