IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

**DIANA MEY**,
**CRAIG CUNNINGHAM**,
**STEWART ABRAMSON**,
**JAMES SHELTON**,
**DAVID VANCE**,
**ROXY VANCE**,
**RUSSELL LOCKE**, and
**THOMAS STARK**, individually
and on behalf of a class of all
persons and entities similarly situated,

                    Plaintiffs,

          v.                                    Civil Action NO. 5:17-CV-179
                                                Judge Bailey

**DIRECTV, LLC**,

                    Defendant.


## ORDER DENYING MOTION TO COMPEL ARBITRATION

"In 2012, Diana Mey entered into a cell-phone service contract with AT & T Mobility

in which she agreed to arbitrate 'all disputes and claims' with AT & T Mobility and its

'subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and

assigns.'  Three years later, AT & T Inc. – AT & T Mobility's parent company – acquired

DIRECTV, which provides satellite television service, not cell-phone service, and is now

connected to AT & T Mobility only by virtue of their shared corporate ownership."  ***Mey v.***

***DIRECTV, LLC***, 971 F.3d 284, 295 (4th Cir. 2020) (Harris, J., dissenting).

"Some years after that, Mey sued DIRECTV for making unwanted telemarketing calls advertising its satellite television service.  DIRECTV moved to compel arbitration.  It did not claim that Mey ever had been a DIRECTV customer, or had signed any contract with DIRECTV containing an arbitration clause.  Instead, DIRECTV relied on Mey's 2012 cell-phone service agreement with AT & T Mobility, arguing that once DIRECTV became a corporate 'affiliate' of AT & T Mobility in 2015, that agreement bound Mey to arbitrate 'all disputes and claims' against DIRECTV, as well."  *Id.*

Pending before this Court is Defendant DIRECTV, LLC's Motion to Compel Arbitration and to Stay Litigation and Supporting Memorandum of Law [Doc. 15],[1] filed February 16, 2018.  By Order entered April 25, 2018, this Court denied the motion to compel arbitration [Doc. 28].  DIRECTV appealed to the United States Court of Appeals for the Fourth Circuit, which by opinion filed August 7, 2020, vacated this Court's decision and remanded the case to this Court.  *See Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020). In its decision, the Fourth Circuit noted this Court had recognized that a construction of the arbitration clause that did "not so limit the scope of the arbitration clause would be unconscionably overbroad."  *Id*. at 295.  But because this Court did not address the unconscionability issue in further detail, the Fourth Circuit remanded for consideration of that issue in the first instance.  At DIRECTV's urging, the Fourth Circuit added that this Court could consider whether Mey had waived any unconscionability challenge in the parties' initial briefing on the motion to compel.

---

[1] Also pending is DIRECTV, LLC's Partial Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6) [Doc. 183], which will be addressed in a separate opinion.

DIRECTV argues that the plaintiffs have waived the issue. This Court cannot agree. A party is not foreclosed from raising issues at a later stage in a proceeding where those issues are relevant and all parties have notice. That is because the doctrine of forfeiture is designed with only one goal in mind: to ensure that parties cannot spring unexpected arguments on one another, long into discovery or on the eve of trial, to one another's disadvantage. *See Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997); *Peterson v. Air Line Pilots Ass'n, Int'l*, 759 F.2d 1161, 1164 (4th Cir. 1985). The decision whether to address this question falls entirely within this Court's discretion. *See Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) (noting that a district court's decision to consider arguments is "discretionary").

"When a party could have raised an argument in his initial appeal, and failed to do so, he has generally waived his right to raise that argument on remand or on appeal from remand." *Labor Relations Div. of Constr. Indus. of Mass, Inc. v. Teamsters Local 379*, 156 F.3d 13, 17 (1st Cir. 1998).

But that principle does not extend to appellees. "[A]ppellate courts should not enforce the [waiver] rule punitively against appellees, because that would motivate appellees to raise every possible alternative ground and to file every conceivable protective cross-appeal, thereby needlessly increasing the scope and complexity of initial appeals." *Kessler v. Nat'l Enters., Inc.*, 203 F.3d 1058, 1059 (8th Cir. 2000). *See also Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 740 (D.C. Cir. 1995) ("[F]orcing appellees to put forth every conceivable alternative ground for affirmance might increase the complexity and scope of appeals more than it would streamline the progress of the litigation.").

