IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF WEST VIRGINIA

Wheeling Division

**DIANA MEY,**
**DAVID and ROXY VANCE,**
**RUSSELL LOCKE, and**
**THOMAS STARK, individually**
**and on behalf of a class of all**
**persons and entities similarly situated,**

    Plaintiffs,

vs.                                                                        Case No. 5:17-cv-00179-JPB

**DIRECTV, LLC,**

    Defendant.

## FOURTH AMENDED CLASS ACTION COMPLAINT

### I. PRELIMINARY STATEMENT

1.     For years, Defendant DirecTV has benefited from satellite television subscription sales generated by authorized dealers who use illegal telemarketing to sell subscriptions, while DirecTV turns a blind eye to their activities and attempts to avoid legal accountability based on self-serving independent-contractor clauses in its dealer contracts.

2.     Twice DirecTV entered into agreements with the Federal Trade Commission to settle illegal telemarketing claims, and twice DirecTV promised the FTC it would evaluate, monitor, investigate, terminate, and otherwise control its dealers to ensure compliance with federal telemarketing laws.

3.     DirecTV has not lived up to these promises. And consequently, a now-defunct southeastern Ohio "Preferred Dealer" called AC1 has violated the Telephone Consumer Protection Act hundreds of thousands of times on DirecTV's behalf.

4.  DirecTV allowed these violations on its behalf to occur even though AC1's founder had for years worked for another DirecTV dealer that used illegal telemarketing. Even worse, DirecTV allowed AC1 to continue selling DirecTV on its behalf *for more than a year* after learning AC1 was using illegal telemarketing to sell DirecTV.

5.  Because DirecTV failed to act, AC1 continued to violate the law to sell DirecTV, sending hundreds of thousands of illegal calls, "spoofed" on the recipient's caller ID to appear that the calls were local calls, to marketing targets like the Plaintiffs – including those who had opted out of receiving telemarketing calls by listing their numbers on the National Do Not Call Registry.

6.  This case, which Plaintiffs bring as a class action for violations of the TCPA, demonstrates the importance of private consumer enforcement actions to hold entities like DirecTV responsible for illegal telemarketing under established legal principles of vicarious liability.

7.  Vicarious liability is an essential feature of the privacy-protecting provisions of the TCPA. Under applicable law, a seller like DirecTV is not shielded from liability simply because *others* violate the law on its behalf and for its benefit. This is so in part because the dealers and lead-generators that place illegal calls often are judgment proof and difficult to identify, and sellers like DirecTV are best positioned to monitor and control their activities. Under these circumstances, and in service of protecting consumers from the nuisance of unwanted telemarketing, liability is imputed to the more reputable and more financially solvent sellers – here, DirecTV.

## II.  PARTIES

8.  Plaintiff Diana Mey resides in Wheeling, West Virginia, in this District.

9. Plaintiffs David and Roxy Vance reside in Beverly, West Virginia, in this District.

10. Plaintiff Russell Locke resides in Jane Lew, West Virginia, in this District.

11. Plaintiff Thomas Stark resides in Weston, West Virginia, in this District.

12. Defendant DirecTV, LLC is a California limited liability company that transacts business throughout the United States, including in this District.

### III. JURISDICTION & VENUE

13. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227 et seq. because this action alleges violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq*.

14. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim—namely, the calls to the Plaintiffs—occurred in this District.

### IV. STATUTORY BACKGROUND

15. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

16. Perhaps the most well-known aspect of the TCPA was the creation of the National Do Not Call Registry. By adding a telephone number to the Registry, a consumer indicates her desire not to receive telephone solicitations. *See* 47 C.F.R. § 64.1200(c)(2).

17. The TCPA and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

18. The TCPA also makes it unlawful to make calls to cellular telephone lines using an "automatic telephone dialing system . . ." without the call recipient's prior express written consent. *See* 47 U.S.C. § 227(b)(1)(A) & (B); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 27 F.C.C. Rcd. 1830, 1844 (2012).

