## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

### Wheeling Division

DAVID and ROXIE VANCE and
CARLA SHULTZ, individually
and on behalf of a class of all
persons and entities similarly situated,

      **Plaintiffs,**

**vs.**                                  **Case No. 5:17-cv-00179-JPB**

**DIRECTV, LLC,**

      **Defendant.**

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR CLASS CERTIFICATION

### I.   INTRODUCTION

This single-count consumer class action is about as clear-cut a case for class certification as one can imagine. Plaintiffs' claim directly mirrors that in *Krakauer v. Dish Network,* 925 F.3d 643 (4th Cir. 2019), where the Fourth Circuit affirmed certification of a class action brought under the Telephone Consumer Protection Act ("TCPA") — the federal statute that prohibits telemarketing calls to numbers on the national Do-Not-Call registry. *See* 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

Just as in *Krakauer*, plaintiffs here are suing a satellite-TV subscription provider that uses an erstwhile authorized dealer to make repetitive and intrusive telemarketing calls to consumers. The only real difference here is the identity of the parties and the scope of the violations. Instead of Dish and its authorized dealer, SSN, this time the duo is DirecTV and its authorized dealer, AC1, which was owned and operated by Adam Cox. Just as in *Krakauer*, Plaintiffs here took pains to put their names on the Do-Not-Call Registry, which, as the Fourth

Circuit put it, "means what it says": Do Not Call. *See* 925 F.3d at 649. Just as in *Krakauer*, Plaintiffs allege that the defendant knowingly and intentionally violated the TCPA by doing exactly what the TCPA prohibits: authorizing and directing the placement of hundreds of thousands of illegal telemarketing calls to consumers on the Do-Not-Call Registry. And just as in *Krakauer*, Plaintiffs here seek certification of a narrowly defined and readily ascertainable class of consumers who were victimized by DirecTV's illegal scheme.

There can be no doubt that this class should be certified. Among other enforcement mechanisms, the TCPA allows a private right of action for violations of the Do-Not-Call registry. *See Krakauer*, 925 F.3d at 649 (citing 47 U.S.C. § 227(c)(5)). In *Krakauer*, the Fourth Circuit observed that "[t]he private cause of action in § 227(c)(5) offers many advantages for class-wide adjudication" because, among other things, "the liability determinations involve no questions of individual reliance . . . [and] the damages calculations do not turn on individual evidence." *Id.* at 655–56 (citations omitted). As a result, and particularly "[g]iven the remedial purpose of the TCPA," it was "no surprise" to the Fourth Circuit that the cause of action in *Krakauer* "was conducive to class-wide disposition." *Id.*; *accord Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) (noting that "[c]lass certification is normal [in TCPA cases] . . . because the main questions . . . are common to all recipients.").

So too here. Just as in *Krakauer*, the common questions that arise in this case predominate for the proposed class. All putative class members received illegal telemarketing calls from AC1, on behalf of DirecTV, despite the fact that they were listed on the Do-Not-Call Registry. All class members received functionally identical calls under an identical fact pattern arising from AC1's telemarketing campaign to sell DirecTV, and the damages sought by Plaintiff

2

and class members under the TCPA are set by statute. Resolving the hundreds of thousands of TCPA claims present here is undoubtedly the superior method for addressing DirecTV's systematic TCPA violations, given the inefficiency of what might otherwise be numerous identical lawsuits, or none at all, as many class members would otherwise forfeit their claims due to the high cost of suing individually under the TCPA where just payment of the filing fee would negate potential statutory damages. *See Krakauer*, 925 F.3d at 656 ("In enacting the [TCPA] Congress sought to deter an activity that, while pernicious and disruptive, does not trigger extensive liability in any single case. Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications."). Thus, class-wide liability is the only way to ensure that sophisticated corporations such as DirecTV stop systematically violating the law and compensate those who were injured.

Class certification is particularly warranted because DirecTV is a repeat player when it comes to violating the TCPA. For years, DirecTV has benefited from satellite television subscription sales generated by its authorized dealers such as AC1, who have engaged in serial violations of the TCPA ("Authorized Dealers"). Indeed, DirecTV has *twice* been sued by the federal government for its rampant TCPA violations. Thus, in 2005 and 2009, the Federal Trade Commission ("FTC") filed enforcement actions against DirecTV for widespread violations of the TCPA. Like here, those enforcement actions involved illegal telemarketing calls made on DirecTV's behalf by its authorized dealers to consumers on the Do-Not-Call registry. Both times DirecTV paid millions in fines to the FTC and promised to monitor the telemarketing practices of its Authorized Dealers, to cease doing business with any Authorized Dealer even suspected of illegal telemarketing, and to create a central mechanism to receive, investigate and respond to

consumer telemarketing complaints relating to the conduct of DirecTV Authorized Dealers.[1] Specifically, as part of the 2009 Permanent Injunction, DirecTV agreed to implement policies and procedures to achieve the following:

- Monitor Authorized Marketers to determine whether they are initiating contact with consumers through outbound telemarketing;

- Cease doing business with any Authorized Marketer who DirecTV knows or even suspects of telemarketing to consumers without their consent; and

- Promptly investigate consumer telemarketing complaints and to take all reasonable steps to identify the person whose activities prompted the complaint.

