IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

DAVID VANCE and ROXIE
VANCE, and CARLA SHULTZ, individually and on behalf
of a class of all persons and entities
similarly situated,

        Plaintiffs,

v.

**CIVIL ACTION NO. 5:17-CV-179**
Judge Bailey

DIRECTV, LLC,

        Defendant.

## ORDER DENYING MOTION TO COMPEL ARBITRATION

Pending before this Court is Defendant DirecTV, LLC's Motion to Compel Arbitration [Doc. 340], filed on July 29, 2022. Plaintiff Carla Shultz filed an Opposition to Defendant's Motion to Compel Arbitration [Doc. 343] on August 12, 2022. Defendant DirecTV, LLC filed a Reply Memorandum of Law in Support of Motion to Compel Arbitration [Doc. 352] on August 19, 2022. Accordingly, this matter is ripe for adjudication. For the reasons contained herein, the Motion will be denied.

## BACKGROUND

### I.    Plaintiffs' Claims

Plaintiffs allege that defendant DirecTV, LLC ("defendant DirecTV") retained ACI Communications ("AC1") to sell defendant DirecTV's services. [Doc. 275 at ¶ 24]. Further, plaintiffs assert AC1 purchased a list of leads and phone numbers from a third party and used that list to make telemarketing calls, but failed to scrub the list for numbers on the national do-not-call list and called those numbers in violation of the Telephone Consumer Protection Act ("TCPA"). [Id. at ¶¶ 26, 29–34]. Plaintiffs do not claim defendant DirecTV itself placed the calls in question; rather, plaintiffs argue DirecTV is vicariously liable for AC1's actions. *See* [Doc. 301 at 15].

### II.   Defendant DirecTV and AC1

Defendant DirecTV provides satellite television services to millions of customers across the United States. [Doc. 325 at 9]. During the relevant time, defendant DirecTV relied in part on a network of local dealers to promote its services. [Id.]. AC1, founded by Adam Cox and his father, was one of defendant DirecTV's dealers for Kentucky, Ohio, and West Virginia. [Doc. 325-2 at 17, 35]. In 2017, AC1 entered into a Preferred Dealer Agreement, wherein it agreed to market the services of defendant DirecTV and several affiliates, including AT&T Mobility. [Id. at 22–23]. The agreement authorized AC1 to promote, market, advertise, solicit, and take orders for the (1) leasing of defendant DirecTV's systems, and (2) sale of subscriptions to single family residential households. [Doc. 325-6 at 25]. According to defendant DirecTV, this agreement constituted an independent contractor relationship, rather

than a joint employer enterprise, joint venture, partnership, or franchise arrangement. [Id. at 2–3].

Pursuant to the agreement, AC1 agreed to comply with a set of marketing guidelines, which expressly prohibited "cold calling." [Id. at 19] ("You are prohibited from outbound telemarketing . . . except via a manually placed return call or text message in response to a direct inquiry from a customer and you are able to substantiate such inquiry . . . Using live operators . . . to place unsolicited (no applicable existing business relationship or qualifying inquiry) outbound telemarketing calls, sometimes also referred to as 'cold calls,' is expressly disapproved of for any use in advertising AT&T branded products and services.") (emphasis omitted). AC1 represented that it would use events, flyers, and doorhangers to promote defendant DirecTV's services. [Doc. 325-7 at 2]. Plaintiffs contend that AC1 nevertheless engaged in unlawful cold-call telemarketing to promote defendant DirecTV's services.

Plaintiffs' expert, Anya Verkhovskaya, asserts that she analyzed the phone numbers listed in AC1's call data, identified phone numbers therein on the national do-not-call list and the dates of those phone calls, and then determined which of those phone numbers received two or more calls from AC1 within a twelve-month period. [Doc. 301-6 at ¶¶ 49, 55]. She then produced a list of 113,997 telephone numbers that plaintiffs contend could belong to potential class members, along with a number of calls purportedly violating the TCPA. [Doc. 301-7].