3

Section 2 of the Federal Arbitration Act provides that:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration **a controversy thereafter arising out of such contract or transaction**, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).

The statutory phrase "arising out of such contract" has been broadened to provide applicability when the claim has "a significant relationship to the contract" or "at least 'touch matters' related to [it]."  David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 652 (2020) (citing *Jones v. Halliburton Co.*, 583 F.3d 228, 235 (5th Cir. 2009) and *Snyder v. CACH, LLC*, 2016 WL 6662675, at *11, n.13 (D. Haw. Nov. 10, 2016)).

"Shortly after the dawn of the new millennium, arbitration clauses metastasized.  For one, companies stopped confining their provisions to claims that 'arose out of or related to' the container contract.  For example, when AT&T acquired Cingular and formed Mobility--an entity that boasts almost 147,000,000 customers--it revamped its arbitration clause to cover 'all disputes and claims.' Sprint soon followed suit, changing its 70,000,000 arbitration provisions to cover 'ANY (we really mean ANY) disagreements.'"  *Id.* at 657 (footnotes omitted).

4

Professor Horton calls arbitration clauses such as the one in the present case "infinite" arbitration agreements.  According to Horton:

> Infinite arbitration clauses exhibit one or more of the following characteristics. First, they are "not limited to disputes arising from or related to the transaction or contract at issue."  For instance, Wells Fargo's customers agree to arbitrate "[*a]ny* unresolved disagreement," and Steiner's arbitration clause covers "*all* disputes, claims or controversies *whatsoever*."  Thus, infinite provisions attempt to govern conduct that has nothing to do with the original transaction, such as sexual harassment after the purchase of household goods or "a punch in the nose during a dispute over medical billing."  Second, infinite clauses extend beyond the original contractual partners.  Like Mobility's Customer Agreement--which applies to the parties' "subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users"-- infinite clauses govern all persons or entities with a connection to the container contract.  Third, infinite provisions have no sunset date.  Although the common law condemns perpetual contracts, infinite clauses "survive the closing of [an] account or termination of any service."
>
>       *      *      *
>
> They are less a contractual provision and more a kind of arbitration servitude.

*Id.* at 639–40 (footnotes omitted).

According to Professor Horton:

Section 2, the FAA's centerpiece, instructs courts to enforce a provision "in any ... contract ... to settle by arbitration a controversy ***thereafter arising out of such contract***." Thus, the statute imposes what I call the "contractual nexus" requirement: it only governs disputes that are tied to in some meaningful way to the parties' agreement.

This boundary was no accident. Congress modeled the FAA on New York's pioneering 1920 arbitration statute. However, New York's version of § 2 applied across the board to any lawsuit "arising *between the parties* to the contract." In contrast, federal lawmakers chose to narrow the FAA to cases that were tethered to the container contract. Likewise, one draft of the FAA applied to any controversies that were merely grounded in the parties' general "transaction[s]." Yet Congress ultimately deleted this phrase, reinforcing the necessity of a contractual nexus. Therefore, because the FAA's vigorous pro-arbitration policies often do not apply to ultra-broad arbitration clauses, courts can continue to find that they are unconscionable, construe them against the drafter, or hold that they exceed a person's reasonable expectations.

*Id.* at 643 (footnotes omitted).

Focusing on the issue of unconscionability, it is clear that the issue is to be decided under West Virginia law. Whether a contract is valid and enforceable is governed by the contract formation and interpretation principles of the forum state. ***Goodwin v. Branch***

*Banking & Trust Co.*, 2017 WL 960028, at *2 (S.D. W.Va. Mar. 10, 2017) (Berger, J) (citing *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569 (4th Cir. 1998)).

"Under West Virginia law, a contract provision that is unconscionable is unenforceable. 'West Virginia's traditional unconscionability doctrine ... requires a showing of both substantive unconscionability, or unfairness in the contract itself, and procedural unconscionability, or unfairness in the bargaining process.' *McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 277 (4th Cir. 2016) (citing *Brown v. Genesis Healthcare Corp.*, 229 W.Va. 382, [386,] 729 S.E.2d 217, 221 (2012) [("*Brown II*")]). 'To be unenforceable, a contract term must—at least in some small measure—be both procedurally and substantively unconscionable.' *Dan Ryan Builders, Inc. v. Nelson*, 230 W.Va. 281, [289,] 737 S.E.2d 550, 558 (2012) (internal quotation marks omitted). 'However, both need not be present to the same degree. Courts should apply a "sliding scale" in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable.' *State ex rel. Richmond Am. Homes of W.Va., Inc. v. Sanders*, 228 W.Va. 125, [136,] 717 S.E.2d 909, 920 (2011)." *Goodwin v. Branch Banking & Trust Co.*, 699 F. App'x 274, 275–76 (4th Cir. 2017).