19. Because allowing an entity "to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions," the FCC has consistently held that a corporation or other entity "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling"). *See also Krakauer v. Dish Network, L.L.C.,* 925 F.3d 643, 659-661 (4th Cir. 2019) (affirming class certification and jury finding that Dish Network was vicariously liable for violations of federal do-not-call law committed by its dealer).

20. As the Court of Appeals has recognized, the TCPA's "simple and administrable" provisions, the "obvious attempt [by Congress] to vindicate the public interest" through the statute's private enforcement provisions, and the overarching congressional intent "to allow consumers to bring their claims at modest personal expense" all combine to "make TCPA claims amenable to class action resolution." *Id.* at 663.

## V.  FACTUAL ALLEGATIONS

**A.  DirecTV has a history of illegal telemarketing, and at least twice assured the FTC it would monitor and control its authorized dealers.**

21. DirecTV has long known that its dealers have used illegal telemarketing to generate business and profits for DirecTV.

4

22. The United States government has twice initiated enforcement actions against DirecTV for illegal telemarketing.

23. On December 12, 2005, the United States filed a complaint seeking civil penalties and injunctive relief against DirecTV. The next day, the United States and DirecTV announced a settlement that required DirecTV to pay over $5.3 million — and on behalf of itself, and its agents and telemarketers — agree not to engage in illegal telemarketing of the kind alleged in this action.

24. The 2005 settlement did not stop DirecTV and those acting on its behalf from violating the law.

25. As a result, on April 16, 2009, the United States filed a second complaint against DirecTV. Shortly thereafter, the United States and DirecTV announced a second settlement agreement, this time agreeing to pay more than $2.3 million, and agree to similar terms as those outlined above.

26. These settlements not only demonstrate that DirecTV *can* undertake a host of obligations to monitor, investigate, terminate, and otherwise control those who sell DirecTV, but also that it promised the FTC it would do so.

**B. AC1 becomes a DirecTV authorized dealer, and immediately begins to telemarket.**

27. In June 2017, DirecTV contracted via a "Preferred Dealer Agreement" with AC1 Communications. Its principal was Adam Cox.

28. The contract authorized AC1:

  a. to hold itself out to the public to promote, market, advertise, and take orders for the sale of DirecTV subscriptions;

  b. to access DirecTV on-line confidential ordering and payment systems; and

5

  c. to obtain log-in credentials so that AC1 could access DirecTV's proprietary training and product information.

29. The contract gave DirecTV the right to revoke AC1's authority to market on its behalf for violations of the contract, for violations of federal law, and for other transgressions.

30. Before founding AC1, Mr. Cox was a salesman for a DirecTV dealer called North Kentucky Satellites, which used telemarketing to sell DirecTV, despite contracts with DirecTV that purported to forbid telemarketing.

31. Mr. Cox also knew that other dealers were using telemarketing to generate business for DirecTV, despite contractual provisions that purported to forbid telemarketing.

**C. AC1 begins placing calls to sell DirecTV using an ATDS.**

32. Almost immediately after contracting with DirecTV, Mr. Cox and AC1 began making sales through telemarketing.

33. AC1 purchased a bulk list of consumer phone numbers from a list company.

34. None of the consumers on this list consented to receive calls from DirecTV or AC1.

35. AC1 then contracted with XenCALL, a telecommunications company that authorizes telemarketers like AC1 to deploy mass telemarketing campaigns using its dialing platform (the "XenCALL Dialer"),

36. The XenCALL Dialer would allow AC1 to make thousands of telemarketing calls to the persons on any list that AC1 uploaded to it, using a predictive dialer function.

37. A predictive dialer is a device that dials stored phone numbers in a random or sequential order, automatically, and then transfers only calls that are answered by a consumer by predicting when a sales representative is available.

38. Each business morning the AC1 sales manager would load a file of phone numbers to the XenCALL Dialer through the internet.

39. The XenCALL Dialer contained a default setting called "All Leads." Under this setting, the XenCALL Dialer would assess the uploaded leads and store the numbers so that they were called automatically according to the following sequence: (1) numbers not called previously were called first, and (2) numbers called the fewest times were called next.