But DirecTV never kept these promises. All it did was change its written policy to supposedly prohibit its Authorized Dealers from selling DirecTV's goods or services via outbound telemarketing. This was mere lip service. Despite the FTC consent decrees and permanent injunctions, DirecTV stood by and looked the other way while its Authorized Dealers continued to telemarket to consumers listed on the Registry, in direct violation of the TCPA and to the direct benefit of DirecTV. Unsurprisingly, consumers continued to complain and to sue DirecTV as its TCPA violations continued unabated.[2]

This lawsuit seeks to hold DirecTV accountable for these actions, and it is exceptionally well-suited for class certification. The named Plaintiffs here — Carla Shultz and David and

---

[1] *See* <u>Exhibit 1</u>, 2009 FTC Order and Permanent Injunction.

[2] *See Miller v. DirecTV*, No. 2:14-cv-07579, Dkt. No. 1 (C.D. Cal, Sept. 5, 2013) (class action filed against DirecTV for TCPA violations); *Oliver v. DirecTV,* No. 1:14-cv-07794, Dkt No. 1 (N.D. Ill. Oct. 6, 2014) (same); *Holcombe v. DirecTV*, No. 4:15-cv-00154, Dkt. No. 1 (N.D. Ga. Aug. 17, 2015) (same); *Armstrong v. DirecTV, LLC and Clear Satellite, Inc.*, No. 4:15-cv-00622, Dkt. No. 2 (N.D. Tex Aug. 17, 2015) (same); *Cordoba v. DirecTV*, No. 1:15-cv-03755, Dkt. No. 1 (N.D. Ga. Oct. 27, 2015) (same); *Swetra v. DirecTV*, No. 1:15-cv-08761, Dkt. No. 1 (D.N.J. Dec. 19, 2015) (same); *Tuck v. DirecTV*, No. 3:16-cv-00160, Dkt. No. 1 (S.D. Cal., Jan. 22, 2016) (same); *Revitch v. DirecTV*, 3:18-cv-01127, Dkt. No. 1 (N.D. Cal. Feb. 21, 2018) (same); *Getz v. DirecTV*, No. 1:18-cv-22802, Dkt. No. 1 (S.D. Fla. Jul. 12, 2018) (same); *Ewing v. DirecTV*, No. 3:19-cv-00018, Dkt. No. 1 (S.D. Cal. Jan. 4, 2019) (same).

Roxie Vance (collectively "Plaintiffs") — all received telemarketing calls from AC1 acting on behalf of DirecTV, all in direct violation of the TCPA. Plaintiffs have already obtained from AC1 the calling records evidencing the telemarketing campaign at issue, so there will be no difficulty ascertaining class members or the number of calls made to phone numbers listed on the Do Not Call Registry.[3] Just as in *Krakauer*, the claims of the Plaintiffs and the proposed class and DirecTV's defenses to such claims, can all be established through class wide proof. And just as in *Krakauer*, the damages calculations will not turn on individual evidence. Certification of Plaintiffs' proposed class is therefore warranted.

## II.  APPLICABLE LAW

In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy" and that Americans were "outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers." Pub. L. No. 102-243, §§ 2(5)–(6) (1991) (codified at 47 U.S.C. § 227). Perhaps the most well-known aspect of the TCPA was the creation of the Do-Not-Call Registry, which was established in 2003 to provide a safe haven from unwanted marketing calls. By adding a telephone number to the Registry, a consumer indicates her desire not to receive telephone solicitations. *See* 47 C.F.R. § 64.1200(c)(2). The TCPA and its implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2); 16 C.F.R. § 310.4(b)(iii)(B) ("It is an abusive telemarketing act or practice and

---

[3] Plaintiffs' expert has identified 113,997 consumer phone numbers that were listed on the Do Not Call Registry and who received 325,030 telemarketing calls from AC1 acting on behalf of DirecTV, all in violation of the TCPA. *See infra* notes 10–14 and accompanying text.

a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.").

The TCPA creates a private right of action for injunctive and monetary relief for any "person who has received more than one telephone call within any 12–month period by or on behalf of the same entity in violation of the [TCPA] regulations." 47 U.S.C. § 227(c)(5). Calls may not be actionable if a seller has an "established business relationship" ("EBR") with a person, which is created after an individual makes a purchase, inquiry, or application for products or services and lasts for a certain number of months. *See* 47 U.S.C. § 227(a)(2),(4); 47 C.F.R. § 64.1200(c)(2), (f)(5).

The prohibitions against telemarketing to consumers who have listed their personal and non-business numbers on the Registry extends both to the entities that physically dial the illegal call and those entities that benefit from such calls. As recognized by the Federal Communications Commission ("FCC"), the federal agency empowered by Congress to implement and interpret the TCPA, because allowing an entity "to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions," a corporation or other entity "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, 6574 (¶ 1) (2013) ("May 2013 FCC Ruling"); *see also Krakauer*, 925 F.3d at 659–61.

6

As the Fourth Circuit recognized in *Krakauer*, the TCPA's "simple and administrable" provisions, the "obvious attempt [by Congress] to vindicate the public interest" through the statute's private enforcement provisions, and the overarching congressional intent "to allow consumers to bring their claims at modest personal expense" all combine to "make TCPA claims amenable to class action resolution." 925 F.3d at 663.