### III. <u>The Named Plaintiffs</u>

The operative complaint names three plaintiffs: David Vance, Roxie Vance, and Carla Shultz. The Vances, who use AT&T Mobility, claim that on June 1, 2018, AC1 placed a telemarketing call to their phone number, which was listed on the national do-not-call list; they

claim they received a second call from AC1 on November 29, 2018. Ms. Shultz alleges she received telemarketing calls from AC1 on July 17 and July 19, 2018. Based on these allegations, this Court granted the proposed class certification in its August 1, 2022, Order Granting Motion for Class Certification.

## APPLICABLE LAW

Section 2 of the Federal Arbitration Act ("FAA") provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 2 is the "primary substantive provision" of the FAA, while §§ 3 and 4 "provide[ ] two parallel devices for enforcing an arbitration agreement: a stay of litigation in any case raising a dispute referable to arbitration, 9 U.S.C. § 3, and an affirmative order to engage in arbitration, § 4." ***Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.***, 460 U.S. 1, 22 (1983).

Generally, "[t]he FAA reflects 'a liberal federal policy favoring arbitration agreements.'" ***Adkins v. Labor Ready, Inc.***, 303 F.3d 496, 500 (4th Cir. 2002) (quoting ***Moses H. Cone***, 460 U.S. at 24). Indeed, the FAA serves as "a response to hostility of American courts to the enforcement of arbitration agreements, a judicial disposition inherited from then-longstanding English practice." ***Circuit City Stores, Inc. v. Adams***, 532 U.S. 105, 111 (2001). Moreover, a court is required to "resolve 'any doubts concerning the scope of arbitrable issues . . . in favor of arbitration.'" ***Hill v. PeopleSoft USA, Inc.***, 412 F.3d 540, 543 (4th Cir. 2005) (quoting ***Moses H. Cone***, 460 U.S. at 24–25); *see also* ***Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.***, 867 F.2d 809, 812 (4th Cir. 1989) ("Indeed, the heavy

presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.").

A party can compel arbitration by establishing: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision which purports to cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of the defendant to arbitrate the dispute. See *Adkins*, 303 F.3d at 500–01.

While the district courts are to apply "the federal substantive law of arbitrability, which governs all arbitration agreements encompassed by the FAA," the courts must also apply the ordinary state law principles regarding the formation of contracts, such as the "validity, revocability, or enforceability of contracts generally." *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013) (citations omitted); see also 9 U.S.C. § 2 (arbitration agreements may be unenforceable "upon such grounds as exist at law or in equity of the revocation of any contract."); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). For example, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2" of the FAA. See *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (citations omitted).

As indicated by the Supreme Court of the United States, "the FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 142 S.Ct. 1708 (2022) (citing *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). Moreover, the high Court explained that the policy favoring arbitration:

"is merely an acknowledgment of the FAA's commitment to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." ***Granite Rock Co. v. Teamsters***, 561 U.S. 287, 302 (2010) (internal quotation marks omitted). Or in another formulation: The policy is to make "arbitration agreements as enforceable as other contracts, but not more so." ***Prima Paint Corp. v. Flood & Conklin Mfg. Co.***, 388 U.S. 395, 404, n.12 (1967). Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. But a court may not devise novel rules to favor arbitration over litigation. See ***Dean Witter Reynolds Inc. v. Byrd***, 470 U.S. 213 (1985). If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it. The federal policy is about treating arbitration contracts like all others, not about fostering arbitration. See *ibid.*; ***National Foundation for Cancer Research v. A. G. Edwards & Sons, Inc.***, 821 F.2d 772, 774 (C.A.D.C. 1987) ("The Supreme Court has made clear" that the FAA's policy "is based upon the enforcement of contract, rather than a preference for arbitration as an alternative dispute resolution mechanism").