"'[A] determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract.' *Quicken Loans, Inc. v. Brown*, 230 W.Va. 306, [323,] 737 S.E.2d 640, 657 (2012) (internal quotation marks omitted). The foundation for a claim of unconscionability is 'gross inadequacy in bargaining

power combined with terms unreasonably favorable to the stronger party.' *State ex rel. AT&T Mobility, LLC v. Wilson*, 226 W.Va. 572, [578,] 703 S.E.2d 543, 549 (2010) (internal quotation marks omitted). 'Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.' *Brown*, 729 S.E.2d at 391." *Goodwin*, 699 F. App'x at 275–76.

"In West Virginia, unconscionability provides a defense against enforcement of a contract. An 'overall and gross imbalance, one-sidedness or lop-sidedness' may support a finding of unconscionability, 'taking into consideration all of the facts and circumstances of a particular case.' Syl. Pt. 4, *Brown v. Genesis Healthcare Corp.*, [229 W.Va. 382,] 729 S.E.2d 217, 220–22 (2012). Factors include 'the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract.' *Id.* at Syl. Pt. 6 (internal quotation marks and citations omitted). The party challenging a contract provision for unconscionability bears the burden of proof on that issue. *Nationstar Mortg., LLC v. West*, 237 W.Va. 84, [88,] 785 S.E.2d 634, 638 (2016) (citing *Brown* [*ex rel. Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 724 S.E.2d 250, 284 (2011) ("*Brown I*")]); *U.S. ex rel. TBI Investments, Inc. v. BrooAlexa, LLC*, 119 F. Supp. 3d 512, 528 (S.D. W.Va. 2015) (Johnston, J.) (same)." *Goodwin*, 2017 WL 960028, at *2.

"Furthermore, the West Virginia Supreme Court cautioned courts to scrutinize contracts of adhesion carefully, particularly to the extent they include provisions that would deter enforcement and vindication of rights, protections, relief, and remedies otherwise

8

available under the law. [*Brown II*,] at Syl. Pt. 13. 'A contract of adhesion should receive greater scrutiny than a contract with bargained-for terms to determine if it imposes terms that are oppressive, unconscionable or beyond the reasonable expectations of an ordinary person.' *Id.* at Syl. Pt. 11." *Id.* at *3.

"However, 'finding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not.' *State ex rel. Ocwen Loan Servicing, LLC v. Webster*, [232 W.Va. 341, 358,] 752 S.E.2d 372, 389 (2013) (quoting from *State ex rel. Dunlap v. Berger*, [211 W.Va. 549, 557,] 567 S.E.2d 265, 273 (2002)). As discussed above, West Virginia precedent requires that both procedural and substantive unconscionability be present, but not necessarily to the same degree. Courts must consider all circumstances to appropriately weigh whether a contract provision is so unconscionable that it cannot be enforced." *Id.* at *4.

"Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract." Syl. Pt. 10, *Brown II*.

"Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party.  The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement.  Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns."  Syl. Pt. 12, *Brown II*.

"There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement."  Syl. Pt. 3, *Dan Ryan Builders, Inc. v. Nelson*, 230 W.Va. 281, 737 S.E.2d 550 (2012) (quoting Syl. Pt. 5, *Virginian Export Coal Co. v. Rowland Land Co.*, 100 W.Va. 559, 131 S.E. 253 (1926)).  As stated another way,  "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) (citing *Am. Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 92 (4th Cir. 1996)) (in turn quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).

Whether a contract is unconscionable is an issue to be decided by the Court.  Syl. Pt. 7, *Brown II* ("'Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court.' Syllabus Point 1, *Troy Mining Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986).").

Turning to the contract at issue in this case, this Court finds the same to be procedurally unconscionable.  It is clearly a contract of adhesion.  In terms of

sophistication, there is a huge imbalance between the AT&T conglomerate and Ms. Mey. Ms. Mey may be somewhat knowledgeable as to the TCPA, but there is no reason to believe that she has expertise in arbitration clauses.

Furthermore, the arbitration provision was a "non-negotiable term" that Mey was not permitted to opt out of or alter if she wanted to obtain AT&T Mobility service. *See State ex rel. Richmond Am. Homes v. Sanders*, 228 W.Va. 125, 136–38, 717 S.E.2d 909, 920–22 (2011).

AT&T Mobility presented an ordinary wireless consumer—one who was not even an account holder herself—with a small electronic pinpad device, which displayed a few lines of AT&T's Wireless Customer Agreement at a time.  Theoretically, Ms. Mey could have clicked through each of these screens, or she could have clicked a button at the bottom that skipped straight to an acknowledgment screen.  Once at the acknowledgment screen, if she wanted to obtain her line of service, she was required to sign her name under an acknowledgment indicating that she had "reviewed and agree[d]" to the Wireless Customer Agreement terms and conditions, "including limitation of liability and arbitration provisions."  She was then required to click a box marked "I Accept."  At that point, Ms. Mey was now irrevocably locked in to face demands that she arbitrate any dispute arising out of any relationship with virtually any of AT&T Mobility's corporate cousins—a list that could, over time, comprise AT&T Mobility's current competitors or not-yet created subsidiaries.

"'Generally speaking, there are two judicially imposed limitations on the enforcement of adhesion contracts or provisions thereof.  The first is that such a contract or provision which does not fall within the reasonable expectations of the weaker or "adhering" party will not be enforced against him.  The second—a principle of equity applicable to all

11

contracts generally—is that a contract or provision, even if consistent with the reasonable expectations of the parties, will be denied enforcement if, considered in its context, is unduly oppressive or "unconscionable."'  Subsequent cases have referred to both the 'reasonable expectations' and the 'oppressive' limitations as being aspects of unconscionability." *Thompson v. Toll Dublin, LLC*, 165 Cal. App. 4th 1360, 1372, 81 Cal. Rptr. 3d 736, 745 (2008) (citations omitted).

Turning to the substantive aspect of unconscionability, this Court finds that the contract is unconscionable as well.   In determining the issue, West Virginia courts "examine whether 'it imposes terms beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable terms.'" *Nationstar Mortg., LLC v. West*, 237 W.Va. 84, 89, 785 S.E.2d 634, 639 (2016) (quoting *Brown I*, 228 W.Va. at 683, 724 S.E.2d at 287 (citation omitted)).

With regard to adhesion contracts, "customers do not in fact ordinarily understand or even read the standard terms.  They trust to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated.  But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose." *Id.*  (quoting *State ex rel. Dunlap v. Berger*, 211 W.Va. 549, 558, 567 S.E.2d 265, 274 (2002)).

Customers, having been informed that the contract contains an arbitration clause, would rationally expect that the agreement required the arbitration of any issues related to that contract.

12

As Judge Harris noted in her dissent in *Mey*, "[a] reasonable person would have no reason to understand 'affiliate' as referring to any entity under common ownership with AT & T Mobility, at any time and for any reason.  Instead, she quite reasonably would assume that this term covered entities related to AT & T Mobility by virtue of their participation, in some way, in the provision of service under the contract she was signing."   *Mey v. DIRECTV, LLC*, 971 F.3d 284, 298 (4th Cir. 2020) (Harris, J., dissenting) (citing *Revitch v. DirecTV*, LLC, 2018 WL 4030550, at \*12–13 (N.D. Cal. Aug. 23, 2018)).

Later in her dissent, Judge Harris reiterated that "[n]o reasonable person procuring cell-phone service from AT & T Mobility and reading the attendant arbitration clause would understand 'affiliate' to include any and all future corporate cousins, as yet unidentifiable, and regardless of whether their relationship with AT & T Mobility would have anything to do with the provision of services under her cell-phone contract."  *Mey*, 971 F.3d at 303.

Again, Judge Harris stressed that "under those ordinary state-law standards, no reasonable AT & T Mobility customer would believe, on signing her arbitration agreement, that she was consenting to arbitrate not only with AT & T Mobility but also, and for all time, with any entity that ever might share a corporate umbrella with AT & T Mobility.  Arbitration is, foundationally, 'a matter of consent,' *Granite Rock*, 561 U.S. at 299, and we may not foist arbitration on a party who has not agreed to it under cover of a presumption."  *Id*. at 304–05.

As noted in *Wexler v. AT & T Corp.*, 211 F.Supp.3d 500 (E.D. N.Y. 2016), construing the same arbitration provision:

Notwithstanding the literal meaning of the clause's language, no reasonable person would think that checking a box accepting the "terms and conditions" necessary to obtain cell phone service would obligate them to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT & T Inc.'s corporate umbrella—including those who provide services unrelated to cell phone coverage. Rather, a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement with Mobility. As explained above, Wexler's claims are not so connected. If a company wishes to bind its costumers to something broader, it must take steps to secure something that a reasonable person would understand as an objective expression of his or her agreement.

Whether framed in terms of unconscionability or contract formation, the end result is the same: the arbitration clause is not enforced.

*Wexler*, 211 F.Supp.3d at 504–05.

The absurdity of the breadth of the contract at issue is demonstrated by the suggestion that a unhappy customer first call Mobility's customer service department. "It would make little sense for an AT & T Mobility customer to call AT & T Mobility's customer service department to ask for help regarding, for example, a wrongful death claim against an employee of DIRECTV – a 'corporate cousin[ ] at least seven times removed,' *Mey v. DirecTV, LLC*, No. 5:17-CV-179, 2018 WL 7823097, at *5 (N.D. W.Va. Apr. 25, 2018) [(Bailey, J.)]. And the process the contract sets out for initiating arbitration reinforces that

14

notion.  Section 2.2, which contains the text of the arbitration provision set forth above, also directs '[a] party who intends to seek arbitration' to send 'by certified mail, a written Notice of Dispute ... addressed to: Office for Dispute Resolution, AT & T, 1025 Lenox Park Blvd., Atlanta, GA 30319.'  It would similarly defy logic for an AT & T Mobility customer to send AT & T Mobility a notice that they intend to bring a claim against, for example, HBO – another corporate cousin – for employment discrimination."   *Mey*, 971 F.3d at 299 (Harris, J., dissenting).

In addition, the arbitration provision provides that if the customer were to prevail, Mobility would pay the attorney fees.  To whom does a customer look—Mobility, which had nothing to do with the issues being arbitrated, or DIRECTV, which is not a party to the arbitration provision?

Furthermore, "[i]f a court, as a matter of law, finds a contract or any clause of a contract to be unconscionable, the court may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause, or limit the application of any unconscionable clause to avoid any unconscionable result." Syl. Pt. 8, *Brown II*, 229 W.Va. 382, 729 S.E.2d 217.  In a case like this, can the judge void the Mobility contract?  If the underlying contract is no longer in effect, there is no contract to refuse to enforce or to sever from.

"Given the boundless scope of the arbitration clause in question, construing 'affiliate' to cover entities like DIRECTV would lead to results so absurd that no reasonable  person could  have  intended  or  anticipated  that  they  would  follow  from  her  cell-phone  service agreement. *See Revitch*, 2018 WL 4030550, at *13; *see also, e.g., D'Annunzio v.*

*Security-Connecticut Life Ins. Co.*, 186 W.Va. 39, 410 S.E.2d 275, 276 Syl. Pt. 2 (1991) (contracts 'should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties')." *Mey*, 971 F.3d at 301–02 (Harris, J., dissenting).

Another factor which this Court has considered is the inequality or lack of real mutuality of the contract. An individual who wanted to take a dispute with an AT & T affiliate to arbitration, as if that would ever happen, would have no way of knowing that the affiliate is subject to an arbitration provision.

This Court is aware of only three other cases that have considered the breadth of the AT & T arbitration provision - two of which were decided after the Fourth Circuit's decision in this case. In all three decisions, the courts refused to enforce the arbitration provision.

The first is *Wexler v. AT & T Corp.*, 211 F.Supp.3d 500 (E.D. N.Y. 2016). In *Wexler*, the Court noted that:

> Mobility's arbitration clause is strikingly broad in two respects. Wexler focuses on the fact that the clause purports to require arbitration of claims against third parties affiliated with Mobility. But it is also unusually broad as to the subject matter it purports to cover. Even agreements traditionally classified as "broad" because they cover all disputes "arising out of" or "relating to" the underlying agreement evidences only the parties' intent "to have arbitration serve as the primary recourse **for disputes connected to the agreement containing the clause**." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 225 (2d Cir.2001)

16

(emphasis added).   Mobility's clause, by contrast, is not limited to disputes concerning its service agreement.

There is, in fact, almost no case law addressing such broad arbitration clauses.   In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), the Supreme Court dealt with the same clause at issue in this case, but the breadth of the clause was not discussed.   Rather, the Court held that a rule of California contract law deeming class-action waivers unconscionable in certain circumstances was preempted by the FAA.   *See id.* at 344 ("Requiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA.").

In *In re Jiffy Lube International, Inc., Text Spam Litigation*, 847 F.Supp.2d 1253 (S.D. Cal. 2012), the district court acknowledged *Concepcion*, but nevertheless concluded that an arbitration clause covering "any and all disputes" "would clearly be unconscionable." *Id.* at 1263.   It cited *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003), in which Judge Posner noted the "absurd results" that would follow from an arbitration clause not tethered to an underlying agreement:

> [I]f Instant Cash murdered Smith in order to discourage defaults
> and her survivors brought a wrongful death suit against Instant
> Cash..., Instant Cash could insist that the wrongful death claim
> be submitted to arbitration.   For that matter, if an employee of
> Instant Cash picked Smith's pocket when she came in to pay

> back the loan, and Smith sued the employee for conversion, he
> would be entitled to arbitration of her claim. It would make no
> difference that the conversion had occurred in Smith's home 20
> years after her last transaction with Instant Cash.

*Id*. at 777. He opined that such results "might be thought unconscionable," *id*. at 778, but did not have to address that issue because the agreement was susceptible of a construction limiting "the duty to arbitrate to disputes arising under 'this Agreement.'" *Id*. at 777.

As far as the parties' and the Court's own research has revealed, *Jiffy Lube* is the only case squarely addressing an arbitration clause as broad as Mobility's. The Court agrees with its colleague in the Southern District of California that such clauses are cause for concern. And the same absurd results that Judge Posner posited would apply here. If Wexler were hit by a Mobility delivery van, or if she tripped over a dangerous condition in a Mobility store, her tort claim would have to go to arbitration. If she bought shares of stock in Mobility and later claimed a decrease in share price was the result of corporate malfeasance, her securities-fraud claim would have to go to arbitration. And since the arbitration clause purports to survive termination of the underlying service agreement, this obligation to arbitrate any claim whatsoever against Mobility would last forever. In fact, the absurd results are even more absurd than those posited in *Jiffy Lube* because the clause would

18

not just cover disputes with Mobility, but would also include any dispute with any of Mobility's affiliates.

AT & T objects that these hypothetical scenarios go far beyond the actual claim in this case. But as in **Steinkamp**, nothing in the arbitration clause itself makes any distinction based on the type of claim involved. *See* 318 F.3d at 777 ("The defendants' lawyer blanched when confronted with such hypothetical cases at oral argument but was unable to suggest a limiting principle.").

    \*   \*   \*

Although the Court shares the concerns voiced in **Jiffy Lube**, holding that Mobility's arbitration clause is unconscionably broad would be in tension with **Concepcion**. The Court concludes instead that an arbitration clause that is unlimited in scope presents a question of contract formation.

**Wexler**, 211 F.Supp.3d at 502–04.

The next case to consider the Mobility arbitration provision is **Revitch v. DIRECTV**, 977 F.3d 713 (9th Cir. 2020), decided the month after the Fourth Circuit's decision in this case. The Ninth Circuit stated that:

we rely on the "written terms alone" when the "contract language is clear and explicit and **does not lead to absurd results**." **Kashmiri**, 67 Cal. Rptr. 3d at 652 (emphasis added). Here, absurd results follow from DIRECTV's preferred interpretation: Under this reading, Revitch would be forced to arbitrate any dispute with any corporate entity that happens to be acquired by

AT&T, Inc., even if neither the entity nor the dispute has anything to do with providing wireless services to Revitch—and even if the entity becomes an affiliate years or even decades in the future.  The Eastern District of New York, addressing a similar set of facts in *Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 504 (E.D.N.Y. 2016), concluded that "no reasonable person would think that checking a box accepting the 'terms and conditions' necessary to obtain cell phone service would obligate them [sic] to arbitrate literally every possible dispute he or she might have with the service provider, let alone all of the affiliates under AT&T Inc.'s corporate umbrella—including those who provide services unrelated to cell phone coverage."  We agree.

"[W]e look to the reasonable expectation of the parties at the time of contract."  *Kashmiri*, 67 Cal. Rptr. 3d at 652.  We also may explain a contract "by reference to the circumstances under which it was made, and the matter to which it relates."  Cal. Civ. Code § 1647.  Here, when Revitch signed his wireless services agreement with AT&T Mobility so that he could obtain cell phone services, he could not reasonably have expected that he would be forced to arbitrate an unrelated dispute with DIRECTV, a satellite television provider that would not become affiliated with AT&T until years later.  Accordingly, we are satisfied that a valid agreement to arbitrate between Revitch and DIRECTV does not exist.

*Revitch*, 977 F.3d at 717–18.

The Court added that "[c]ontrary to the dissent's characterization, our conclusion that DIRECTV's preferred interpretation of the contract is absurd has nothing to do with the relative merits of arbitration compared to litigation.  Dissent at 727–28.  We are merely following the Supreme Court's command that 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).  Interpreting Revitch's agreement to arbitrate a dispute with AT&T Mobility as a consent to arbitrate any and all disputes with unknown corporate entities to be acquired by AT&T, Inc. years in the future is undoubtedly absurd.   We are not persuaded by the dissent's argument that the absurd-results canon is inapplicable in this extreme case." *Revitch*, 977 F.3d at 719, n.3.

In making a decision contrary to the decision in this case, the Ninth Circuit obviously considered and rejected the Fourth Circuit decision:

We are aware that the Fourth Circuit, considering a recent case presenting facts and issues substantially similar to those presented here (including, most pertinently, an arbitration clause identical to that signed by Revitch), has arrived at the opposite conclusion.  *See Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020).  Moreover, we are aware that with our decision today, we are opening a circuit split on this difficult issue: Can anything less than the most explicit "infinite language" in a consumer services agreement bind the consumer to arbitrate any and all disputes with (yet-unknown) corporate entities that might later become affiliated with the service provider—even

when neither the entity nor the dispute bear any material relation to the services provided under the initial agreement? *See* David Horton, ***Infinite Arbitration Clauses***, 168 U. Pa. L. Rev. 633, 670–78 (2020).

      Much of the Fourth Circuit's reasoning in ***Mey*** tracks that of the dissent here, and as such is already addressed in our foregoing analysis. There is, however, one particular point in the ***Mey*** opinion which does merit additional attention. Namely, the majority in ***Mey*** contends that in evaluating the soundness of DIRECTV's preferred interpretation of the arbitration clause, it would be inappropriate for a court to consider the "troubling hypothetical scenarios" to which such an interpretation could give rise. 971 F.3d at 293–95. For that contention, the Fourth Circuit relies on ***Parm v. Bluestem Brands, Inc.***, 898 F.3d 869, 878 (8th Cir. 2018), which it characterizes as "rejecting interpretation by hypothetical in favor of looking 'to the underlying factual allegations'" in the case at bar, ***Mey***, 971 F.3d at 294. But we understand ***Parm*** to stand for a narrower proposition, and one that is ultimately inapposite here.

***Revitch***, 977 F.3d at 719–20.

      The "hypotheticals merely serve to bolster our conclusion that the parties' intention—based on their reasonable expectations at the time of contract—was not to form an arbitration agreement of the kind that DIRECTV would now have us read into the contract." ***Id.*** at 721.

The most recent case which this Court has seen examining the Mobility provision is *Thomas v. Cricket Wireless, LLC*, 2020 WL 7260532 (N.D. Cal. Dec. 10, 2020), in which the Court held that the scope of the Mobility arbitration provision is "inoperably broad and thereby unconscionable." *Thomas*, 2020 WL 7260532, at *7.

Judge Alsup explained that:

As at least one other court has observed, the scope of AT&T Mobility's arbitration agreement is "unusually broad as to the subject matter it purports to cover. Even agreements traditionally classified as 'broad' because they cover all disputes 'arising out of' or 'relating to' the underlying agreement evidences only the parties' intent 'to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause.'" *Wexler*, 211 F.Supp.3d at 502 (citation omitted) (emphasis in original). AT&T Mobility's arbitration provision, however, is not just limited to disputes concerning its wireless services agreement. Instead, it goes further and purports to cover "all disputes and claims" between Waters and Mobility's affiliates, no matter how unrelated those claims are to the wireless services agreements Waters signed with Mobility in 2018 and 2019. Cricket is not even coy about the overbreadth of the Mobility's arbitration provision. In fact, it contends that the arbitration agreements Waters signed "require arbitration of 'all disputes and claims,' with no exceptions" . . . .

But as the undersigned noted in *Esparza* [*v. SmartPay Leasing, Inc.*, 2017 WL 4390182 (N.D. Cal. Oct. 3, 2017) (Alsup, J)], reading an arbitration provision as applying to any and every claim between the parties, "even

including employment and tort claims, with no limiting principle would render the clause impermissibly broad, and therefore inoperable." 2017 WL 4390182, at *3. Similarly, in *In re Jiffy Lube*, Judge Miller refused to enforce the defendant's "incredibly broad" arbitration clause, which provided "that any and all disputes, controversies or claims...will be resolved by mandatory arbitration." 847 F.Supp.2d at 1262. There, the plaintiff had signed an oil change contract that contained said arbitration provision. Thereafter, the plaintiff happened to join an unrelated putative class action against the defendant for unsolicited and mass marketed text messages in violation of the TCPA. The defendant tried to compel arbitration of the plaintiff's TCPA claim based on the arbitration provision contained within the oil change contract. Judge Miller observed that the language of the arbitration agreement was "not limited to disputes arising from or related to the transaction or contract at issue" and that the defendant had not identified a single decision "involving an arbitration agreement that is so unlimited[.]" *Ibid*.

.    .    .

As Judge Miller noted, "a suit by [the plaintiff] against [the defendant] regarding a tort action arising from a completely separate incident could not be forced into arbitration — such a clause would clearly be unconscionable." *Id*. at 1262–63.

*Thomas*, 2020 WL 7260532, at *10–11.

Finally, *Thomas* dismissed any concern that finding a provision such as the Mobility arbitration provision would violate *Conception*:

24

Lastly, Cricket states, without elaborating, that the undersigned's language in *Esparza*, as well as a finding herein that AT&T Mobility's arbitration provision is unconscionable would be in tension with the Supreme Court's decision in *AT&T Mobility LLC v. Conception*, 563 U.S. 333 [(2011)]. This order disagrees. Though it appears that *Conception* involved Mobility's same broad arbitration clause, its scope was not at issue. *See id.* at 336. Rather, the issue there was whether or not the FAA preempted the California Supreme Court's decision in *Discover Bank v. Superior Court*, 36 Cal.4th 148 (1005), which had held that class waivers in consumer arbitration agreements were unconscionable under a certain set of conditions. The Supreme Court found the FAA did preempt the rule elucidated in *Discover Bank* because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 352 (citation and quotation omitted). It noted that Section 2 of the FAA "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as...unconscionability, but not by defenses that apply only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue." *Id.* at 339 (citation and quotation omitted). Thus, to the extent Cricket argues that *Conception* stands for the proposition that an arbitration provision cannot be deemed unenforceable based on state unconscionability law, it is incorrect. The general doctrine of unconscionability, unlike the arbitration-specific rule in *Discover Bank*, does not derive its meaning from

the fact that an agreement to arbitrate is at issue.  Rather, it applies to all contracts, not just agreements to arbitrate.

In short, *Conception* did not disrupt the Supreme Court's longstanding principle that "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" Section 2 of the FAA.  *Dr. Associates, Inc. v. Casarotto*, 517 U.S. 681, 682 (1996).

*Thomas*, 2020 WL 7260532, at *12–13.

This Court agrees with the preceding authorities.  The Mobility arbitration provision is overbroad, absurd and unconscionable, and far exceeds anything contemplated by Congress in enacting the FAA.

Based upon all of the foregoing, this Court finds that the arbitration provision in the Mobility agreement is unconscionably broad.  Defendant DIRECTV, LLC's Motion to Compel Arbitration and to Stay Litigation and Supporting Memorandum of Law [**Doc. 15**] is **DENIED**.[2]

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: February 12, 2021.

JOHN PRESTON BAILEY
**UNITED STATES DISTRICT JUDGE**

---

[2] In light of the recent decisions in *Revitch* and *Thomas* and in light of the limitations of § 2 of the FAA and Judge Harris' excellent dissent, the undersigned would respectfully urge that the Fourth Circuit should revisit its prior decision.