40. This function demonstrates that the XenCALL Dialer had the capacity to store numbers using a sequential number generator, and to then dial such numbers, thus meeting the definition of ATDS. *See Facebook, Inc. v. Duguid,* 141 S. Ct. 1163, 1167 (2021).

41. The XenCALL Dialer is not a "trigger" or "login notification" system of the sort that was alleged to violate the TCPA in *Facebook*. 141 S. Ct. at 1168, 1170 (describing allegations that Facebook "programm[ed] its equipment to send automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser."). The calls AC1 made to the Plaintiffs were not triggered by any action on their parts. They were simply cold-called via the XenCALL Dialer by AC1, on DirecTV's behalf.

42. The XenCALL Dialer also included a function that allowed AC1 to disguise the number from which the Dialer was actually calling on behalf of AC1 and DirecTV. This feature-known as "spoofing" causes a fictitious number to appear on a consumer's caller identification screen.[1]

---

[1] Spoofing is illegal. The Truth in Caller ID Act of 2009 makes it "unlawful for any person within the United States, in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value." 42 U.S.C. § 227(e)(1).

**D.      Plaintiff Diana Mey receives calls and commences this action, giving DirecTV actual notice of AC1's telemarketing.**

43.     On August 12, 2017, just months after AC1 became an authorized dealer, AC1 made an automated telemarketing call via the XenCALL dialer to Ms. Mey's cellular telephone line, (304) 242-XXXX, a number that had been listed on the National Do Not Call Registry for more than 31 days prior to the calls at issue.

44.     When Ms. Mey answered the call, a sales representative began reading a scripted pitch for DirecTV goods and services.

45.     The caller eventually identified himself as a representative of AC1, which is located in Kentucky.

46.     The area code of the phone number appearing on Ms. Mey's caller identification screen, however, was from West Virginia, making it look like the call was local.

47.     When Ms. Mey asked why the call appeared to be from a West Virginia area code, the caller claimed that was the number programmed into "the dialer."

48.     Upon further inquiry from Ms. Mey, the caller admitted the call had been made using an autodialer.

49.     The call to Ms. Mey was "spoofed" to disguise origin of the call.

50.     Ms. Mey never gave AC1 or DirecTV consent to call her cellular phone using an autodialer.

51.     Before filing this lawsuit, Ms. Mey wrote to AC1 and its owner, Adam Cox, and reported that she had received an illegal telemarketing call from AC1 in violation of the TCPA. In response, AC1 admitted making the call, but offered no evidence of consent.

52.     Ms. Mey commenced this action on December 11, 2017.

53.     DirecTV was served with the original complaint on January 9, 2018.

**E.     Despite actual notice that AC1 was using telemarketing, DirecTV allowed AC1 to continue selling DirecTV, which led to more illegal telemarketing to the Plaintiffs and class members.**

54.    Even though Ms. Mey's lawsuit advised DirecTV of AC1's purportedly unauthorized telemarketing, DirecTV did nothing to stop AC1 from continuing to telemarket to sell DirecTV until it finally terminated AC1 on January 19, 2019, more than one year after DirecTV was served with this lawsuit.

55.    By allowing AC1 to continue to telemarket in violation of the TCPA and the DirecTV-AC1 contract, DirecTV ratified and approved of AC1's conduct, and continued to benefit from the DirecTV subscriptions that AC1 acquired through its unauthorized and illegal telemarketing.

56.    Moreover, DirecTV broke its promises to the FTC that it (a) would monitor the marketing practices of authorized dealers such as AC1 to ensure they were not telemarketing in violation of the TCPA and DirecTV's agreement with the FTC, (b) investigate all complaints, and (c) would take action and stop doing business with any authorized retailer that did not comply.

57.    Consequently, DirecTV's actions and inactions allowed AC1 to make hundreds of thousands of illegal telemarketing calls on behalf of DirecTV.

*AC1 places illegal calls to David and Roxy Vance
in June and November of 2018*

58.    On June 1, 2018, AC1 made a telemarketing call using an ATDS (the XenCALL Dialer) to David and Roxy Vance's residential cellular telephone line, (304) 637-XXXX, a number that was and had long been listed on the National Do Not Call Registry.

59.    According to AC1's call detail records, this call was answered, and the call disposition was noted in the records as "not interested."

60. On November 29, 2018, AC1 made a second ATDS telemarketing call using the XenCALL Dialer to Mr. Vance at this same number.

61. AC1's call records state the call was connected.

62. AC1 has admitted the calls were placed using a predictive auto-dialer, which meets the TCPA definition of an ATDS.

63. Neither AC1 nor DirecTV had express written consent to place these calls.

64. Neither AC1 nor DirecTV had an established business relationship with Mr. Vance.

*AC1 places an illegal call to Plaintiff*
*Russell Locke in November 2018*

65. On November 28, 2018, AC1 made a telemarketing call using an ATDS (the XenCALL Dialer) to Russell Locke's cellular telephone line, (304) 871-XXXX.

66. AC1's call records state the call was connected.

67. AC1 has admitted the calls were placed using a predictive auto-dialer, which meets the TCPA definition of an ATDS.

68. Neither AC1 nor DirecTV had express written consent to place these calls.

*AC1 places an illegal call to Thomas Stark*
*in November 2018*

69. On November 29, 2018, AC1 made a telemarketing call using an ATDS (the XenCALL Dialer) to Thomas Stark's cellular telephone line, (304) 422-XXXX.

70. AC1's call records state the call was connected.

71. AC1 has admitted the calls were placed using a predictive auto-dialer, which meets the TCPA definition of an ATDS.

72. Neither AC1 nor DirecTV had express written consent to place these calls.

**F.    DirecTV is vicariously liable for illegal telemarketing calls made on its behalf by AC1 to Plaintiffs and class members.**

73.    Under the terms of its Preferred Dealer Agreement, and by its conduct, DirecTV is vicariously liable for all calls placed by AC1 to Plaintiffs and class members.

74.    All calls were placed by AC1 on behalf of DirecTV.

75.    AC1 was authorized to market DirecTV's products and services using DirecTV's trademarks and trade name.

76.    DirecTV allowed AC1 to hold itself out the public as authorized to sell DirecTV's goods and services.

77.    DirecTV trained AC1 and supported its marketing efforts financially and with supervisory support.

78.    DirecTV allowed AC1 to access proprietary internal computer systems for the purpose of selling DirecTV's products and services.

79.    DirecTV required AC1 to conduct customer service inquiries and satisfaction surveys.

80.    At all times, DirecTV had the power to control the marketing conduct and practices of AC1 and simply chose not to.

81.    At all times, DirecTV had unfettered authority to require that AC1 act in compliance with its Preferred Dealer Agreement and applicable law.

82.    By virtue of its 2005 and 2009 agreements with the FTC, DirecTV represented that it was capable of and would evaluate, monitor, investigate, terminate, and otherwise control its dealers' (including AC1's) telemarketing practices to ensure compliance with federal telemarketing laws.

83. DirecTV failed to do so, and as a result, Plaintiffs and all class members received illegal telemarketing calls from AC1 on DirecTV's behalf.

## VI. CLASS ACTION ALLEGATIONS

84. As authorized by Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on behalf of all other persons or entities similarly situated throughout the United States.

85. The classes of persons Plaintiffs propose to represent include:

CLASS 1 (Count One):
All persons within the United States (a) to whom AC1 placed a call to a cellular telephone line, (b) using equipment that has the capacity to dial numbers automatically without human intervention, (c) to promote the sale of DirecTV goods or services.

CLASS 2 (Count Two):
All persons within the United States (a) whose telephone numbers was listed on the Do Not Call Registry, and (b) who received more than one telemarketing call within any twelve-month period at any time from AC1, (c) to promote the sale of DirecTV goods or services.

86. Excluded from the class are the Defendant, any entities in which the Defendant has a controlling interest, the Defendant's agents and employees, any Judge to whom this action is assigned, and any member of the Judge's staff and immediate family.

87. The proposed class members are identifiable through phone records and phone number databases that will be obtained through discovery.

88. The potential class members number in the hundreds of thousands, at least. Individual joinder of these persons is impracticable.

89. Plaintiffs are members of the classes.

90. There are questions of law and fact common to Plaintiffs and the proposed class, including but not limited to:

    a. Whether the calls at issue were placed using an automatic telephone dialing system to send telemarketing calls;

    b. Whether the calls were placed without obtaining the recipients' valid prior express written consent;

    c. Whether the Defendant's agents placed more than one call within a 12-month period to numbers on the Do Not Call Registry;

    d. Whether the Defendant's conduct was negligent, willful, or knowing; and

    e. Whether the Plaintiffs and the class members are entitled to statutory damages because of the Defendant's actions.

91. Plaintiffs' claims are based on the same facts and legal theories, and therefore are typical of, the claims of class members.

92. Plaintiffs are each adequate representatives of the classes because their interests do not conflict with the interests of the classes, they will fairly and adequately protect the interests of the classes, and they are represented by counsel skilled and experienced in class actions, including TCPA class actions.

93. The actions of the Defendant are applicable to the classes and to Plaintiffs.

94. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from call records obtained in discovery and from reliable databases.

95. The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case and given the small recoveries available through individual actions.

96. Plaintiffs are not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

### VII. LEGAL CLAIMS

### Count One:
### Violation of the TCPA's provisions prohibiting autodialed calls to cell phones

97. Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

98. The Defendant violated the TCPA, either directly or through the actions of others, by initiating a telephone call to Plaintiffs' cellular telephone lines using an automatic telephone dialing system. *See* 47 U.S.C. § 227(b)(1)(A).

99. The Defendant's violations were willful and/or knowing.

### Count Two:
### Violation of the TCPA's Do Not Call provisions

100. Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

101. The Defendant violated the TCPA, either directly or through the actions of others, by initiating more than one telephone call to the Plaintiff Mey in a twelve-month period while her number was on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c).

102. The Defendant's violations were willful and/or knowing.

### VIII. RELIEF SOUGHT

Plaintiffs request the following relief:

A. That the Court certify the proposed classes;

B. That the Court appoint Plaintiffs as class representatives;

C. That the Court appoint the undersigned counsel as counsel for the class;

D. That the Court enter a judgment permanently enjoining the Defendant from engaging in or relying upon telemarketing, or, alternatively, from engaging in or relying upon telemarketing that violates the TCPA;

E. That, should the Court permit Defendant to engage in or rely on telemarketing, it enter a judgment requiring it to adopt measures to ensure TCPA compliance, and that the Court retain jurisdiction for a period of six months to ensure that the Defendant complies with those measures;

F. That the Court enter a judgment awarding any other injunctive relief necessary to ensure the Defendant's compliance with the TCPA;

G. That Defendant and its agents, or anyone acting on their behalves, be immediately restrained from altering, deleting, or destroying any documents or records that could be used to identify class members;

H. That the Court enter a judgment awarding Plaintiffs and all class members statutory damages of $500 for each negligent violation of the TCPA and $1,500 for each knowing or willful violation;

I. That the Court enter an order awarding the Plaintiffs reasonable attorneys' fees and costs; and

J. That the Plaintiffs and all class members be granted other relief as is just and equitable under the circumstances.

**Plaintiffs request a jury trial as to all claims of this Complaint so triable.**

Plaintiffs,
By Counsel,


 /s/ John W. Barrett
John W. Barrett
Jonathan R. Marshall
Sharon F. Iskra
Benjamin Hogan
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV  25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
jmarshall@baileyglasser.com
siskra@baileyglasser.com
bhogan@baileyglasser.com

Anthony Paronich
PARONICH LAW, P.C.
350 Lincoln St., Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
anthony@paronichlaw.com

Edward A. (Ted) Broderick
BRODERICK LAW, P.C.
Boston, MA 02111
Telephone: (617) 738-7080
Ted@Broderick-law.com

Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA  01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

*Counsel for Plaintiffs*