### III.   RELEVANT FACTS

#### A. Diana Mey Receives Calls and Commences This Action, Giving DirecTV Actual Notice of AC1's Telemarketing.

On August 12, 2017, just months after AC1 became a DirecTV Authorized Dealer, AC1 made a telemarketing call to the original plaintiff in this litigation, Diana Mey. Specifically, AC1 initiated a telemarketing call to Ms. Mey's cellular telephone line, a number that had been listed on the National Do Not Call Registry for more than 31 days prior to the call at issue. When Ms. Mey answered the call, a sales representative began reading a scripted pitch seeking to sell DirecTV goods and services. The caller eventually identified himself as a representative of AC1, and claimed that AC1 was located in Kentucky. The area code of the phone number appearing on Ms. Mey's caller identification screen, however, was from West Virginia, making it look like the call was local. The caller ID was "spoofed" to disguise the origin of the call. But Ms. Mey never gave AC1 or DirecTV consent to call her cellular phone.

Before filing this lawsuit, Ms. Mey wrote to AC1 and its owner, Adam Cox, and reported that she had received an illegal telemarketing call from AC1, in violation of the TCPA. In response, AC1 admitted making the call, but offered no evidence of consent. Ms. Mey commenced this action on December 11, 2017.[4]

---

[4] *See* Dkt. No. 1, Class Action Complaint (filed Dec. 22, 2017); *see also* Dkt. No. 275, Fifth Amended Class Action Complaint at ¶¶ 35–42.

Even though this lawsuit informed DirecTV of AC1's illegal telemarketing, DirecTV still did nothing to stop AC1 from continuing to telemarket to sell DirecTV until it finally terminated AC1 on January 16, 2019, more than one year after DirecTV was served with this lawsuit.[5] During his deposition, Mr. Cox testified that after the *Mey* lawsuit he simply continued to use telemarketing tactics to sell DirecTV's goods or services, and DirecTV did nothing about it for more than a year.[6]

At any time, DirecTV could have confirmed whether or not AC1 was generating new sales via telemarketing by simply calling any of the new customers acquired by AC1 and asking them how they were originally contacted. At any time, DirecTV could have asked AC1's sales staff how they were acquiring new customers. But DirecTV appears not to have ever attempted any of these basic acts of due diligence, even though it was required, under the 2009 FTC Permanent Injunction, to monitor AC1 to determine if it was telemarketing and to cease doing business with any Authorized Dealer who DirecTV knew or even suspected was engaged in illegal telemarketing.[7]

---

[5] Even after this TCPA class action was filed in November of 2017, DirecTV *still* took no action against AC1 for more than a year. It was only in January 2019, after facing pressure from this lawsuit, that DirecTV finally terminated AC1 as a DirecTV Authorized Dealer. And this case is not the first or the last since DirecTV's promise to monitor its authorized dealers and curb TCPA violations. *See* Exhibit 2, Termination Letter From DirecTV to AC1, dated January 16, 2019. In fact, several months after this lawsuit was filed, AC1 was internally discussed and celebrated as a candidate for a Regional New Dealer of the Year award. *See also* Exhibit 3, AC1 Nominated for Regional New Dealer of the Year Award (March 2018); Exhibit 4, Deposition of Adam Cox at 84 (Cox admits that he was recognized by DirecTV as the "retailer of the year" *after* the *Mey* litigation was filed).

[6] Exhibit 4, Deposition of Adam Cox at 82-84 (Cox admits he did not stop telemarketing even after the *Mey* lawsuit was filed).

[7] *See* Exhibit 1.

**B.  After This Lawsuit is Filed, AC1 Places Illegal Telemarketing Calls To The Vances and Ms. Shultz.**

On June 1, 2018, over six months after this lawsuit was filed, AC1 made a telemarketing call to (304) 637-XXXX, the Vance's residential telephone number that was, and had long been, listed on the National Do-Not-Call Registry. According to AC1's call detail records, this call was answered, and the call disposition was noted in the records as "not interested." Despite that, on November 29, 2018, AC1 made a second telemarketing call to the Vances at this same number. Neither AC1 nor DirecTV had express written consent to place these calls. Nor did it have an established business relationship with the Vances.[8]

On July 17, 2018, AC1 made a telemarketing call to (304) 879-XXXX, Ms. Shultz's telephone number that was, and had long been, listed on the Do-Not-Call Registry. On July 19, 2018, AC1 made a second telemarketing call to (304) 879-XXXX. Neither AC1 nor DirecTV had express written consent to place these calls. Nor did it have an established business relationship with Ms. Shultz.[9]

**C.  Plaintiffs' Data Expert Analysis Identifies 325,030 Telemarketing Calls Made To 113,997 Numbers Listed On The Do Not Call Registry.**

During the course of discovery in this litigation, AC1 produced call records evidencing telemarketing calls it made to consumers on behalf of DirecTV during the class period from July 1, 2017, through November 30, 2018. Plaintiffs then retained Anya Verkhovskaya, a data expert with the Consumer Expert Group who has extensive TCPA class action expert experience, to analyze those records to determine how many calls were made to consumer phone numbers listed

---

[8] *See* Dkt. No. 275, Fifth Amended Class Action Complaint at ¶¶ 48–55.
[9] *Id.* at ¶¶ 56–61.

on the Do Not Call Registry.[10] All of these calls were telemarketing calls made by AC1 and sought to sell DirecTV goods or services.[11]

Ms. Verkhovskaya's analysis of AC1's call records show that AC1 placed two or more calls in a twelve-month period to 113,997 consumer telephone numbers that were listed on the Do-Not-Call Registry for at least thirty days prior to the call.[12] Ms. Verkhovskaya performed this analysis using the following methodology:

- Ms. Verkhovskaya first reviewed AC1's telemarketing records showing the total number of telemarketing calls made to all numbers that were connected to the called party;

- Ms. Verkhovskaya then identified numbers that were dialed more than once in any 12-month period;

- Ms. Verkhovskaya then cross-checked these numbers against the National Do-Not-Call Registry and identified numbers that had received more than one telemarketing call within a 12-month period, and which were listed at the time on the National Do-Not-Call Registry;

- Ms. Verkhovskaya then identified any unique telephone numbers to which the AC1 call records suggested had an existing business relationship with DirecTV and removed those numbers.

In Ms. Verkhovskaya's final analysis, during the class period, AC1 acting on behalf of DirecTV, made 325,030 telemarketing calls to 113,997 phone numbers that were listed at the time on the Do Not Call Registry. Consistent with Mr. Cox's testimony that AC1 continued to telemarket for DirecTV even after this lawsuit was filed, Ms. Verkhovskaya found that AC1 made the majority of these unlawful calls — 297,909 telemarketing calls to 75,632 numbers

---

[10] Exhibit 5, Expert Report of Anya Verkhovskaya, President and Chief Executive Office of CEG.
[11] Exhibit 4, Deposition of Adam Cox at pg. 23–25; 35–38; 66–74; Exhibit 6. First Supplemental Declaration of Adam Cox at ¶¶1–13; Exhibit 7, Second Supplemental Declaration of Adam Cox at ¶¶1–55.
[12] Exhibit 5, at 4, 18, 29.

listed on the Registry — even after the commencement of this lawsuit.[13] All numbers included in Ms. Verkhovskaya's final class list (the "Class List" as produced in Exhibit G to her Expert Report) received more than one telemarketing call from AC1 for DirecTV within a 12-month period, and numbers were listed on the Do-Not-Call Registry at least thirty-two days prior to receiving the first telemarketing call from AC1 for DirecTV.[14]

### D. Plaintiffs Can Identify Virtually All Putative Class Members By Name and Address And Can Exclude Any Business Numbers From The Class List.

As Ms. Verkhovskaya further explains in her expert report, class members can be identified by their names and addresses by using reputable data sources to conduct a "reverse look up." This methodology uses phone numbers contained in the Class List to identify the owners or users of the phone numbers contained in the Class List by their name and number.[15]

Ms. Verkhovskaya used the same methodology to identify class members in TCPA class actions in a multitude of cases, including *Krakauer v. Dish Network, L.L.C. See* 311 F.R.D. 384, 389–92 (M.D.N.C. 2015) (finding Ms. Verkhovskaya's methodology sufficient to identify class members).[16] Finally, Ms. Verkhovskaya explains in her expert report how she can access and utilize similar industry leading and accepted data providers to identify whether any of the numbers contained on the Class List were business numbers which can be removed from the class.[17]

---

[13] *Id.* at Exhibit H.

[14] *Id.* The Class List is attached to Ms. Verkhovskaya's report at Exhibit G. Exhibit G identifies all calls made to consumers on the Registry during the entire class period. Exhibit H identifies calls made to consumers on the Registry even after the commencement of this lawsuit.

[15] *Id.* at 21.

[16] *Id.* at 11, 22.

[17] *Id.* at 18, 26–27, 29. Notably, it is unlikely that the Class List contains many business numbers in the first instance. AC1 testified that although it was authorized to telemarket to businesses under its contract with DirecTV, it did not do so and only "made sales to residential customers." Exhibit 4, Cox Depo at 89.

## IV.    THE PROPOSED CLASS

Under Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff proposes the

following class definition:

> All persons within the United States (a) whose telephone numbers were listed on
> the Do Not Call Registry, and (b) who received more than one telemarketing call
> within any twelve-month period at any time from AC1, (c) to promote the sale of
> DirecTV.[18]

## V.    ARGUMENT

A putative class action must satisfy each of the four requirements of Rule 23(a): (1)

numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. In addition, the

proposed class action must fall into one of the three categories enumerated in Rule 23(b). *See*

*Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013). Plaintiffs here seek certification under

Rule 23(b)(3), which adds two additional prerequisites: predominance and superiority. *See*

*Krakauer*, 311 F.R.D. at 389 (reviewing applicable elements under Rule 23(a)–(b)), *aff'd*, 925

F.3d at 659–61 (affirming class certification and jury finding that Dish Network was vicariously

liable for violations of the Do-Not-Call Registry by authorized dealer).

In seeking class certification under Rule 23, the plaintiff has the burden of demonstrating

that the requirements for class-wide adjudication have been met. *Krakauer*, 925 F.3d at 654.

However, a court should not "engage in free-ranging merits inquiries at the class certification

stage," but "should consider merits questions only to the extent that they are relevant to

determining whether the Rule 23 prerequisites . . . are satisfied." *EQT Prod. Co. v. Adair*, 764

F.3d 347, 357–358 (4th Cir. 2014) (cleaned up). Ultimately, "[d]istrict courts have 'wide

---

[18] The phone numbers of class members are all listed on the Class List, attached to Ms.
Verkhovskaya's report with the comprehensive Class List at <u>Exhibit G</u> and list of class members
called after the commencement of this lawsuit at <u>Exhibit H</u>.

discretion in deciding whether or not to certify a proposed class,' and their decisions 'may be

reversed only for abuse of discretion.'" *Cent. Wesleyan Coll. v. W.R. Grace & Co.,* 6 F.3d 177,

185 (4th Cir. 1993) (citing *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 728–29 (4th Cir. 1989));

*see also Ward v. Dixie Nat'l Life Ins. Co.,* 595 F.3d 164, 179 (4th Cir. 2010).

In *Krakauer*, the Fourth Circuit held that "the class certified by the district court easily

meets the demands of Rule 23." 925 F.3d at 658. The same is true here.

### A. The Proposed Class is Ascertainable Because it is Objectively Defined and Readily Identifiable.

First, this class is ascertainable because, as in *Krakauer*, all class members can be

identified "without extensive and individualized fact-finding or mini-trials." *Id.* (citing *Adair*,

764 F.3d at 358). Although Rule 23 contains an implicit threshold requirement that the members

of a proposed class be readily identifiable, "[t]he goal is not to identify every class member at the

time of certification." *Id.* Instead, Rule 23 merely requires that the class be defined "in such a

way as to ensure that there will be some administratively feasible way for the court to determine

whether a particular individual is a member at some point." *Id.* (cleaned up); *see also Adair*, 764

F.3d at 358 (ascertainability requires that the class be defined "in reference to objective

criteria."); William B. Rubenstein, 1 *Newberg on Class Actions* § 3:3 (5th ed.); *Manual for

Complex Litigation, Fourth* § 21.222 (Fed. Judicial Ctr. 2004) (same).

In *Krakauer*, the Court found the class was ascertainable because the defendant's own

records could be used to "show[] when calls were placed and whether the call went through."

*Krakauer*, 925 F.3d at 658. The same is true here. All class members whose numbers are

included on the Class List have been identified as consumers who received more than one

telemarketing call from AC1, on their non-business phones, that were listed at the time on the Do

Not Call Registry. Plaintiffs' expert, Ms. Verkhovskaya, has further explained the methodology pursuant to which she can identify these class members by their name and address.[19]

Those steps, coupled with any directives this Court may issue concerning notice and further efforts to confirm the identities of class members, satisfy the requirement that the class be reasonably identifiable. *See Krakauer*, 311 F.R.D. at 389–92 (accepting virtually identical methodology applied by Ms. Verkhovskaya after analyzing telemarketing call records to identify class members as sufficient to identify class members); *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 245–48 (N.D. Ill. 2014) (granting certification in TCPA case and rejecting defense claim that all class members must be identifiable at class certification stage).

## B.  All Rule 23(a) Requirements Are Met.

### 1.  Rule 23(a)(1): Thousands of Illegal Telemarketing Calls to Thousands of Class Members Easily Satisfies Numerosity.

Courts in this Circuit have generally found that classes of roughly forty or more plaintiffs are sufficient to satisfy the numerosity requirement of Rule 23(a). *See Brunson v. Louisiana-Pac. Corp.*, 266 F.R.D. 112, 117 (D.S.C. 2010) (collecting cases). Here, Ms. Verkovshkaya's report makes clear that AC1, acting for DirecTV, made 325,030 illegal telemarketing calls to 113,997 non-business numbers listed on the Do Not Call Registry.[20] Because it would be impracticable to join all of these proposed class members, numerosity is satisfied.

### 2.  Rule 23(a)(2): Dispositive Questions Uniformly and Commonly Apply to All Class Members.

Rule 23(a)(2) next requires that there be "a common question of law or fact among the members of the class." While both common questions of law and common questions of fact exist as to this class, both need not be shown to satisfy the rule. To meet the commonality

---

[19] Exhibit 5, at 19–27.
[20] *Id.* at 4, 18, 29.

requirement, the representative plaintiffs are required to demonstrate that the proposed class members "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). In other words, commonality requires that the claims of the class "depend upon a common contention … of such a nature that it is capable of class wide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*; *see also Haywood v. Barnes*, 109 F.R.D. 568, 577 (E.D.N.C. 1986) ("[A] single common question [of law or fact] is sufficient to satisfy the rule.").

Here, common questions are dispositive, apply equally to all class members, and can be resolved using common proof and uniform legal analysis. They include the following:

- Did the telemarketing calls placed to class members by AC1 acting on behalf of DirecTV violate the TCPA?

- Is DirecTV vicariously liable for the telemarketing calls placed on its behalf by AC1 during the class period?

- Can DirecTV meet its affirmative burden of demonstrating that any class member provided their prior express consent signed in writing to receive the telemarketing calls at issue?

- Can DirecTV meet its affirmative burden of demonstrating that it had an established business relationship with any class member prior to the telemarketing calls at issue?

- Can DirecTV meet its affirmative burden of demonstrating that it is entitled to a defense of safe harbor?

- Are class members entitled to recover statutory damages of up to $500 per violation of § 227(c)?[21]

---

[21] These damages are set by statute, and require no individualized analysis of harm. *See*, *e.g.*, *Targin Sign Sys., Inc. v. Preferred Chiropractic Ctr., Ltd.*, 679 F. Supp. 2d 894, 898–99 (N.D. Ill. 2010) (availability of statutory damages in TCPA case made individualized damages inquiry unnecessary and class certification appropriate).

- Should those damages constitute "willful" or "knowing" violations of the TCPA, thereby entitling all class members to treble damages under the TCPA?

All class members share these legal and factual questions. Further, the uniformity of the applicable law — the TCPA — makes resolution of these questions on a class-wide basis viable. Whether or not DirecTV is vicariously liable for the actions of AC1 is a legal question that can be resolved on behalf of the entire class via common proof. *See, e.g.*, *Sandusky Wellness Ctr., LLC v. Wagner Wellness, Inc.*, No. 3:12 CV 2257, 2014 WL 6750690, at *5 (N.D. Ohio Dec. 1, 2014) (certifying a TCPA case and noting "the case involves common legal questions regarding Defendants' liability under the TCPA"); *Krakauer*, 311 F.R.D. at 394–96 (certifying TCPA class and noting that common questions include whether calls were made by Dish's authorized dealer to class members and whether Dish is vicariously liable for those calls).

### 3. Rule 23(a)(3): Typicality Is Satisfied Because All Class Members Received Substantively Identical Telemarketing Calls From AC1.

As with commonality, the threshold requirement for typicality is "not high." *See Brown v. Nucor Corp.*, 576 F.3d 149, 153 (4th Cir. 2009). To meet the typicality requirement of Rule 23(a)(3), a class representative must simply "be part of the class and possess the same interest and suffer the same injury as the class members." *Deiter v. Microsoft Corp.,* 436 F.3d 461, 466 (4th Cir. 2006) (quoting *Falcon*, 457 U.S. at 156). Typicality does not require that the representatives' claims be identical to every other member of the class, so long as proving the elements for Plaintiffs' claim advances the claims of other class members. *Id.* ("The essence of the typicality requirement is captured by the notion that 'as goes the claim of the named plaintiff, so go the claims of the class.'") (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998)). Instead, where the named plaintiffs' claims arise "from the same event or practice or course of conduct that gives rise to the claims of other class members" and

16

are "based on the same legal theory" as the claims of the class, typicality is satisfied. *Bullock v. Bd. of Educ. of Montgomery Cnty.*, 210 F.R.D. 556 (D. Md. 2002); *see also Sandusky Wellness*, 2014 WL 6750690, at *5 (certifying a TCPA case and finding that "[t]he 'typicality' requirement is met as the legal theory for each class member is based on the same facts and legal theory as [plaintiff]").

The Vances and Ms. Shultz, like all class members, received telemarketing calls from AC1, on a number listed on the Do-Not-Call Registry, seeking to sell DirecTV's goods or services. The Vances and Ms. Shultz must prove the same elements as every class member.  The claim requires only "two things: a number on the Do-Not-Call registry, and two calls made to that number in a year." *Krakauer*, 925 F.3d 655. The Vances and Ms. Shultz also seek the same statutory relief as the class. By proving their own legal claims, Plaintiffs will prove the class claims. No individualized inquiry is necessary. As a result, the typicality requirement is satisfied.

### 4.   Rule 23(a)(4): The Named Plaintiffs and Their Counsel Are Adequate To Represent The Class.

Rule 23(a)(4)'s requirement that the class be adequately represented is met in this case both with respect to Plaintiffs and their counsel.

Regarding the former, representative plaintiffs must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement "tend[s] to merge" with the commonality and typicality criteria; in other words, when those requirements are met, the interests of the class members will likely be protected in their absence. *Falcon*, 457 U.S. at 157, n.13. The adequacy inquiry further serves to "uncover conflicts of interest between named parties and the class they seek to represent," as well as the "competency of class counsel." *Harris v. Rainey*, 299 F.R.D. 486, 491 (W.D. Va. 2014) (citations omitted).

A class representative is inadequate only if there is evidence of a true conflict of interest between the representative and class members. *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997). The "conflict must be more than merely speculative or hypothetical," and must "go to the heart of the litigation." *Gunnells v. Health Plan Servs., Inc.*, 348 F.3d 417, 430–31 (4th Cir. 2003) (citation omitted).

Here, none of the named Plaintiffs has any interests that conflict with those of other class members. Rather, their interests are perfectly aligned with every other member of the class. All seek a determination that DirecTV violated the TCPA, and all seek the same statutory damage remedy. As a result, they will adequately represent this class.

The same is true as to class counsel. Courts consider "whether class counsel are qualified, experienced, and generally able to conduct the proposed litigation." *Nolan v. Reliant Equity Invs.*, No. 3:08–CV–62, 2009 WL 2461008, at *4 (N.D. W. Va. Aug. 10, 2009). Counsel's competence and experience "will most often be presumed in the absence of proof to the contrary." *Black v. Rhone-Poulenc, Inc.*, 173 F.R.D. 156, 162 (S.D. W. Va. 1996) (citing 1 Herbert B. Newberg, *Newberg on Class Actions* § 3:24 (3d ed. 1992)). Attached at Exhibit 8 are declarations from Plaintiffs' counsel addressing the factors the Court "must consider" for adequacy of class counsel under Rule 23(g).

Importantly, Plaintiffs' counsel also represented the class in *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, 2018 WL 6305785, at *3 (M.D.N.C. Dec. 3, 2018) (in $63 million class judgment after trial, finding that "Class Counsel [Barrett, McCue, Broderick, Paronich] here [are] particularly experienced and skilled in TCPA litigation," and "achieved an excellent result on behalf of the class."), *aff'd,* 925 F.3d 643 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 676 (2019). Further, this Court has appointed Plaintiffs' counsel Barrett and Marshall to lead multi-

district TCPA litigation consolidated in this district that resulted in an approved $28 million class settlement, and found them to be adequate class counsel. *See In Re: Monitronics Int'l, Inc. Tel. Consumer Prot. Act Litig*, No 1:13-MD-02493, Dkt. No. 1214 (N.D. W. Va. Jun. 12, 2018) (Bailey, J.). Counsel submit that this track record demonstrates their adequacy to represent this virtually identical class as in *Krakauer*.

### C.   All Rule 23(b)(3) Requirements Are Met Because Common Issues Predominate And A Class Action Is the Superior Method Of Adjudicating This Matter.

The Rule 23(b)(3) requirements of predominance and superiority are also met here, just as they were in *Krakauer*. *See* 925 F.3d at 658–59.

#### 1.   Common Issues Predominate.

The predominance requirement of Rule 23(b) is satisfied when "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *See Krakauer*, 311 F.R.D. at 394–95 (certifying a TCPA case and noting that common questions in TCPA class action relating to calls made to consumers on the Do-Not-Call Registry predominates over individual questions), *aff'd,* 925 F.3d at 655–57 (affirming certification and noting that the many common questions of law and issues of fact predominate over individual issues).

The predominance analysis is qualitative, not quantitative, and thus common issues may predominate even when some individualized inquiry is required. *See Gunnells*, 348 F.3d at 429. The central concern is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623.

Here, as in *Krakauer*, common issues overwhelmingly predominate. *See* 925 F.3d at 658. There are two overriding questions in this case: (1) whether AC1 contacted class members listed on the Do-Not-Call registry; and (2) whether DirecTV is liable for AC1's actions. Any

individual issues or defenses are limited and easily resolved with aggregate data from DirecTV. And all class members seek the same measure of statutory damages, which prevents the need to conduct individualized damage determinations. Notably, these same common facts were at issue in *Krakauer. See* 925 F.3d at 658–59 (explaining that the district court properly determined that "all of the major issues could be shown through aggregate records," rejecting the argument that "individual fact-finding would be required," and that because those "determinations were reasonable, there is no error for us to correct"). There, the Fourth Circuit had no difficulty finding that the predominance requirement was met. *See id.* at 658. The same conclusion is warranted here.[22]

### 2. The Class Action Mechanism is the Superior Method of Resolving Plaintiffs' Claims.

Rule 23(b)(3)'s superiority requirement is also met here. First, if this class action is not allowed to proceed, the alternative result is likely a lack of any relief for class members.  That alone shows that a class action is the superior method of litigating these claims. *See* William B. Rubenstein, 2 *Newberg on Class Actions* § 4:87 (5th ed.) (noting superiority requirement is met in class actions involving small claims because "[i]n such cases, there will either be a class action or there will be no litigation."); *Amchem*, 521 U.S. at 616 (noting with regard to

---

[22] DirecTV may claim that some consumers whose numbers are on the Class List are pre-existing customers of DirecTV with whom it had an established business relationship ("EBR"). If so, it is DirecTV's burden to identify such consumers, as a claim of an EBR is an affirmative defense under the TCPA. 47 C.F.R. § 64.1200(f)(5). To date, DirecTV has failed to identify a single class member who was a pre-existing customer of DirecTV at the time of the telemarketing calls at issue, although it has been in possession of AC1's calling records for the past several years. Similarly, DirecTV may claim that some members on the Class List are customers of its parent, AT&T, and that the claims of such consumers must be resolved at arbitration. Again, however, DirecTV has long been in possession of the telemarketing call records, which can be used to identify the called party, and has failed to identify a single class member who it claims is subject to an arbitration clause.

20

superiority requirement that "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.") (internal quotation marks and citation omitted).

Most of those who received these unwanted calls would not seek relief on an individual basis because the cost of proceeding on an individual basis would not be practical or economical given the potential size of individual awards. *See Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 753 (2012) (noting the unlikely possibility that a consumer would pay the $400 federal court filing fee to bring a $500 claim and emphasizing that all 65 TCPA cases brought in the Seventh Circuit since 2005 were class actions). As a result, a class action is undoubtedly superior to individual litigation. *See Krakauer*, 311 F.R.D. at 400 (finding superiority requirement met because, "[g]iven the relatively small statutory damages, *see* 47 U.S.C. § 227(c)(5), the class members likely have little interest in controlling the litigation in this case.") (citations omitted); 7A Wright, Miller & Kane, Federal Practice and Procedure (2d ed. 1986) § 1777 (a class action enables those who have small claims that might not be worth litigating individually to combine their resources and vindicate their rights collectively).

Second, a class action consumes far fewer resources than binary litigation. As the *Krakauer* district court wrote, "given the large number of class members and claims, class-wide adjudication of the claims would be more efficient" piecemeal litigation. *Id.* Thus, "[a]djudicating these claims in one forum would provide flexibility, control, and consistency that would not exist with individual litigation." *Id.*

Third, there is no question that this class action will be manageable, even if the case goes to trial. As in *Krakauer*, the hundreds of thousands of TCPA violations alleged can be proven by

one expert witness through a series of authenticated telemarketing call records. The evidence as to DirecTV's direct liability for the actions of AC1 will involve only a handful of witnesses with actual knowledge of the fact that DirecTV approved, encouraged, benefitted from, and actually celebrated AC1's illegal telemarketing. And the evidence as to whether DirecTV's conduct was knowing or willful, to support treble damages, can similarly be proven via a handful of witnesses and a manageable number of documents. There can therefore be no question that a class action is the superior method of adjudicating these claims. *See Krakauer*, 925 F.3d at 655–57.[23]

Finally, and perhaps most importantly, certification of this class will effectuate the important social goals underlying the TCPA — a fact the Fourth Circuit strongly emphasized in *Krakauer*. There, the Court observed that "the advantages of class resolution follow directly from the statute," which "creates a simple scheme for determining if a violation occurred, whether a defense is available, and what the damages ought to be." *Id.* at 659. The Court went on to emphasize the societal benefits of allowing class actions like this one, noting that "[t]he TCPA was enacted to solve a problem. Simply put, people felt almost helpless in the face of repeated and unwanted telemarketing calls." 925 F.3d at 663 (citation omitted). To combat this serious problem, "Congress responded with an Act [the TCPA] that featured a combination of public and

---

[23] *See also Jay Clogg Realty Grp., Inc. v. Burger King Corp.*, 298 F.R.D. 304, 308–09 (D. Md. 2014) (collecting cases). *See Bee, Denning, Inc. v. Cap. All. Grp.*, 310 F.R.D. 615, 630 (S.D. Cal. 2015) ("In the context of the TCPA, the class action device likely is the optimal means of forcing corporations to internalize the social costs of their actions"). *See Turza*, 728 F.3d at 684 ("[c]lass certification is normal in litigation under [the TCPA]"); *Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities, Inc.*, No. 09-c-07299, 2014 WL 540250, at *15, n. 11 (N.D. Ill. 2014) ("*Chapman I*"), *leave to appeal denied* 747 F.3d 489 (7th Cir. 2014) ("*Chapman II*") (Posner, J.) (discussing "the many cases during and since 2011 in which TCPA classes have been certified, as well as the Seventh Circuit's observation in *Turza* that class certification is the norm in TCPA cases").

private enforcement, allowing suits both to enjoin intrusive practices and deter future violations
through money damages." *Id.*

This important private enforcement feature of the TCPA, the Court made clear, is
tailormade for class-wide adjudication, noting that "[t]he features of the private right of action in
§ 227(c)(5), whether statutory damages or strict liability, evince an intent by Congress to allow
consumers to bring their claims at modest personal expense. *These same features also make
TCPA claims amenable to class action resolution*." *Id.* (emphasis added).

Underscoring this point, the *Krakauer* Court went on to say that denying class
certification "would contort a simple and administrable statute into one that is both burdensome
and toothless." *Id*. The Court concluded that "[i]t would be dispiriting beyond belief if courts
defeated Congress' obvious attempt to vindicate the public interest with interpretations that
ignored the purpose, text, and structure of this Act at the behest of those whose abusive practices
the legislative branch had meant to curb." *Id*.

This resounding endorsement of TCPA class actions leaves no room for doubt as to
whether this class should be certified. Just as in *Krakauer*, the proposed class action seeks to
resolve the claims of over one hundred thousand consumers in one case — consumers who
would not otherwise have any realistic chance of holding DirecTV accountable for its
misconduct. These consumers seek the exact same statutory damages based on liability evidence
common across the class, and the claims are based on misconduct that is *per se* illegal. The
proposed class is defined by specific, objective, and verifiable criteria. All of the primary issues
of law and fact in the action are common to the class, and predominate over any individual
issues. And the class is represented by counsel experienced in handling TCPA class actions in
many other cases, including *Krakauer*.

In short, this is a model case for the application of the class action mechanism. It should be permitted to proceed under Rule 23.

## **CONCLUSION**

For the foregoing reasons, the Court should certify this action as a class action on behalf of the class herein defined.

Dated:  April 11, 2022                                   Plaintiffs,

By Their Counsel,

/s/ John W. Barrett
John W. Barrett
Jonathan R. Marshall
Sharon F. Iskra
Benjamin Hogan
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV  25301
Telephone: (304) 345-6555
jbarrett@baileyglasser.com
jmarshall@baileyglasser.com
siskra@baileyglasser.com
bhogan@baileyglasser.com

Matthew P. McCue
THE LAW OFFICE OF MATTHEW P. MCCUE
1 South Avenue, Suite 3
Natick, MA  01760
Telephone: (508) 655-1415
mmccue@massattorneys.net

Edward A. Broderick
BRODERICK LAW, P.C.
176 Federal Street, Fifth Floor
Boston, MA 02111
Telephone: (617) 738-7080
Ted@Broderick-law.com

24

Anthony Paronich
PARONICH LAW, P.C.
350 Lincoln St., Suite 2400
Hingham, MA 02043
Telephone: (617) 485-0018
anthony@paronichlaw.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF WEST VIRGINIA

### Wheeling Division

**DIANA MEY and**
**DAVID and ROXY VANCE,**
**individually and on behalf of a class of all**
**persons and entities similarly situated,**

      **Plaintiffs,**

**vs.**                                      **Case No. 5:17-cv-00179-JPB**

**DIRECTV, LLC,**

      **Defendant.**

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the <u>11th</u> day of April 2022, a copy of **Plaintiffs' Memorandum of**

**Law in Support of Motion for Class Certification** was filed using CM/ECF, the Court's

electronic notification system, which provided notice to all counsel of record.

                                        */s/ John W. Barrett*
                                        John W. Barrett