And indeed, the text of the FAA makes clear that courts are not to create arbitration-specific procedural rules like the one we address here. Section 6 of the FAA provides that any application under the statute—including an application to stay litigation or compel arbitration—"shall be made and heard in

the manner provided by law for the making and hearing of motions" (unless the statute says otherwise). A directive to a federal court to treat arbitration applications "in the manner provided by law" for all other motions is simply a command to apply the usual federal procedural rules, including any rules relating to a motion's timeliness. Or put conversely, it is a bar on using custom-made rules, to tilt the playing field in favor of (or against) arbitration. As explained above, the usual federal rule of waiver does not include a prejudice requirement. So Section 6 instructs that prejudice is not a condition of finding that a party, by litigating too long, waived its right to stay litigation or compel arbitration under the FAA.

***Sundance***, 142 S.Ct. at 1713–14.

## **DISCUSSION**

In consideration of the arguments asserted by the parties, this Court finds that the question of waiver as it pertains to arbitration is the lynch pin, threshold issue ultimately resulting in resolution of the pending Motion. Accordingly, this Court focuses its analysis entirely on waiver as it is entirely dispositive–here, defendant DirecTV unquestionably waived arbitration based on the history and factual backdrop of this litigation.

Plaintiff Shultz argues that by litigating for months against her before filing its Motion, defendant DirectTV waived its right to arbitrate. This Court agrees.

Ms. Shultz was added to this case as a named plaintiff and class representative on February 23, 2022. [Doc. 343 at 4–5]. In the months that followed, defendant DirecTV deposed Ms. Shultz, litigated various discovery disputes, and vigorously opposed class

7

certification by specifically arguing that Ms. Shultz was not an adequate class representative. See [Doc. 325 at 2, 24–25]. Defendant DirecTV did not move to compel arbitration of Ms. Shultz's claims until July 29, 2022, more than five months after she was added to the case. Prior to that time, defendant DirecTV litigated this case as if no arbitration agreement existed.

These actions constitute waiver. As the Supreme Court of the United States clarified in **Sundance**, a party "knowingly relinquish[es] [its] right to arbitrate by acting inconsistently with that right." 142 S.Ct. 1708, 1714 (2022). There is no question that defendant DirecTV knew about its right to arbitrate, and its arguments to the contrary are not well taken.[1] Defendant DirecTV previously moved to compel arbitration of other named plaintiffs' claims based on the same arbitration provision. Rather than promptly compel Ms. Shultz to arbitration after she was added to the case, defendant DirecTV engaged in extensive discovery and litigation, which served only to delay resolution of the dispute. In fact, a review of the entire record of this matter as a whole leads this Court to believe that defendant DirecTV withheld its Motion to Compel until after the outcome of class certification in an act of legal gamesmanship and strategic pleading. These actions were wholly "inconsistent" with an intent to enforce its right to arbitrate. See **Degidio v. Crazy Horse Saloon & Rest. Inc**, 880 F.3d 135, 140 (4th Cir. 2018) ("[A]rbitration laws are passed to expedite and facilitate the

---

[1] For example, defendant DirecTV claims that it did not learn of the purported agreement to arbitrate until deposing Ms. Shultz. This argument strains credulity in light of defendant DirecTV's long history (even reflected in this case) of aggressively attempting to enforce AT&T's arbitration clause. Defendant DirecTV and its corporate parent AT&T could have searched records at any time to determine whether Ms. Shultz was related to any of its customers in West Virginia, but it did not do so and coincidentally filed the pending Motion on the eve of class certification becoming ripe for adjudication.

settlement of disputes and avoid the delay caused by litigation, not to provide a means of furthering and extending delays.").

As articulated in ***Sundance***, the proper inquiry for arbitration waiver solely "focuses on the actions of the person who h[olds] the right" to arbitrate. 142 S.Ct. at 1713. Based on that standard, this Court expressly finds that defendant DirecTV waived any right to arbitration based on its litigation activity prior to filing the instant Motion and, accordingly, the Motion is denied.

## **CONCLUSION**

Based on the foregoing analysis, Defendant DirecTV, LLC's Motion to Compel Arbitration [**Doc. 340**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit true copies of this order to all counsel of record.

**DATED**: August **25**, 2022.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE